UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JASON KELLER                                                    PETITIONER

V.                                         CIVIL ACTION NO. 1:21-CV-134-KHJ

BURL CAIN, et al.                                            RESPONDENTS

ORDER

This is a capital habeas case. The Petitioner, Jason Lee Keller, was convicted

of capital murder and sentenced to death in the Circuit Court of Harrison County,

Mississippi. He asks this Court to issue a writ of habeas corpus that vacates his state-

court conviction and sentence. For the following reasons, the Court denies Keller's

petition and dismisses this case with prejudice.

I.      Background

On the morning of June 21, 2007, Terry Ann Muffi walked into a Food Mart

in Biloxi, Mississippi, to buy some tobacco and rolling papers. [22-5] at 71.[1] No one

was behind the counter, *id.*, and Muffi looked around the store until she noticed a

pack of Doral cigarettes on the floor. *Id.* at 72, 121. She picked up the cigarettes, put

them on the counter, and noticed that the cash register drawer was ajar. *Id.* at 72.

Muffi stepped closer to the counter and saw the body of Hat Nguyen, the store's

---

[1] The state-court record is contained in this Court's docket entries [22], [23], and
[24]. It spans thousands of pages and documents. For brevity's sake, the Court will simply
refer to the relevant docket entry and page number when citing to the record.

owner, on the floor behind the counter. *Id.* at 72–73, 79–80. She picked up a nearby

phone and called 911. *Id.* at 74.

Teo Nguyen[2] worked at a nearby nail salon. *Id.* at 88. He had known Hat

Nguyen for several years, *id.* at 90, and he went into her store every morning to buy

cigarettes. *Id.* at 88. When he entered the store on June 21, 2007, he noticed that it

was "messy," "everything was . . . on the floor," and the cash register appeared to be

damaged. *Id.* at 96. He saw Muffi behind the counter, and she told him to go outside

and get the name of the convenience store to tell the 911 dispatcher. *Id.* at 89. He

did so. *Id.* When he came back inside, he looked over the counter and saw Hat

Nguyen on the floor. *Id.* at 89–90.

Muffi gave Teo the phone and asked him to tell her what the 911 dispatcher

said. *Id.* at 74–75, 90. Following the dispatcher's instructions, Muffi began to

perform CPR on Hat. *Id.* at 74–75. She noticed blood on Hat's shirt from an

apparent injury to her abdomen, and when she put her hand under Hat's neck, it

was covered in blood. *Id.* at 75, 90.

Soon after, first responders arrived. *Id.* at 75–76. They confirmed that Hat

Nguyen was dead and found what appeared to be small caliber gunshot wounds to

her head and abdomen. *Id.* at 101–02; [23-14] at 27–28; [22-12] at 43. There were no

shell casings at the scene, leading investigators to believe the murder weapon was a

revolver. [22-12] at 43. Officers cleared the building and began searching for a

suspect. [22-5] at 102. Later that afternoon, the Biloxi Police Department received

---

[2] He was not related to Hat Nguyen, the victim.

"a lot of phone calls" indicating that Jason Keller was the murderer. *Id.* at 112; *see also* [23-14] at 30. Police learned that Keller had stolen a truck, "that he had been on crack for a long time, and that he . . . was going to rob a bank and go out in a blaze of glory." [22-12] at 40. Additionally, his ex-girlfriend told officers that he smoked Doral cigarettes, the same brand Muffi had observed on the floor in Hat Nguyen's store. *Id.* at 41. Finally, Keller was already suspected to have stolen a .22 revolver from a pawn shop the day before the murder. *Id.* at 42–43.

Keller woke up that morning in the waiting room of a hospital, where he had slept. [23-14] at 3. He walked to his stepfather's workplace and stole his truck, intending to visit his ex-girlfriend and son, but on the way, he hit a curb and blew out two tires. *See id.* at 3–4. He "had nothing else to do," so he made his way on foot to Hat Nguyen's Food Mart to get some cigarettes. *Id.* at 4. He had the .22 he had stolen the day before. *Id.*

Keller went inside the store and asked for a pack of Doral cigarettes. *Id.* at 4, 13. Hat Nguyen was behind the counter. *See id.* When she turned to get the cigarettes, Keller pulled out the gun. *Id.* at 4. Nguyen then saw the gun and started screaming, "No," and Keller shot her. *Id.* at 4–6. While Keller tried to open the cash register, Nguyen ran outside. *Id.* at 6. Keller pocketed his gun, [22-6] at 116, and gave chase. [23-14] at 6. Nguyen stopped, agreeing to give him money. *Id.* They went back inside, and Nguyen gave him some cash and rolls of coins from a small box behind the counter. *Id.* at 8–9, 16. Keller then shot Nguyen again. *Id.* at 16, 22. She fell to the floor, incapacitated, and Keller shot her a final time, in the back of

her head at close range. *Id.* at 6–7. He took the money and a carton of cigarettes, ran, and hid in the backyard of a nearby house. *Id.* at 8, 13.

When Keller started hearing sirens, he ran to his stepfather's house, where he stole another truck. *Id.* at 8–9. He threw the spent .22 shell casings off a bridge and drove to a bank in Biloxi. *Id.* at 8–9, 19. At the bank, he exchanged the rolled coins for cash. *Id.* at 9; *see also* [22-5] at 126–28. From there, he went to a "crack house" in Gulfport, where he smoked crack cocaine and laid low. [23-14] at 9–10, 18. Later that night, Keller sold the murder weapon for $75 worth of crack cocaine and started riding around Gulfport in the stolen truck. *Id.* at 10.

Eventually, law enforcement officers spotted him and gave chase. *Id.* at 11. Keller ignored the officers and kept driving long enough to call and say goodbye to several family members. *Id.* He finally pulled over around 11:30 or 11:45 p.m. *See id.* at 11, 30–31; [22-3] at 58. When he exited the truck, Keller brandished a shotgun choke (a pipe that fits on the end of a shotgun barrel) because he wanted the police to shoot him. [23-14] at 11–12; Notice of Conventional Filing [56].[3] Officers shot him, and he was transported back to the same hospital where he had begun his day. *See id.* at 3, 12.

Minutes after Keller arrived at the hospital, Craig Shows, an investigator with the Biloxi Police Department, read him his rights and interviewed him for about 10 to 15 minutes in the emergency room. [22-3] at 22, 24–25. The interview

---

[3] Pursuant to the Court's [54] Order, the State conventionally filed a copy of dashcam video showing the officers shoot and arrest Keller. *See* [56]. The Court has viewed the video, and Keller wanted the officers to think he had a gun because he brandished and pointed the shotgun choke at them as if it were a gun.

was not initially recorded. *Id.* at 27. Keller admitted that he had killed Hat Nguyen, and he told Shows that the gun was at the crack house in Gulfport. *Id.* at 29. He also admitted that he had stolen the gun from a pawn shop the day before. *Id.* Then another officer brought in a recorder, and Shows went over the same questions again. *Id.* at 29–30. Keller provided the same answers. *Id.* Keller never asked for an attorney, and he never invoked his right to remain silent. *Id.* at 26, 50.[4]

Sometime between 1:00 and 3:00 a.m. on June 22, 2007, Michael Brown, an investigator with the Biloxi Police Department, took a second recorded statement from Keller after reading him his rights. *Id.* at 58–59, 61, 64–65.[5] Once again, Keller did not ask for an attorney or invoke his right to remain silent, but it was apparent to the officer that Keller was in pain while receiving medical treatment. *Id.* at 26, 50, 61. Keller admitted that he went into the "store in Biloxi" to get cigarettes. [56]. He asked to "talk about this later," and Brown responded, "We can, but I . . . need just a little bit of information now, if you can give it to me." *Id.* Keller replied, "I can't think straight." *Id.* Brown asked him whether he had fired the gun when he robbed the store, and Keller said, "You tell me. . . . You seen it, didn't you?" *Id.* Keller said, "You got me hurting . . . talking," and he admitted that he took

---

[4] The State conventionally filed a copy of the recording. *See* [56]. The record does not contain a transcript. The Court has listened to the recording, and Keller's speech is mostly unintelligible. He was groaning in obvious pain throughout the recording—at times, almost screaming. The recording also contains substantial background noise.

[5] The State conventionally filed a copy of the second recorded statement. *See* [56]. The record does not contain a transcript. The Court has listened to the recording, and, as in the first interview, Keller groaned throughout the recording in obvious pain. His speech was more intelligible than in the first recording, but it was still muffled and slurred. The second recording has much less background noise than the first one. Investigator Brown often had to repeat his questions and regain Keller's attention.

money from the store. *Id.* Brown asked him, "Do you remember how many times you shot the lady?" *Id.* Keller responded: "Probably like four." *Id.* Brown then ended the questioning. *Id.*

Brown took a third recorded statement from Keller later that day in the hospital's intensive care unit. [22-3] at 65; [23-14] at 3–25.[6] After Brown read Keller his rights, Keller again admitted that he had shot and killed Hat Nguyen during an armed robbery. [23-14] at 3–6. He told Brown everything he had admitted before, including that he had stolen two trucks belonging to his stepfather, that he had traded the rolled coins for cash at the bank, that he had thrown the spent shell casings off a bridge, that he had gone to a crack house to smoke crack cocaine after murdering Nguyen, and that he had sold the gun to someone at the crack house. *Id.* at 3–4, 8–10, 18. Once again, Keller did not ask for an attorney or invoke his right to remain silent. *Id.* at 3–25; [22-3] at 67. In fact, he was "very willing to talk . . . [and] very cooperative," and investigators found nothing to contradict what he told them. [22-5] at 123.

Dr. Paul McGarry, a forensic pathologist, conducted Hat Nguyen's autopsy. [23-30] at 17; [22-5] at 134. He found that she suffered four gunshot wounds: one entering the center of her abdomen above the naval; one entering the right side of her head but not breaching the skull; one entering the left side of her head from

---

[6] The State conventionally filed a copy of the recording. *See* [56]. The record contains a transcript. *See* [23-14] at 3–25. The Court listened to the recording, and the transcript is accurate. Investigator Brown took the third statement at about 2:00 p.m. on the day after officers apprehended Keller—around 13 hours after the first statement and 11 hours after the second. In the recording, Keller was lucid, and he spoke clearly without any groaning, slurred speech, or substantial complaints about pain. [56].

close range and going into her brain; and one entering the base of her skull from close range, going into her brain and severing the brain stem from her spinal column. [23-30] at 4, 9, 19; [22-5] at 135, 138, 143–45, 149–50. All four bullets were retrieved from the wounds. [23-30] at 9.

Dr. McGarry found that the cause of death was "MASSIVE BRAIN DESTRUCTION" due to a "RECENT CONTACT GUNSHOT WOUND TO THE HEAD," with "THREE GUNSHOT WOUNDS TO THE HEAD AND ABDOMEN" as contributing factors. *Id.* at 17. He testified at trial that he could not determine the exact order in which the shots were fired or how much time passed between them. [22-5] at 147; [22-6] at 10. Still, he testified that the wound to Nguyen's abdomen was "minimally disabling," and that the head shot that did not breach the skull "would be like a blow to the head," after which she could still function. [22-6] at 6. The shot to the left side of her head entered her brain, though, and while it was "certainly a more disabling wound," it was not fatal. *Id.* The shot to the base of her skull was the final, fatal shot. *Id.* at 3, 6. He noted a "heavy soot stain" on the base of her skull, "indicat[ing] that the gun was placed against her neck and fired upward into her head." [22-5] at 150. McGarry testified that this shot severed Nguyen's brain stem, causing her to "go limp and be brain dead." *Id.*

McGarry also described how each gunshot affected Nguyen during the last moments of her life:

> [T]he wound of the abdomen would be painful but not disabling. It would be alarming, she would hear the gunshot, she would feel the impact on the center of her body. She would probably realize from that that she had actually been shot, which would be an alarming and painful

7

experience. She's still able to move around, but she's still feeling the pain and the emergency situation of being shot at. The wound of the right side of the head would be much more painful. It hits the bone, it causes a tear of the scalp, it gives her a definite feeling that she's being seriously injured, but she's still awake, she's still alive, she still knows something terrible is happening, and is at least enough awake and alert to be aware of an emergency situation that she's in danger of losing her life.

.     .     .

The wound of the left side of the head, much more devastating, much more brain damaging. I can't be sure that she would be fully alert and aware. It would be much more painful. It goes through the bone . . . as well as . . . the brain itself. It would be very painful. Whether she would be totally alert and aware that this was a brain wound I can't be sure, but she very well could know that, but still she's awake enough to know that she's in danger of death.

.     .     .

[The final shot] is instantly devasting to the brain, to the level of consciousness would go to zero. It goes right through the back of her brain where the center of consciousness is. The center of respiratory control, blood pressure, pulse, everything is seriously damaged with that wound, and she is, in effect, brain dead at the time that bullet hits her brain stem.

[22-6] at 7–9. Although McGarry could not determine how much time passed between the first shot and the last one, he said it would have been a period of minutes. *Id.* at 10.

On March 31, 2008, a grand jury indicted Keller for capital murder during the commission of a robbery. [22-1] at 21. Keller was appointed counsel, who filed many pretrial motions, including a motion to suppress the statements he made to officers in the hospital. *Id.* at 35–40, 86–101. On August 27, 2009, the trial court held an omnibus hearing on Keller's pretrial motions. [22-3] at 9–110. On the motion to suppress, the court heard testimony from four officers from the Biloxi Police Department who took part in the murder investigation: Craig Shows, Rick Allen, Michael Brown, and David Shoemaker. *Id.* It also listened to the recordings of

the statements and considered Keller's medical records from the hospital stay. *Id.* at 31–32, 40, 42, 52–53, 56, 70, 80; [22-13] at 78.

Ultimately, the trial court found that the first two statements taken in the emergency room "were not the product of a free, voluntary or intelligent waiver of Keller's *Miranda*[7] [r]ights" because he had been shot, was receiving morphine for the pain, had tested positive for cocaine, and was undergoing the insertion of a chest tube. [22-13] at 80. The trial court noted that Keller was audibly groaning and moaning in the recordings, and that his speech was "slurred and at times, practically inaudible." *Id.* But the court found that the third statement—taken after Keller had been stabilized and transferred to a room in the intensive care unit— "was freely and voluntarily given after an intelligent and knowing waiver of [his] rights under *Miranda*." *Id.* The trial judge noted that Keller was "alert, aware and responding clearly and appropriately to the questions presented" by the officers. *Id.* Accordingly, the trial court granted the motion to suppress the first two recorded statements but denied it as to the third. *Id.* at 80–81.

Keller was tried on October 5–8, 2009. [22-3] at 112. The State presented testimony from Terry Ann Muffi, Teo Nguyen, Dr. Paul McGarry, and several officers involved in the investigation. *Id.* at 4–5. The State also presented evidence of Keller's third confession statement, including Investigator Michael Brown's testimony and a recording of the confession. [22-5] at 114–19. On October 7, 2009,

---

[7] *See Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that a confession obtained in violation of the Fifth or Sixth Amendment is not admissible at trial).

the jury returned a unanimous guilty verdict on the charge of capital murder. [22-2] at 47–48; [22-6] at 51–53.

During the sentencing phase of trial, the State reintroduced all the evidence admitted during the guilt phase, and it called Hat Nguyen's oldest son, Huy Bao Pham, to testify. [22-6] at 60–61. It also called the Harrison County Circuit Clerk, Gayle Parker, and introduced evidence that Keller had a prior conviction for armed robbery. *Id.* at 70–71. Keller called several mitigation witnesses, including his older brother, his natural father, two corrections officers, and the psychologist who had evaluated him before trial. *Id.* at 77–99, 134–53; [22-7] at 2–11. Keller also testified in his own defense. [22-6] at 100–34.

The jury found that Keller had actually killed Hat Nguyen, that he had attempted to kill her, and that he had intended to kill her.[8] [22-2] at 95. As aggravating circumstances, the jury found that Keller had been "previously convicted of a felony involving the use of threat of violence to the person," that he murdered Nguyen while he "was engaged in the commission of a robbery," and that he murdered Nguyen "for the purpose to avoid or prevent a lawful arrest." *Id.* Finally, the jury found that there were insufficient mitigating circumstances to outweigh the aggravating circumstances and that Keller should receive the death penalty. *Id.*; [22-7] at 75. The trial court polled the jury, and the verdict was unanimous. [22-7] at 75–76.

---

[8] *See* Miss. Code Ann. §§ 97-3-19, 99-19-101(7).

Keller appealed his conviction and sentence. [22-2] at 126. He raised many issues on appeal, including whether the trial court had erred in denying the motion to suppress his third confession statement. [22-20] at 4–5. On February 13, 2013, the Mississippi Supreme Court entered an En Banc Order in which it found that the trial court had admitted Keller's third confession statement "into evidence without discussion or analysis of the coercive circumstances of the first two confessions, or their possible effect upon the third statement." [22-10] at 60. Therefore, it retained jurisdiction but remanded the case to the trial court "to conduct an evidentiary hearing to determine whether—because of the circumstances under which they were taken—any of the three statements made by Jason Lee Keller to law enforcement was coerced and, if so, whether any information learned in a coerced confession was used to gain additional information from Keller." *Id.* at 61.

The trial court held an evidentiary hearing on April 5, 2013. [22-11] at 33–35. Keller presented a variety of evidence, including testimony from two medical experts and two of the investigating officers. *Id.* at 3–4. On May 3, 2013, the trial court entered its decision. [22-10] at 69–80. It found (1) that "the totality of the circumstances establishes that none of the statements given by Jason Lee Keller were 'coerced' by the improper actions of the investigating law enforcement officers"; (2) that the "third statement was freely and voluntarily given after an intelligent and knowing waiver of Keller's rights under *Miranda* and sufficiently removed and distinguishable from the conditions present during the first two statements to be 'purged of the primary taint,' if any, of those statements"; and (3) "that the

11

information obtained in the first two statements was not 'used to obtain additional information' from Keller in the third statement." *Id.* at 80.

On February 6, 2014, the Mississippi Supreme Court affirmed Keller's conviction and sentence. *Keller v. State* (*Keller I*), 138 So. 3d 817 (Miss. 2014). For the confession statement admitted at trial, the Mississippi Supreme Court held that the "record supports the trial court's finding that Keller intelligently, knowingly, and voluntarily confessed." *Id.* at 850. Keller filed a Petition for a Writ of Certiorari with the Supreme Court of the United States, but it was denied. *Keller v. Mississippi*, 574 U.S. 1159 (2015).

On June 12, 2015, Keller filed a Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief in the Mississippi Supreme Court, asserting many post-conviction claims, including that his trial counsel had provided ineffective assistance by not investigating and discovering significant mitigating evidence.[9] [23-9]. On May 23, 2017, the Mississippi Supreme Court entered an Order summarily finding that all the issues raised in the post-conviction petition were meritless, except the claim that Keller's trial counsel had provided ineffective assistance by not investigating and discovering significant mitigating evidence. *Keller v. State* (*Keller II*), 229 So. 3d 715, 716 (Miss. 2017). The Mississippi Supreme Court held that Keller had "made a substantial showing of a denial of his right to effective assistance of counsel," and therefore, it granted him leave to proceed in the trial court on that issue. *Id.*

---

[9] *See* Miss. Code. Ann. § 99-19-101(6).

On November 27–28, 2018, the trial court held an evidentiary hearing on the post-conviction claim. Keller presented testimony from many lay and expert witnesses. [24-54] at 64–66. On July 31, 2019, the trial court entered an Order and Judgment denying Keller's petition on the grounds that he had did not demonstrate either that his trial counsel's representation fell below an objective standard of reasonableness or that, but for counsel's alleged errors, he would have obtained a different result.[10] [24-53] at 58–70; [24-54] at 1–39.

Keller appealed the trial court's decision. [24-64] at 169. On December 10, 2020, the Mississippi Supreme Court affirmed the denial of his post-conviction claim. *Keller v. State* (*Keller III*), 306 So. 3d 706 (Miss. 2020).

On April 16, 2021, Keller initiated this federal habeas proceeding. Mot. for Appointment of Counsel [1]. After the Court appointed counsel, Order Appointing Counsel [5], Keller filed his initial [13] Petition for a Writ of Habeas Corpus. He later amended the petition, asserting 23 grounds for relief, some of which were unexhausted. Am. Pet. for a Writ of Habeas Corpus [27]. Accordingly, he filed a [30] Motion to Stay the case while he filed a successive post-conviction petition in the Mississippi Supreme Court. The Court denied the Motion to Stay, and Keller filed a [40] Second Amended Petition, omitting the unexhausted claims, pursuant to the Court's [39] Order.

---

[10] *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

II.      Standard

Petitions for writs of habeas corpus by prisoners challenging state-court

convictions because of alleged constitutional deprivations are governed by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. No. 104-

132, § 104, 110 Stat. 1214, 1218–19. AEDPA permits this Court to "entertain an

application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to

the judgment of a State court only on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[I]t

is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68

(1991). Moreover, AEDPA only permits this Court to grant habeas relief on claims

adjudicated in state court in two circumstances:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in
> > the State court proceeding.

28 U.S.C. § 2254(d).

Before the Court conducts the Section 2254(d) analysis, a habeas petitioner

must clear several procedural hurdles. "The point of AEDPA . . . is to require

prisoners first to exhaust state court remedies before seeking federal relief."

14

*Broadnax v. Lumpkin*, 987 F.3d 400, 406 (5th Cir. 2021). Therefore, a federal habeas petitioner "must exhaust all claims in state court prior to requesting federal collateral relief." *Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008); *see also* 28 U.S.C. § 2254(b)(1)(A). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest [state] court." *Smith*, 515 F.3d at 400 (alteration in original) (quoting *Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004)). The exhaustion requirement "'refers only to remedies still available at the time of the federal petition,' . . . [and] it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) (alterations in original) (first quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); and then quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Generally, federal courts dismiss unexhausted habeas claims without prejudice, but they may also deny unexhausted claims and dismiss them with prejudice. *Buntion v. Lumpkin*, 31 F.4th 952, 964 n.4 (5th Cir. 2022) (per curiam); *see also Smith*, 515 F.3d at 400; 28 U.S.C. § 2254(b)(2).

Additionally, a federal habeas court "will not take up a question of federal law presented in a case 'if the decision of [the state] court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (alteration in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "The rule applies with equal force whether the state-law ground is substantive or procedural," *id.*, and this rule is

jurisdictional in nature. *See Ford v. Davis*, 910 F.3d 232, 237 (5th Cir. 2018). The Court must "honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law" in the alternative. *Buntion*, 982 F.3d at 949 (cleaned up).

A federal habeas claim is procedurally barred where "the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar." *Mullis v. Lumpkin*, 47 F.4th 380, 387–88 (5th Cir. 2022) (quoting *Gonzales v. Davis*, 924 F.3d 236, 243 (5th Cir. 2019) (per curiam)). This is a corollary to the exhaustion requirement, in that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address the merits of those claims in the first instance." *Davila v. Davis*, 582 U.S. 521, 527 (2017) (cleaned up).

"Where a state court asserts a procedural bar, [the Court] presume[s] that obstacle is 'adequate and independent,'" *Paredes v. Quarterman*, 574 F.3d 281, 289 (5th Cir. 2009) (per curiam), and the petitioner has the burden of proving it is not. *See Mullis*, 47 F.4th at 390. If the State has "firmly established and regularly followed" the rule by the time of the relevant state court decision, then the rule is adequate. *See id.* at 388 (cleaned up). "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on or to be interwoven with federal law, then the state rule is independent." *Buntion*, 31 F.4th at 962 (cleaned up). A state procedural rule can be "firmly established and regularly followed . . . even if there is an occasional

16

aberrant state court decision." *Mullis*, 47 F.4th at 388 (cleaned up). "The question is whether the rule is applied strictly or regularly to the vast majority of *similar* claims." *Id.* (cleaned up).

"Federal review of the merits of a procedurally-barred claim is permitted, however, where the petitioner is able to 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law.'" *Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)). "To establish 'cause' . . . the [petitioner] must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Davila*, 582 U.S. at 528 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "A factor is external to the defense if it 'cannot fairly be attributed to' the [movant]." *Id.* (quoting *Coleman*, 501 U.S. at 753). "The Supreme Court has not provided an exhaustive catalog of such objective impediments to compliance with a procedural rule, but a showing that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials[] made compliance impracticable[] would constitute cause." *United States v. Vargas-Soto*, 35 F.4th 979, 993 (5th Cir. 2022) (cleaned up). But, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753

(quoting *Murray*, 477 U.S. at 488); *see also Prible v. Lumpkin*, 43 F.4th 501, 518 (5th Cir. 2022).[11]

Once a habeas petitioner has cleared these procedural hurdles, "AEDPA restricts a federal court's ability to grant habeas relief after an adjudication on the merits in state court to only two grounds." *Chamberlin v. Fisher*, 885 F.3d 832, 837 (5th Cir. 2018). First, questions of law are addressed under Section 2254(d)(1), which permits relitigation of claims adjudicated on the merits in state court when the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). "'[C]learly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Poree v. Collins*, 866 F.3d 235, 246 (5th Cir. 2017) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)).

"A state prisoner can only satisfy the 'contrary to' standard if he shows the state court decision 'arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023) (quoting *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir.

---

[11] A habeas petitioner can also overcome procedural default if they "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Harper v. Lumpkin*, 64 F.4th 684, 694 n.1 (5th Cir.) (per curiam), *cert. denied*, 144 S. Ct. 429 (2023). This exception "is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." *McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012) (quoting *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001)). Keller does not argue that he is actually innocent.

2019) (en banc)). To satisfy the "unreasonable application" prong, "the petitioner must 'show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Id.* (quoting *Langley*, 926 F.3d at 156). Stated another way, "the state court's decision [must] be 'so lacking in justification' that the error is 'beyond any possibility for fairminded disagreement.'" *Russell v. Denmark*, 68 F.4th 252, 262 (5th Cir. 2023) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This standard is difficult to meet. *Id.*

Therefore, Section 2254(d)(1) "establishes a highly deferential standard for evaluating state-court rulings that requires federal courts to give those rulings the benefit of the doubt." *Engle v. Lumpkin*, 33 F.4th 783, 790 (5th Cir. 2022) (cleaned up). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The habeas court must determine "whether 'fairminded jurists could disagree' as to how the Supreme Court's caselaw applies to the circumstances that the state court confronted; if so, then [the court] cannot set aside the state court's conclusion." *Engle*, 33 F.4th at 790 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Second, questions of fact are addressed under Sections 2254(d)(2) and (e)(1). *Neal*, 78 F.4th at 783. Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the "applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Then, Section 2254(d)(2) permits relitigation of claims adjudicated on the merits in state court when the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). In other words, the Court first applies Section 2254(e)(1)'s "clear and convincing" standard to specific factual issues and then applies Section 2254(d)(2)'s "reasonableness" standard to the state court's decision as a whole. *Neal*, 78 F.4th at 783; *see also Lucio v. Davis*, 751 F. App'x 484, 488 (5th Cir. 2018) (per curiam).

"The deference to state-court factfinding required by these provisions precludes a federal court from setting 'aside reasonable state-court determinations of fact in favor of its own debatable interpretation of the record.'" *Neal*, 78 F.4th at 783 (quoting *Rice v. Collins*, 546 U.S. 333, 335 (2006)). "Ultimately, to clear the required threshold, the petitioner must show 'a reasonable factfinder must conclude' the state court's determination of the facts was unreasonable." *Id.* (quoting *Rice*, 546 U.S. at 341). An "unreasonable determination of the facts" is one "outside the bounds of reasonable debate." *See Seals v. Vannoy*, 1 F.4th 362, 370 (5th Cir. 2021). In this context, "[t]he term 'unreasonable' refers not to ordinary error or even to circumstances where the petitioner offers a strong case for relief, but rather to extreme malfunctions in the state criminal justice system." *Mays v. Hines*, 592 U.S. 385, 391 (2021) (per curiam) (cleaned up).

"Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that conclusion are reviewed under Sections 2254(d)(2) and (e)(1)." *Neal*, 78 F.4th at 783.

There are yet other hurdles petitioners must clear to receive relief. When conducting a Section 2254(d) analysis, the Court may generally only consider "the record that was before the state court that adjudicated the claim on the merits." *Lucio v. Lumpkin*, 987 F.3d 451, 471 (5th Cir. 2021) (en banc) (emphasis omitted) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). And even if a petitioner clears AEDPA's general bar on relitigation, the Court may not grant habeas relief "if the trial error was harmless." *Burgess v. Dretke*, 350 F.3d 461, 466 (5th Cir. 2003). That is, "a federal court may grant habeas relief only if it determines that the constitutional error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 466–67 (cleaned up). Finally, the petitioner must "persuade a federal habeas court that 'law and justice require' relief." *Brown v. Davenport*, 596 U.S. 118, 134 (2022) (quoting 28 U.S.C. § 2243). "And whatever else those inquiries involve, they continue to require federal habeas courts to apply [the Supreme] Court's precedents governing the appropriate exercise of equitable discretion." *Id.*

AEDPA was designed to "curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases." *Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir. 1999) (quoting H.R. Rep. No.

104-518, at 111 (1996) (Conf. Rep.)). The restrictions on the Court's authority to grant habeas relief recited above "further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). The Court must give challenged state-court decisions the benefit of the doubt. *Charles v. Stephens*, 736 F.3d 380, 387 (5th Cir. 2013) (per curiam).

> This deferential standard stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings and requires the state prisoner to show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility.

*Id.* (cleaned up).

III.   Analysis

    A.  Ground 1a: Ineffective Assistance of Trial Counsel by Failure to Investigate and Discover Mitigating Evidence

Keller broadly argues that his trial counsel "failed to make a reasonable investigation of mitigating evidence and failed to provide jurors with extensive and accurate evidence for imposing a sentence less than death." [40] at 11.[12] More specifically, he argues that his trial counsel (1) failed to conduct adequate mitigation interviews with witnesses by not contacting "the vast majority of family, friends, and others familiar" with his character and background; (2) failed to investigate his educational background; and (3) failed to obtain expert assistance regarding his psychological and neurological functioning. *Id.* at 11, 17, 19.

Keller further contends that this federal habeas Court should look beyond the state-court record because "the state post-conviction proceedings were inadequate."

---

[12] *See* Miss. Code Ann. § 99-19-101.

*Id.* at 21–22. He argues that the proceedings were inadequate because the trial court improperly conducted its own research outside the evidence the parties presented, improperly discrediting his expert testimony with no evidence. *Id.* at 22–24. He also argues that the proceedings were inadequate because his post-conviction counsel provided ineffective assistance. *Id.* at 27–30.

The State responds that the Mississippi Supreme Court reasonably applied the applicable law, that the record contains evidence supporting its factual determinations, that Keller has failed to demonstrate that its decision was objectively unreasonable, and that Keller has failed to rebut its factual determinations by clear and convincing evidence. Mem. in Supp. [49] at 19. The State also argues that the Court cannot consider any of the new evidence Keller attached to his Second Amended Petition because it was not presented to the state court that adjudicated this claim. *See id.* at 46.

       1.   Facts Relevant to this Claim

During the sentencing phase of trial, Keller called six witnesses. First, he called his older brother, Jerry Bankester, Jr. [22-6] at 77. Bankester generally testified that he had grown up in the same household as Keller, and that Keller was a "good kid" until he started having drug problems around the age of 27. *Id.* at 78.

Next, Keller called his natural father, Jerry Bankester, Sr. *Id.* at 80. He generally testified that Keller was "a good person, a good boy, went to school and was always respectful." *Id.* at 81. He said Keller "never had any trouble with people. Everybody seemed to like him. He made friends easily. He's got a good attitude . . .

23

." *Id.* at 82. But then Keller "got on drugs" in his twenties, and "that's when he started changing really." *Id.* He "didn't want to hold a job steady," and he "would go off and stay two or three days at a time before he came home and . . . wouldn't tell me where he had been or what he was doing." *Id.*

Keller's next witness was Deborah Whittle, a Harrison County Sheriff's Deputy in charge of the Offender Services Program. *Id.* at 90. She testified that in the two years Keller had been detained before trial, he had only had "[t]wo minor rule violations." *Id.* at 91. The first was not "follow[ing] an order from a staff member. He didn't get up for head count." *Id.* at 92. The second was "for being on the top tier [of the jail] without permission." *Id.* She contrasted these minor rule violations with more serious ones, such as "[f]ighting, contraband, smoking, property destruction, things like that." *Id.* at 93.

Keller also called Melinda Hester, an employee of the Harrison County Sheriff's Department who had overseen the maximum-security block at the Harrison County Jail. *Id.* at 96. She testified that Keller had been "a fairly good inmate," that he interacted well with others, and that he was "rather quiet inside the block." *Id.* at 97. She recommended Keller for a "life-learning program" overseen by the jail's minister and chaplains, in which inmates learned "parenting skills [and] anger management," among other things. *Id.* at 97–98.

Keller testified in his own defense during the sentencing phase of trial. *Id.* at 99. He admitted that he was a drug addict. *Id.* at 100–01. He started using cocaine when he was 16 or 17 years old. *Id.* at 101. The defense introduced a record of

Keller's grades from elementary school through at least eighth grade. *Id.* at 102;
[22-16] at 47. It shows that he was never an excellent student, but that his grades
began to noticeably drop off around sixth or seventh grade. [22-16] at 47. He
dropped out of school after the ninth grade. [22-6] at 102. At the time, he was using
cocaine, marijuana, LSD, and heroin. *Id.* at 102–03.

Keller admitted that he was serving a life sentence for robbing a bank, and
that he had served a previous stint in prison for "stealing things." *Id.* at 104. He
testified that he got released early from the previous sentence for good behavior,
despite getting into trouble for drug use while he was in prison. *Id.* at 105.
According to Keller, he had never gotten in trouble for fighting with other inmates
or being disrespectful to an officer, and he had enrolled in the "life-learning
program," "parenting classes," "[a]nger management," "[a]lcohol anonymous, drug
anonymous, art class, [and] cognitive thinking." *Id.* at 105–06. Since being jailed for
Nguyen's murder, he had been written up for oversleeping and stopping to speak
with someone on the upper tier of the prison. *Id.* at 108. Keller added that when he
committed the armed robbery several months before murdering Nguyen, he had
used a BB gun. *Id.*

Keller said he did not enter the store intending to rob or shoot Nguyen. *Id.* at
109. When asked how he felt about it, he said, "Terribly bad, terribly. No excuse,
none whatsoever." *Id.* He continued: "I can't live with it, but her family has got to
live with it, my family's got to live with it. They are the main ones that are
suffering." *Id.* On cross-examination, he continued to express regret: "I'm sorry for

what I did. I know it doesn't matter much . . . to them because there's no replacing her, . . . but I am very sorry." *Id.* at 110; *see also id.* at 117, 131.

Keller testified that he had used cocaine all night before he murdered Nguyen, and one hour before he stole his stepfather's truck on the morning of the murder. *Id.* at 112–13. He said that he was "delirious, hadn't had no sleep, nothing in four days straight using drugs." *Id.* at 112; *see also id.* at 117–18. Keller denied that he had gone into the store intending to rob Nguyen, *id.* at 114, but he could not explain why he shot her. *Id.* at 117. He said that his actions were caused by "the drugs." *Id.* at 117–18. He admitted, though, that "[t]he whole reason we're here" was his fault. *Id.* at 120.

Keller also initially admitted that—after he had shot Nguyen multiple times and taken the money, when she was incapacitated on the ground—he put the gun to the back of her head and executed her. *Id.* at 122. He later contradicted this testimony, denying that Nguyen was on the ground and claiming that they were both standing. *Id.* at 123–25, 128. He eventually admitted that she was "possibly" crouching, *id.* at 126, and that she was not fighting him. *Id.* at 128. Regardless of Nguyen's position at the time of the final shot, Keller explained his actions in the following exchange with the prosecutor:

Q.  Why did you do that?

A.  I was scared and I don't know why I—it was a situation where once you're that far, you know, you just.

Q.  Hell, I'm that far, I may as well go ahead and kill her dead?

A.      No, that's not it. I don't know. I wasn't, you know, I was scared, I was relentless, you're right. Action upon action, you're correct.

*Id.* at 122. Keller testified: "There is no explanation why. . . . I mean, that was not my intention, my actions, I was scared, you know, it was a situation where who knows what to do. I mean, it's just something that happened." *Id.* at 128–29.

For his final witness, Keller called Dr. Beverly Smallwood, the psychologist who examined him before trial. *Id.* at 134. The trial court had ordered Smallwood to conduct a psychological examination "for purposes of ascertaining [Keller's] present mental condition and determining whether he is presently suffering from a mental disease or defect for which he is in need of . . . care or treatment . . . ." [22-1] at 46–47. It specifically instructed her to address "(a) whether or not [Keller] has a factual as well as rational understanding of the nature and object of the legal proceedings against him and has the ability to reasonably assist his attorney in the preparation of his defense; and, (b) to describe [Keller's] mental state at the time of the alleged offense(s) with respect to his ability to know the difference between right and wrong in relation to his actions at that time." *Id.* at 47.

Smallwood examined Keller on February 20, 2009, and produced a report of her findings. [23-18] at 31–39. During the interview, Keller talked about his background. *Id.* at 34–35. He "denie[d] any past trauma in his life," *id.* at 36, but he admitted that his parents had never married, that his father was "a big drinker," that he dropped out of high school around tenth grade, and that he started using drugs at a young age. *Id.* at 34, 37. At 18 years old, he was arrested for burglary and

grand larceny, which he committed to support his drug habit. *Id.* at 35. Although his family had tried to persuade him to get drug treatment, he had not done so. *Id.*

According to Smallwood, Keller showed "significant guilt, self-reproach, and self-derogation," and he was "very sad about what had happened." *Id.* He had a "history of depression," including "recurrent thoughts of death . . . , but he denie[d] any suicidal intent." *Id.* at 36. Keller claimed to have "problems with anxiety," but he had experienced no substantive psychotic symptoms, except when on hallucinogenic drugs. *Id.* Smallwood questioned him about his mental state at the time of the offense and his understanding of the legal proceedings. *Id.* at 37–38. He understood the nature of the charges, the purpose of the proceedings, the possible outcomes at trial, the sentencing options, and his attorney's role. *Id.* She ultimately concluded that he had "a factual as well as rational understanding of the nature and object" of the criminal proceedings and "the ability to reasonably assist his attorney in the preparation of" his defense. *Id.* at 38. She also concluded that "at the time of the alleged offense(s), [he had] the ability to know the difference between right and wrong in relation to his actions at that time." *Id.* She recommended that his counsel obtain "a mitigation study regarding [Keller's] psychological functioning." *Id.* at 38–39.

On July 24, 2009, Smallwood conducted an intellectual assessment of Keller "to determine [his] overall intellectual functioning, as well as his ability to perform

specific types of tasks." [23-13] at 60. His "Full Scale IQ" was 85, "which falls in the Low Average range of intellectual functioning." [23-14] at 2.[13]

At trial, Smallwood explained what the court had asked her to determine in the first evaluation and what a forensic psychological evaluation entails. [22-6] at 138–40. She told the jury about Keller's family background, describing it as "tightknit." *Id.* at 141. She also testified that he dropped out of high school in tenth grade because of "girls and drugs." *Id.* He was "very cooperative" during the interview and "very forthcoming" about the murder. *Id.* at 141–42. She said he "was very remorseful, tearful at times, and . . . talked about the impact that [his actions] had on [Nguyen's] family and his family." *Id.* at 142.

Keller told Smallwood that he had a drug problem for "[m]any years, starting in high school." *Id.* at 142. She described how Keller's drug addiction led to the murder:

> When a person has a drug addiction that person is very different than how they are when they are not using drugs. As we work with people in treatment and the person has been in a very destructive kind of pathway, making decisions that are very unwise, making hurtful decisions toward their families and really being in a situation where their life is just totally spinning out of control. And once they go through treatment and once they become clean, if they stay clean, then the differences are very dramatic. And in Jason's case[,] I . . . didn't know him at that time, but it is not surprising that when he is in jail and he is clean and not using drugs he would be very compliant. . . . When a person is using an amphetamine like cocaine, and certainly doing that on a chronic basis, it really impacts their ability to think, it affects the part of their brain that controls that decision-making capacity and the ability to think and make decisions in a constructive or reasonable way.

---

[13] Both of Smallwood's reports were admitted into evidence at trial. [22-7] at 11–12.

*Id.* at 143–44. In short, "[b]eing on drugs diminishes or debilitates a person's wise decision-making." *Id.* at 145.

After receiving the court's instructions and hearing arguments from counsel, the jury deliberated for about five hours before returning a death sentence. [22-7] at 73–75.

In his petition for post-conviction relief, Keller argued that his trial counsel provided ineffective assistance by not discovering significant mitigating evidence. [23-9] at 39–132. He claimed that trial counsel provided deficient representation by not investigating and presenting evidence of Keller's social history, drug use, and life background. *Id.* at 41, 55, 65–132. In support of the claim, he presented a variety of evidence, including dozens of affidavits from friends, family members, former teachers, former classmates, and experts. *See id.* The Mississippi Supreme Court found that he had "made a substantial showing of a denial of his right to effective assistance of counsel," and granted him leave to proceed in the trial court on the issue. *Keller II*, 229 So. 3d at 716.

In the hearing before the trial court, Keller called 11 witnesses. [24-54] at 64–66. The first witness was his older sister, Pamela Adams. [24-55] at 4–5. She testified that they lived in a "lower class" neighborhood as children. *Id.* at 7. She was at least 10 years old when Keller was born, and she "always" took care of him. *Id.* at 8, 20. She testified that Keller burned himself as a child while playing with matches, causing a burn "going from his butt down to his leg . . . ." *Id.* at 11. But she did not believe Keller was hospitalized, and their mother treated the burns. *Id.* at

11–12. When Keller was 10 or 11 years old, he went to live with his natural father, Jerry Bankester. *Id.* at 14. Bankester drank alcohol "[s]ometimes . . . [o]n the weekends." *Id.* at 15. Yet he "always kept a nice house." *Id.* at 12.

She did not know that Keller had a drug problem until he was arrested after an incident at a video store as a young adult. *Id.* at 18, 24, 29. According to Adams, Keller was not disciplined as often as she and her sisters had been, but their mother "yelled a lot." *Id.* at 26–27. She said there was marijuana use among Keller's siblings. *Id.* at 28–29. It "wasn't around Jason," though, and it "wasn't up until after [she] got married." *Id.* at 29. She did not "consider that anywhere like the stuff that they do now." *Id.* at 28.

On cross-examination, Adams testified that her mother and Edward Keller, her father and Jason Keller's stepfather, "were . . . good parents . . . ," *id.* at 19, who took care of their children's needs. *Id.* at 20. She said Edward Keller visited weekly and provided support, and her mother worked. *Id.* at 19–20. Although she took care of Keller often, she admitted that their mother had not left her with the responsibility of raising him. *Id.* at 20. Their mother "[a]lways" kept a clean house, and they were expected to help around the house and follow the rules. *Id.* at 21. But she moved out when Keller was six years old, and she knew nothing about his daily life after that point. *Id.* at 22. She saw him at holidays, and it was not apparent to her that he had a drug problem. *Id.* at 24–25.

Next, Keller called his sister, Lydia O'Brien. *Id.* at 30. She said that he was a "normal boy" who "liked to terrorize" and "pick on" his siblings often. *Id.* at 31. Their

family moved around a "good bit" when they were kids, *id.* at 32, but they always stayed with their mother, Jeraldine Keller. *Id.* at 33. At one point, they lived with a stepfather, "Rocky Mountain," who was "hard" on them, and O'Brien said he "drank every night." *Id.* at 33–34. "[S]ome nights it was one, but usually it was about a 12-pack." *Id.* at 34. On the weekends, he might drink twice that much, or more, in one night. *Id.* He and Keller did not get along. *Id.*

When Keller was about six years old, he burned his legs while playing with matches and had to go to the hospital. *Id.* at 35. O'Brien testified that he "stayed bandaged up for a long time," and their mother "had to carry him around." *Id.* at 36. The burns were painful, and when their mother changed the dressing, O'Brien could hear Keller screaming. *Id.*

According to O'Brien, she and her sisters "always got in trouble," while Jason never got in trouble. *Id.* She said he "would get in trouble at school if he didn't get his [ADHD] medicine," and their mother had "to take his medicine to the school a lot." *Id.* at 36–37. O'Brien was not aware when Keller started using drugs, and she did not know he had a drug problem until he first went to jail. *Id.* at 37–38. In her teenage years, they had been around marijuana use by "[c]ousins and stuff like that" who lived nearby. *Id.* at 38.

On cross-examination, O'Brien admitted that their childhood was "as normal as can be." *Id.* at 39. She clarified that Keller had not burned himself while left alone without supervision, but he was playing while their parents prepared to evacuate the family before a hurricane. *Id.* at 40. She testified that their parents

had been attentive to Keller's needs, but she could not testify about Keller's day-to-day life after he was 10 or 11 years old because she moved out. *Id.* at 40–41. She said that although their stepfather (Rocky) drank, he was never abusive. *Id.* at 42. "He was more so meaner to the boys of the family than the girls" because he had a military background, *id.*, but he was never "abusive" toward Keller. *Id.* at 45.

Next, Keller called Ricky Handler, one of his friends from high school. *Id.* at 46–47. Handler testified that on some days, Keller would be "[q]uiet" in class, and on other days, "he would be jumping off the walls." *Id.* at 49. In 2015, Handler had executed an affidavit in which he claimed that Keller mostly cooked for himself and took care of himself, but during the hearing he claimed he did not recall making that statement about the cooking. *Id.* at 52–54. He admitted that he did not know much about Keller's home life because he would just pick Keller up or stop by his house for 5 to 10 minutes. *Id.* at 54. He never went inside Keller's home or met any of his family. *Id.* at 49. He denied that Keller was a loner, testifying that he had about 10 friends in high school. *Id.* at 54.

Keller also called Sandra Meaut, his former third grade math teacher. *Id.* at 56, 58. She said he had been "a very sweet boy[; h]e needed extra help sometimes[;] and he was a little active." *Id.* at 58. She "worked one-on-one with him. He sat near . . . [her] desk, and [she] would help him when he needed help." *Id.* According to Meaut, "most of the time [Keller] looked kind of unkept. His clothes were a little bit too big and his shoes were too big . . . ." *Id.* at 59. She tried to contact his parents "[s]everal times," but she could not get in touch with them. *Id.* She testified that she

sent notes home with Keller, asking his parents to come in for a conference. *Id.* at

61. It was not unusual, though, for parents to ignore such requests. *Id.*

Next, Keller called Nancy Sherman, his former special education teacher. *Id.*

at 63–64. She said: "I don't remember anything specific about his learning

disability. I do know that it was probably fairly severe or he would not have been

placed in my class . . . . I don't remember him being in a lot of trouble." *Id.* at 64.

She said that students placed in her classroom "usually had a learning disability in

more than one area, and it was usually so severe that they could not function in the

general ed[ucation] classroom and be successful . . . ." *Id.* at 65. She taught "life

skills," such as "counting money [and] making change." *Id.* She did not recall

meeting Keller's parents, and she normally met students' parents because she had

to meet with them to write an individualized education plan. *Id.* at 65–66. Her

general procedure was to contact parents by first sending a letter home with the

student, then mailing a letter, and then a phone call. *Id.* at 66. Keller's attorneys

told her that he had missed 36 days of school in the eighth grade, and she described

that as "very excessive." *Id.* at 67; [24-56] at 1.

Keller then called Charles Kemp, a childhood friend. [24-56] at 3–4. They

knew each other from first grade to middle school, and Keller went to Kemp's house

often. *Id.* at 4–5. Kemp testified that Keller only had a couple of friends in school,

and that he was bullied. *Id.* at 6. He said:

> Jason was . . . different. . . . [T]hey used to call him different names and
> stuff . . . . [M]ost kids will be . . . just all clean and set out a standard,
> and Jason was just different from that standard. . . . [M]ost kids . . .
> would like wipe their face or whatever, but Jason was just a regular

rambunctious boy. You know, he really didn't have time for all that. . . .
[L]et's play, let's go. You know, I don't care how dirty I am, let's go.

*Id.* Children called Keller "snotty nose Jason and pigpen," *id.*, but Keller did not

pick on other kids. *Id.* at 7. Kemp testified: "My grandmother loved him. My mother

loved him. My aunt loved him. He was a very nice guy." *Id.* According to Kemp,

Keller "wasn't a scholar," but he "still passed the grades," with a little help. *Id.*

On cross-examination, Kemp admitted that he did not know much about

Keller's home life because they spent most of their time together at Kemp's

grandmother's house. *Id.* at 11. He also testified that he never saw Keller using

drugs. *Id.*

Next, Keller called Chad Spiers, one of his high school friends. *See id.* at 13.

Spiers testified that he and Jason used drugs together when they were 17 years old.

*Id.* at 14. Specifically, they used crack cocaine, heroin, LSD, and marijuana. *Id.* at

14, 16. According to Spiers, Keller's father never told them to stop or seemed to

care. *Id.* at 14. He said, "I'm not sure if he actually just seen us smoking crack. But,

I mean, it was obvious what we were doing. . . . Crack smoke everywhere." *Id.* at 15.

They did not smoke crack in front of Keller's father, though. *Id.* at 19.

Spiers testified that their drug use started as "friends just smoking weed, and

then it just got to where it was . . . more than weed, and . . . every day revolved

around getting high." *Id.* at 16. Spiers said he would "stay over at Jason's house"

because "it would just be easier for when we got up to go get more drugs," as

Keller's father did not "stay on" them the way Spiers' mother did. *Id.* As for the

murder, Spiers testified: "[I]t really blew my mind because it wasn't . . . Jason—

Jason wasn't like that. He wasn't violent." *Id.* at 15. He and Keller were only friends for about a year and a half, though, before Spiers was incarcerated for auto burglary and burglary of a dwelling. *Id.* at 16–17.

Keller's next witness was Harvey Hughes, his mother's first cousin. *Id.* at 21–22. Hughes testified that he was familiar with Keller's family up until "the time [Keller] was six or eight years old maybe," although he went to their home "very seldom." *Id.* at 25–26. He said, "it wasn't too good of an environment to be around." *Id.* at 25. He described Keller as "a nice kid" and recalled seeing him play outside. *Id.* at 26. He did not see any drugs or alcohol when he was at their house. *Id.* But he never visited Jerry Bankester's (Keller's natural father's) home. *Id.* at 27.

Keller then offered the deposition transcript of William Westall, his first cousin. *Id.* at 27–28; [24-61] at 4–39. Westall testified that he lived with Jerry Bankester, Keller's natural father, and B.O. Bankester, Keller's grandfather, for some time as a teenager. [24-61] at 9–11. During that time, he observed Keller's father drink "quite a bit" of alcohol. *Id.* at 11–12. He said, "two fifths of liquor a day was not out of the question," *id.* at 12, and it was "a normal practice" for Bankester to drive under the influence. *Id.* at 14. At that time, Keller was three or four years old, *id.* at 12, and he would visit "[a]lmost every weekend." *Id.* at 14. Westall testified: "[M]any a time I would see Jason pick his father's beer up and drink it." *Id.* at 23. He said Keller would also "swip[e]" cigarettes from his father, light them on his own, and smoke them, despite only being three or four years old. *Id.* at 24–25. Bankester called Keller "the last of the Mohicans" and said that "he could do what

he wanted to do." *Id.* at 13. Once, Bankester punched Westall because Westall had attempted to discipline Keller. *Id.* Westall said that no member of the family was allowed to discipline Keller in his father's presence. *Id.* at 13–14. On cross-examination, Westall clarified that Keller lived with his mother during this time, and he only visited his father on some weekends. *Id.* at 17–18. Westall did not see Keller regularly after his early childhood, and so he did not know about his drug habits. *Id.* at 31–32. Westall said that if he had been asked to testify at Keller's sentencing hearing, he would have done so. *Id.* at 37.

Keller then called Harvey Poole, one of his middle-school friends. [24-56] at 28–29. Poole testified that he and Jason became friends in fifth or sixth grade. *Id.* at 29. He said:

> [W]e were both outcasts. I was more of an outcast by choice. It seemed like he was more of an outcast because he was really poor . . . . [H]e was in some of the [learning disability] classes . . . . [S]ome of the other students used to make fun of him. It seemed like the faculty even singled him out because of his disabilities. . . . The teacher would make him read out loud because he couldn't read out loud very well.

*Id.* Poole described one incident:

> I remember when the Reebok pumps came out, he had wore . . . some knock off Reebok pumps. And one of them blew out when he jumped off the bleachers. And so when he was walking, they would squeak when he walked. And he got picked on because of that. And it bothered him.

*Id.* at 32. Poole said that Keller did not participate in school activities, but he went to parties outside school. *Id.* at 42.

Poole described Keller's home life: "[I]t wasn't exactly a Leave it to Beaver lifestyle. He was exposed to drugs at a young age. . . . I know I started smoking weed with him the summer between seventh and eighth grade. And he was already

smoking weed when we started smoking weed." *Id.* at 30–31. "He didn't really want to go home much. I wasn't sure where his parents were at." *Id.* at 31. Poole never went inside Keller's home, and they never spent time there. *Id.* at 33. So, they stayed at Poole's house "or in the streets," *id.* at 31, and Poole never met Keller's parents. *Id.* at 43. Poole recalled selling weed to someone in Keller's family—an older brother or uncle—but he said everyone in "the families of the people I hung around" smoked weed back then. *Id.* at 32–33. It was not "an uncommon thing." *Id.* at 33. Poole lost contact with Keller when he dropped out of school in tenth grade. *Id.* at 37.

Keller called Dr. Dale Watson, a neuropsychologist, as an expert witness. *Id.* at 52–54. Keller's attorneys retained Watson to "do a comprehensive battery of neuropsychological tests including intelligence testing, memory testing," and test "a lot of different neuropsychological function[s] related to different parts of the brain . . . ." *Id.* at 57. He administered the tests at the Mississippi State Penitentiary over three days and prepared an affidavit with his opinions. *Id.* at 57–58; *see also* [24-61] at 70–71; [24-62] at 1–36. The testing showed no evidence of malingering. [24-56] at 59.

Keller's full-scale IQ was 85. *Id.* at 64. Watson explained, though, that intelligence does "not necessarily" accurately "gauge a person's ability to function in everyday life." *Id.* at 65. He testified: "Somebody with low average IQ, if they also have neuropsychological deficits, they can function at much lower levels . . . ." *Id.* He claimed that Keller suffers from such deficits. *Id.* at 66. On the "General

Neuropsychological Deficit Scale," Keller's score "fell within the mildly impaired range of neuropsychological functioning." *Id.* at 66–67. In practical terms, a person with mildly impaired neuropsychological functioning "show[s] impairments that normal people do not possess typically. . . . [I]t will affect their ability to function in the real world. It can affect their ability to function in school settings in particular." *Id.* at 67.

Keller also displayed impairment in four tests designed to identify brain damage. *Id.* at 67–69. According to Watson, the tests revealed "evidence of right hemisphere dysfunction," [24-57] at 1, as well as "executive functioning deficits." *Id.* at 4. "[E]xecutive functioning" refers to "problem solving primarily, but [also] judgment, mental flexibility, direction of behavior." *Id.* These functions are generally "associated with the frontal lobe of the brain." *Id.* Accordingly, Keller had "difficulties" with mental flexibility, as well as "attentional deficits," and these deficits would adversely affect his ability to make decisions in changing situations. *Id.* at 4, 7. Keller also exhibited severe impairment on a "Social Cognition Test" designed to measure a person's ability to process emotional information conveyed by both visual and audio cues. *Id.* at 7–8. While Keller's scores on some tests were adequate, Watson cautioned, "[I]f somebody has a deficit in one particular part of the brain . . . , it doesn't necessarily mean they can compensate for that" with other abilities. *Id.* at 9–10.

Watson noted that Keller's relatives had not performed well in school, establishing a "general pattern." *Id.* at 10. He also noted that Keller had physical

39

traits "potentially" indicating *in utero* exposure to alcohol, although he later admitted there could be other causes. *Id.* at 10–11, 49. Watson believed that Keller had been accurately diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a child, and he testified that many people with ADHD do not "grow out of it." *Id.* at 12. He said, "[i]t really has significant impacts on people's lives in terms of . . . how they function, length of life, [and] probability of incarceration . . . ." *Id.* Although Watson did not see "a lot of evidence of hyperactivity," Keller "continued to have attentional deficits" and behavior patterns correlated with ADHD, such as substance abuse. *Id.* at 12–13.

Watson testified that Keller suffered "severe trauma" as a child when he "was playing with lighter fluid and matches and his leg was set on fire." *Id.* at 14. Watson said a traumatic event could affect the "neuropsychological development of the brain." *Id.* "Particularly for burn victims it can be devastating to experience that. You can have lifelong impacts, disfigurement, motor limitations, sensory limitation potentially." *Id.* at 15. He acknowledged, "It's hard to say whether that would have a long-standing impact on him. I would think most of the deficits that I saw are probably more related to developmental issues." *Id.* at 14. But he testified that Keller "showed kind of the cardinal features of a post-traumatic stress disorder," and he believed that the childhood burns were the cause. *Id.* at 15. Keller claimed to still have nightmares about the experience, and he was reported to be "always fearful around fire after that." *Id.* at 16. Watson said the PTSD was "ongoing," although "probably moderated over time." *Id.*

Watson also testified that drug use during Keller's pre-teen and teenage years was "a negative prognostic indicator," in that the brain was "still developing during that period of time." *Id.* at 17. He said that "drug abuse is a . . . magnifier of any underlying deficits," and therefore, Keller's drug use at the time of the crime could have exacerbated his existing neuropsychological deficits. *See id.* at 17–18. In fact, Watson testified that Keller's ADHD, post-traumatic stress disorder, low average IQ, and brain dysfunction were all "working together" at the time he murdered Hat Nguyen. *Id.* at 19. He could not point to one factor that caused Keller to commit murder. *Id.* at 52. Rather, he said that it was "the confluence of different factors and situational factors . . . ." *Id.* At the same time, Watson specifically denied that these factors robbed Keller of agency. *Id.* at 52–53. He said: "I'm not saying he wasn't responsible. I do think it reduces his . . . decision-making capacity." *Id.* at 53.

On cross-examination, Watson admitted that Keller's alleged brain dysfunction would "[n]ot necessarily" make him prone to violence. *Id.* at 36. He said that the way these neuropsychological deficits manifest themselves would vary by individual. *Id.* at 36–37. He asserted, though, that chronic drug use would not cause all the deficits he found. *Id.* at 37. He also admitted that he relied solely on the affidavits provided by Keller's attorneys for collateral information to supplement Keller's self-reporting. *Id.* at 38–39.

Keller called Dr. George Woods, a psychiatrist, as an expert in neuropsychiatry. *Id.* at 60–61; [24-58] at 18–19. Keller's attorneys retained Woods to "do a neuropsychiatric examination." [24-58] at 21. Woods stated:

> A neuropsychiatric examination . . . is broader than a psychiatric examination. It requires that you not only do a typical social history, mental status examination, but it also requires that you review pertinent records that may speak to a person's cognitive abilities as well as their psychological abilities. It also requires that you may perform certain physical tests that . . . give you more information about a person's . . . cognitive or neurological abilities and not just his psychological abilities.

*Id.* at 21–22. Woods interviewed Keller, reviewed his social and medical history, reviewed "different medical systems," such as his eyes and ears, and performed "some neurological testing." *Id.* at 22.

According to Woods, Keller "immediately presented" as someone with "midline" brain defects, both currently and historically. *Id.* at 23–24. He said, "[I]n the photographs and to some degree today . . . you see a pushed in face, . . . that has no lip, . . . what we call a flattened philtrum. And those are symptoms." *Id.* at 24. Also, Keller had "an inguinal hernia that had to be repaired at eight months," and that is a symptom. *Id.* at 25. Keller failed a "graphesthesia" test, which signified that "his corpus callosum, that communication between the right side and left side [of the brain], is not functioning properly." *Id.* at 27.

Woods noted that Keller "had been burned" when he was about three or four years old "from the hip to right about the ankle." *Id.* at 28. As part of the treatment, he underwent "debridement," in which layers of scarred tissue are taken away so that new skin can grow. *Id.* "This is tremendously painful, particularly in a child."

42

*Id.* Woods testified that there is a "body of literature that is significant for a child to have PTSD secondary to burns," *id.*, and he noted that Keller "has a slight limp," which "is secondary to the tightening of the musculature . . . and of the skin that was burned." *Id.* at 29. Keller reported that he continues to have nightmares about the incident. *Id.* at 30. Woods therefore believes that "Keller did suffer from childhood post-traumatic stress disorder," *id.*, which could "have the potential of having a much more significant impact on long-term functioning because [it occurred] during developmental stages." *Id.* at 31–32.

Although Keller scored an 85 on the IQ test, Woods testified that "IQ is a limited measure of how someone functions in the world." *Id.* at 34. He said, "IQ really is a function of what you have gathered in the first six years, seven years of your life. It is not a test of brain function . . . in the same way that neuropsychological testing is." *Id.* "[O]ver the years there have not been the same type of assessments for IQ testing and real-world functioning as there have been for neuropsychological assessments." *Id.*

Woods affirmed Watson's opinions and testified that "there's no question based upon the neuropsychological testing" that Keller has neurological impairment. *Id.* at 35. Woods said that Watson's testing showed that Keller suffered from impairment in the right frontal lobe area, which affected his "ability to both recognize emotions and respond to the emotions effectively." *Id.* at 36. He also said Keller suffered from impairment in the right parietal lobe, which affected his "executive functioning of being able to get the big picture." *Id.* at 37. Finally, he said

Keller had impairment in the corpus callosum, which "is indicative of early neurodevelopmental disorders." *Id.* at 38.

Woods also administered the Montreal Cognitive Assessment, a test often used to screen for dementia. *Id.* at 41. He said Keller could not complete the second part of the test, which indicated impairment in "the part of the brain that allows you to see the big picture, to understand . . . clearly what the next steps are . . . ." *Id.* at 43. Although Keller did well on other tests, his "relative strengths . . . do not offset his impairments in . . . being able to effectively weigh and deliberate." *Id.* at 43–44.

And Woods administered the Barkley test, "an interview that is designed to look at executive functioning in the real world." *Id.* at 45. "Executive functioning is the ability to effectively weigh and deliberate, to sequence one's behavior, to pick-up social cues, to understand context, and to get the big picture." *Id.* at 46. Woods said Keller performed poorly on the areas of the test covering self-management of time, self-restraint, and self-motivation, but not self-regulation. *Id.*

Woods testified that these areas of brain dysfunction were neurodevelopmental, rather than acquired in an acute event damaging the brain. *Id.* at 48–49. He said Keller's medical records included nothing that would cause brain injury. *Id.* at 49. And he said there was no correlation, "even given his long history of drug use, between the specific kinds of impairments that he has and them being caused by drugs and alcohol." *Id.* Woods testified that Keller's childhood suggested hyperactivity, but not "any specific cognitive or mental impairment." *Id.*

at 50. His life history was "really more indicative of a child brain that is slow and becoming inhibited. . . . His [brain] did not develop in the way that most children's brains would develop." *Id.*

As for fetal alcohol syndrome, Woods testified:

> Mr. Keller has, in my professional opinion, an impairment of neurodevelopmental development that started in the first trimester and that continued into the second trimester. That includes the dysmorphology of the face. That includes cognitive brain problems which started at that time. That includes . . . the inguinal hernia. So certainly within the . . . different possible diagnoses in the first trimester, fetal alcohol is by far the greatest even though there are multiple other diagnostic possibilities.

*Id.* at 52. He later admitted that "there is no corroboration that [Keller's] mother drank," but he added, "I often run into mothers who do not acknowledge that they drank during the pregnancy." *Id.* at 67–68.

Woods testified that all these factors—Keller's low-average IQ, neurodevelopmental issues, ADHD, and PTSD—"were present and impacting his behavior on" the day of the murder. *Id.* at 52–53. He said that the drugs in Keller's system would have exacerbated the existing brain issues, and "that's why even though these behaviors were every day of life, this particular episode may have made . . . those deficits stand out." *Id.* at 54. Woods added that all of the neuropsychological testing that had been performed on Keller in his post-conviction proceedings was available in 2009 at the time of trial, *id.*, and that there was no reason to believe the results would have been any different if the testing had been performed back then. *Id.* at 56. Woods later added that he believes that Keller has bipolar disorder, although his symptoms also resembled ADHD. [24-59] at 34.

On cross-examination, Woods admitted that he had not tested for malingering, but he claimed that it was impossible to malinger on the tests he had administered. [24-58] at 60–61. He also admitted that he relied on Keller's attorneys to provide collateral information to supplement Keller's self-reporting. *Id.* at 65.

Woods affirmed that Keller was responsible for his actions, but he also said, "that the combination of his drug use, . . . sleep deprivation, et cetera, is exactly the kind of scenario that would lead to this type of tragic, inappropriate behavior on his part." [24-59] at 20. He said it was a "perfect storm[ ] with someone that is cognitively impaired. It could happen with someone who was not, but in his case it's just the kinds of cognitive impairments that can create a vulnerability to a situation." *Id.* He denied that Keller "had the ability to walk away and not harm Ms. Nguyen,"[14] but he admitted that Keller was not forced to take drugs, did not murder Nguyen by accident, and knew what he was doing. *Id.* at 24.

The State called one witness: Keller's trial counsel, Lisa Collums. *Id.* at 43–45. Collums testified that she had tried three or four capital cases. *Id.* at 44. She represented Keller in both his bank robbery and capital murder cases. *Id.* at 44–45. After he was charged with capital murder, she spoke with him "[o]n multiple occasions" to gather information about the murder, his family, and his life. *Id.* at 45–46. She also spoke to some of his family members, including his mother and

---

[14] Woods later softened this opinion and said that Keller's "ability to just walk away was impaired. Not that he did not have the ability, but that his ability was impaired." *Id.* at 39.

sister. *Id.* at 46, 53. Her office's investigator also spoke with people. *Id.* at 47. They collected Keller's medical records, school records, and criminal history, and obtained a psychological evaluation from Dr. Beverly Smallwood. *Id.* at 47–48. Collums specifically testified that nothing in her interactions with Keller led her to believe that he had any psychological impairments or needed additional testing, and that if she "had felt that way, [she] would [have] asked for more testing." *Id.* at 49.

Collums admitted that she did not obtain a mitigation study as Dr. Smallwood recommended. *Id.* at 52–53. She also admitted that she did not speak with any of Keller's former classmates or coworkers. *Id.* at 54. But she did not believe that a follow-up mitigation study was merited. *Id.* at 58. She noted that Keller could "communicate well," and she observed that he "obviously had a raging drug problem when this offense occurred." *Id.* She said his history of drug use did not "necessarily impl[y] that he's got some type of mental deficiency," *id.*, and that he "was always cooperative and pleasant to talk to." *Id.* at 64. In summary, she said that "we did everything that we thought could be done to be helpful for him[,]" including "[g]oing out and talking to friends, relatives, hearing what they had to say about him, what they knew about him." *Id.* at 65.

After the hearing, Keller asked to speak to the court. [24-60] at 3. He said:

> I'm probably going to say something against my attorney's wishes. Yesterday I was able to—you gave me a chance to speak, but I was overcome with joy and thankfulness yesterday. I wanted to get mad and angry but I couldn't. But my mother and father being portrayed as bad parents, it's not possible. It's unheard-of. My parents were always there for me, baseball practice, football practice, school. I remember my mom bringing me medicine to school twice a day, not once a day, twice a day. So for them trying to—not them, but just people blaming my crime or

what I did on that day on my parents is just—it's wrong. And my daddy's not here to defend himself. My mama wasn't here to defend herself. So I'm going to stand up for them. I know they're fighting for my life. . . . But it's not worth it to me, you know, to lie on my parents and let them be lied on because I know they were good parents. They tried everything they could. I was in adolescence. I was a bad child. I liked drugs. I got high and I made stupid decisions. But it wasn't nothing for my parents. It was all Jason. And that's all I can say about my parents.

*Id.* at 4–5.

Additionally, during the hearing, the judge stated, with respect to the lay witnesses: "I have some concerns because virtually every witness who's testified has contradicted their affidavits." [24-56] at 46. Later, after the hearing, the judge observed:

> [M]ost of the affidavits are not helpful. They contain a lot of information that has nothing to do with the issue that's before the court. . . . Secondly, I have serious concerns about the differences in the affidavits of those who testified versus what their testimony was which gives me reason to question some of the other information that is provided.

[24-59] at 68. Keller's post-conviction counsel admitted that the affidavits contained "stuff that is not relevant to anything from what I can tell," with paragraphs that went "on and on about stuff that has nothing to do with mitigation in my opinion." *Id.* at 69. He observed that an attorney likely wrote them, and accordingly, he advised the court that he "would have a lot more faith in what the witnesses said on the stand and subject to cross-examination than what was in those affidavits." *Id.* at 69–70.

The parties submitted briefing,[15] and the trial court entered an opinion on July 31, 2019. [24-53] at 58–70; [24-54] at 1–39. It found that "[o]f those submitting

---

[15] [24-51] at 26–58; [24-53] at 3–50.

affidavits who also testified, there was no witness who testified in complete accord with his or her affidavit." [24-53] at 68. Accordingly, the trial court concluded that the affidavits submitted with the petition were "not particularly reliable." *Id.* The trial court also found that much of the material in the affidavits was irrelevant to the issues presented in the petition, addressing "matters that occurred either before Keller was born, when he was incarcerated, or wholly outside of his presence." *Id.* It also noted factual inconsistencies among the affidavits themselves, further damaging their credibility. *Id.* at 69.

The trial court discussed the evidence presented during the hearing. *Id.* at 69–70; [24-54] at 1–19. It found that the lay testimony presented during the post-conviction hearing "differ[ed] little from the lay testimony presented at trial." [24-54] at 19. In post-conviction, Keller simply offered more witnesses and more details. *Id.* The trial court disagreed with Keller's characterization of the evidence. *Id.* at 21–22. It said, "The picture which the Petition and argument attempts to paint of Keller's family life and history is simply not supported by the actual evidence presented." *Id.* at 21. Rather, the trial court observed:

> The evidence is that Keller was well cared for and always lived in a house when he was with his mother and in a mobile home while with his father. He was clothed and fed. He was provided medical care. His family was not well off, but they were certainly not destitute or poverty stricken.

*Id.* The trial court noted evidence that Keller had friends, dated, played with his siblings, participated in recreational activities, and had parents that remained

friends over the years and "were fully engaged in his life." *Id.* at 22. Indeed, the trial court noted Keller's own words to this effect at the end of the hearing. *Id.* at 36.

As for Keller's expert witnesses, the trial court found that neither was "particularly credible." *Id.* at 22. It noted that "neither doctor was really familiar with the facts of Keller's crime and the evidence submitted at trial." *Id.* It also noted many unmerited inferences and factual inconsistencies in the experts' opinions. *Id.* at 24–27. During its discussion of the experts' testimony, the trial court cited many articles it had found online that had not been presented during the hearing, but purportedly discredited the experts' shared opinion that chronic drug use does not impair brain functions. *Id.* at 28.

Ultimately, the trial court found that Keller's trial counsel had adopted a trial strategy to "establish that Keller was a good person who was no problem to society except . . . when he used drugs." *Id.* at 19. It noted that Keller's trial counsel had "discussed Smallwood's recommendation" to obtain a mitigation study "and determined not to pursue it further." *Id.* at 31. It listed the variety of evidence that Keller had presented in mitigation concerning his family, school background, and drug use, and concluded that "[w]hat is now known from the evidentiary hearing is not vastly different from what was known at the time of trial." *Id.* Although Keller presented expert testimony in post-conviction, the trial court observed that his alleged mental defects "caused . . . the same problem as his drug use: inability to make good decisions particularly in a novel or escalating situation." *Id.* at 32. The trial court observed that evidence presented in post-conviction effectively told the

same story that Keller's trial counsel had told at trial: that Keller had no substantive problems except when he was using drugs. *Id.* Accordingly, "counsel's strategy of depicting Keller as a good guy who just messed up due to drugs is supported by this additional information, not contradicted by it." *Id.*

And there was no evidence "that trial counsel was on notice or should have been on notice of any claimed neurocognitive defect . . . ." *Id.* at 37. Therefore, the trial court found that Keller had not shown that his trial "counsel's representation in this regard fell below an objective standard of reasonableness." *Id.* at 34.

The trial court further found that even if his trial counsel had provided deficient assistance, the added evidence presented in post-conviction was "largely cumulative." *Id.* While the jury had not been presented the experts' opinion that Keller suffered from neuropsychological impairments, ADHD, and PTSD, the trial court concluded that this evidence would not have altered the outcome of the trial. *Id.* at 34–35. It observed that Keller's alleged mental impairments would have impaired him every day, yet the evidence demonstrated that he "only had issues and committed his crimes when he was using drugs." *Id.* at 35. The trial court also observed that the experts' opinion that Keller could not make good decisions "when faced with a novel or rapidly escalating situation" would have opened the door to the prosecution exploring how he had handled similar situations—such as his prior offenses. *Id.* For these reasons, the trial court denied the petition. *Id.* at 39.

Keller appealed. [24-65]; [24-66]. He repeated the arguments on counsel's failure to investigate his background or follow Dr. Smallwood's recommendation to

obtain a mitigation study. [24-66] at 8–31. He also argued that the trial court had ignored the evidence of neuropsychological defects presented by his experts, Dr. Watson and Dr. Woods. *Id.* at 31–42. Finally, Keller argued that the trial court had improperly engaged in factual research outside the record by searching for internet articles, and that it had manufactured tactical decisions for his trial counsel. *Id.* at 42–44.

The Mississippi Supreme Court affirmed the trial court's decision. *Keller III*, 306 So. 3d at 715. First, it found that the trial court "correctly found that Keller's trial counsel was not constitutionally ineffective." *Id.* at 711. It said that evidence introduced during the evidentiary hearing contradicted Keller's argument that his family background led to his drug use and the murder. *Id.* at 712. Even if the evidence did show "a neglectful family that led Keller down a road to murder," it was within his trial counsel's discretion to choose a different mitigation strategy. *Id.* Also, while Keller claimed his trial counsel did not present evidence of his educational background, evidence of his school record was admitted at trial, and any new evidence presented in the evidentiary hearing would have had "a negligible effect on the sentencing profile." *Id.*

As for trial counsel's failure to follow Dr. Smallwood's recommendation to obtain a mitigation study, the Mississippi Supreme Court held that Keller's counsel provided effective assistance by "perform[ing] some mitigation investigation," obtaining a competency evaluation and IQ test, and presenting evidence of his "low-average IQ." *Id.* at 713. It observed that "[t]here are countless ways to provide

effective assistance in any given case," and the court "indulge[s] a strong presumption that . . . , under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)). Therefore, the Mississippi Supreme Court held that the trial court did not clearly err in finding that trial counsel provided adequate assistance. *Id.* at 713–14.

Finally, the Mississippi Supreme Court addressed several alleged errors in the trial court's reasoning. First, it held that the trial court did not ignore the testimony of Keller's experts. *Id.* at 714. Rather, as the finder of fact, it was "free to accept all, part, or none" of their testimony, and it performed its task by considering their opinions, assessing their credibility, and weighing the evidence as it deemed appropriate. *Id.* (cleaned up). Second, it held that the trial court did not "manufacture a tactical decision for trial counsel," but "simply assessed the credibility of the witnesses" and analyzed their testimony. *Id.* Third, it found that the trial court had erroneously conducted factual research outside the record. *Id.* But it held that the error was harmless because "trial counsel's strategy of humanizing Keller was adequate." *Id.* at 715.

2.  Applicable Law

The Fifth Circuit has summarized the law governing claims of ineffective assistance of counsel:

> To demonstrate a claim of ineffective assistance of trial counsel under *Strickland v. Washington*, the defendant must show both that counsel rendered deficient performance and that counsel's actions resulted in actual prejudice. To demonstrate deficient performance, the defendant

must show that, in light of the circumstances as they appeared at the time of the conduct, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Trial counsel's strategic decisions must be given a strong degree of deference. On habeas review, if there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard, the state court's denial must be upheld. . . .

To demonstrate prejudice under *Strickland*, [the petitioner] must show that counsel's deficient performance was so serious as to deprive him of a fair trial, a trial whose result is reliable. This requires the showing of a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different.

*Rhoades v. Davis*, 852 F.3d 422, 431–32 (5th Cir. 2017) (cleaned up); *see also Strickland*, 466 U.S. at 687–89.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome. Prejudice exists when the likelihood of a different result is substantial, not just conceivable." *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013) (cleaned up). "[C]onclusory assertions of prejudice are insufficient . . . ." *Green v. Johnson*, 160 F.3d 1029, 1041 (5th Cir. 1998). Moreover, "the Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims." *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir. 2019) (per curiam); *see also Zimmerman v. Cockrell*, 69 F. App'x 658, 2003 WL 21356018, at *12 (5th Cir. 2003) (per curiam) ("We have reservations with respect to the applicability of cumulative error in the context of ineffective assistance after the

enactment of AEDPA."). In other words, the Court need not "calculate prejudice on a cumulative basis." *Hill*, 781 F. App'x at 281.[16]

"When an ineffective-assistance-of-counsel claim is subject to AEDPA, the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether counsel's performance fell below the *Strickland* standard. *Trottie*, 720 F.3d at 241 (cleaned up). In the context of a habeas claim, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 242 (cleaned up). "Thus, while surmounting *Strickland*'s high bar is never an easy task, establishing that a state court's application of *Strickland* was unreasonable under [Section] 2254(d) is all the more difficult," as both standards are "highly deferential," and "doubly so" when combined. *Id.* (cleaned up). "AEDPA review is doubly deferential because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Russell*, 68 F.4th at 272 (cleaned up). "Doubly deferential means that we afford both the state court and the defense attorney the benefit of the doubt." *Id.* (cleaned up).

As for mitigation, "[t]he Supreme Court has interpreted the Sixth Amendment to require defense counsel 'to make reasonable investigations [into potential mitigating evidence] or to make a reasonable decision that makes particular investigations unnecessary.'" *Brewer v. Lumpkin*, 66 F.4th 558, 565 (5th

---

[16] *Kyles v. Whitley*, 514 U.S. 419, 436 (1995), cited by Keller, applied a cumulative prejudice analysis to *Brady* claims.

Cir. 2023) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). "There are no 'strict rules' for counsel's conduct beyond 'the general requirement of reasonableness.'" *Trottie*, 720 F.3d at 242 (quoting *Pinholster*, 563 U.S. 195–96). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.* (quoting *Richter*, 562 U.S. at 108). Rather, counsel may develop a strategy that balances cost with benefit. *Id.* at 243. "[A] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Id.* (quoting *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011)).

After conducting a reasonable investigation, "defense counsel also has an obligation to make reasonable strategic decisions regarding which witnesses and evidence he will present." *Id.* "Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy[,] and speculation about what witnesses would have said on the stand is too uncertain." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *see also Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993) (explaining that "general allegations and speculation" are insufficient to support ineffective assistance claim). Accordingly, "petitioners making claims of ineffective assistance based on counsel's failure to call a witness [must] demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing

that the testimony would have been favorable to a particular defense." *Woodfox*, 609 F.3d at 808 (cleaned up). There is no "per se rule that a particular type of mental health expert is required in death penalty cases." *Carter v. Mitchell*, 443 F.3d 517, 526 (6th Cir. 2006).

The Court assumes that counsel's decision not to "present a particular line of argument or evidence" was a strategic choice. *Trottie*, 720 F.3d at 243 (quoting *Taylor v. Maggio*, 727 F.2d 341, 347 (5th Cir. 1984)); *see also Devoe v. Davis*, 717 F. App'x 419, 430 (5th Cir. 2018) (per curiam). The Court "must defer to the state court's factual findings and deny relief if there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Trottie*, 720 F.3d at 244 (cleaned up). "[A] tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997). Indeed, "an attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *United States v. Bernard*, 762 F.3d 467, 477 (5th Cir. 2014) (cleaned up). And an attorney's failure to present mitigating evidence cumulative of what was presented does not prejudice the defendant. *Brewer*, 66 F.4th at 566.

### 3.  New Evidence

Keller attached several exhibits to his Second Amended Petition which were not part of the record in front of the Mississippi Supreme Court when it addressed this claim. "The Supreme Court has strictly instructed" that lower courts' review

under Section 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Lucio*, 987 F.3d at 471 (quoting *Pinholster*, 563 U.S. at 181) (emphasis omitted). But if a habeas petitioner can "demonstrate that habeas relief is warranted under [Section] 2254(d) on the state court record alone[,] . . . then a federal habeas court may entertain new evidence pursuant to the limitations of [Section] 2254(e)(2)." *Broadnax*, 987 F.3d at 406–07 (emphasis omitted). "The point of AEDPA . . . is to require prisoners first to exhaust state court remedies before seeking federal relief, and it would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." *Id.* (cleaned up).

As provided below, Keller has not shown that habeas relief is warranted under Section 2254(d) on the state court record alone. Therefore, the Court cannot consider the new evidence attached to his Second Amended Petition.

### 4.  Failure to Investigate Keller's Life History

Keller claims that his trial counsel did not adequately investigate his background and that the evidence presented during the sentencing phase of his trial resulted from an incomplete investigation. The record, though, contains substantial evidence supporting the state courts' denial of this claim.

First, the record contains evidence that an attempt to portray Keller's upbringing as dysfunctional and traumatic would have been a distortion of the truth. Keller himself stated during the post-conviction evidentiary hearing that his

parents were good parents, and he accused his attorneys and the witnesses of trying to "lie on" his parents and portray them as worse than they were. [24-60] at 4–5. Indeed, the post-conviction record contains evidence that Keller's upbringing, while not perfect, was generally fine. Both of his parents were involved in his life, and they remained friends with each other, despite not living together. He had loving siblings, with whom he played as children. He had multiple friends in adolescence, with whom he socialized. He participated in organized sports, including football and baseball. He participated in other recreational activities, such as pick-up basketball and skateboarding. In fact, while Keller's briefing frames the burns he suffered in childhood as an example of parental negligence, one could reasonably frame the event as an example of diligent parents doing their best under suboptimal circumstances. Keller was unsupervised and vulnerable only because his parents were preparing to evacuate their family before a hurricane.

The record contains evidence of alcohol and marijuana use among Keller's family, and while not destitute, they were not affluent. No evidence suggests that Keller was abused as a child or an adolescent or that he lived in dangerous conditions. And no evidence suggests that he ever lacked food, shelter, or clothing. Rather, the record shows that Keller was raised in a working-class home by loving parents who did their best for him, but they were thwarted by Keller's own poor decisions over years of chronic drug use and criminal activity.

Under these circumstances, Keller's trial counsel did not provide ineffective assistance by electing a different strategy in the sentencing hearing than Keller's

post-conviction and habeas counsel would have chosen. Trying to blame Nguyen's murder on Keller's family could have easily backfired, inflaming the jury. The Court's scrutiny of trial counsel's performance "must be highly deferential." *Strickland*, 466 U.S. at 689. The Court "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and Keller has the burden of "overcom[ing] the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (cleaned up). "There are countless ways to provide effective assistance in any given case." *Id.*

Here, Keller's trial counsel made the reasonable decision to portray him as a generally good person from a loving family whose drug use led him to make poor decisions. The evidence supports that characterization. The consistent refrain from Keller's friends and family throughout the record was that he is a good person who does bad things when he is on drugs. Moreover, Keller's attempted suicide-by-cop, confession statement testimony during the sentencing phase of trial, along with his comments to the trial judge in the post-conviction hearing, demonstrate that he regrets the pain he has caused other people.

Even if it were deficient representation for Keller's trial counsel not to put on more evidence of his background, the error was harmless. Much of the proposed evidence would have been cumulative. Also, as the trial court, Mississippi Supreme Court, and Keller's own post-conviction counsel acknowledged, much of the material in the affidavits from friends and family was irrelevant. And it is unlikely that

other information about Keller's family background would have altered the outcome of the sentencing phase of trial, considering the evidence against him. In particular, the evidence from trial showed that he shot Nguyen, chased her outside, forced her back into the store, shot her again, took her money, and then shot her one last time in the back of the head while she was helpless. Keller's argument that more information about his family background would alter the jury's deliberations is belied by the brutal and senseless nature of his crime. Indeed, as the Court already noted, blaming the murder on Keller's upbringing could have inflamed the jury, rather than eliciting their sympathy.

For these reasons, the Court concludes that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts.

### 5.   Failure to Investigate Keller's Educational Background

Keller also claims that his trial counsel did not present evidence of his educational background. He argues that his trial counsel should have presented evidence to the jury of his struggles in school and his parents' lack of involvement in his education. The record contains substantial evidence supporting the state courts' denial of this claim.

Keller's counsel did, in fact, offer evidence of his educational background. As recounted above, his trial counsel introduced a record of his grades from elementary school through at least eighth grade. [22-6] at 102; [22-16] at 47. It reveals that he

was never an excellent student, but that his grades began to noticeably drop off around the sixth or seventh grade. [22-16] at 47. He was placed in special education during his eighth-grade year, and his grades improved. *See id.* Keller also testified that he dropped out of school after the ninth grade because of his drug use. [22-6] at 102. Finally, Dr. Smallwood testified that she had administered an IQ test, and that Keller scored an 85, in the low-average range. *Id.* at 149–51. She explained that about 82% of the population would score better than Keller on the same test. *Id.* at 151.

Even if Keller's trial counsel had not offered evidence of his educational background at trial, the added evidence from post-conviction would not have substantially altered the quality or nature of his mitigation case. Sandra Meaut, Keller's third-grade teacher who testified in post-conviction, provided some more details about his educational background, but his grades from third grade were already part of the trial record. *See* [22-16] at 47. Although Meaut testified that Keller's parents were unresponsive to her invitations for them to meet with her, she also testified that was not unusual among her students. [24-55] at 61. Keller himself also spoke in defense of his parents, emphasizing that they "were always there for [him], baseball practice, football practice, school." [24-60] at 4–5.

Keller's eighth-grade special education teacher, Nancy Sherman, could not recall the extent of his learning problems or ever meeting his parents, but she said all the students in her classroom typically had severe learning disabilities. [24-55] at 64–66. The school record admitted at trial, though, shows that his grades that

year were significantly better than the year before, *see* [22-16] at 47, and Keller's

score on Dr. Smallwood's IQ test was admitted at trial. [22-6] at 149–51.

In summary, it was clear from the trial record that Keller struggled in school.

The jury had his grade record, which also revealed that he was in special education.

Keller testified at trial that he dropped out of school after ninth grade because of his

drug use. It is unlikely that the added evidence on his educational background

introduced in post-conviction would have altered the outcome of the sentencing

phase of trial, particularly considering the nature of his crime and the evidence

supporting his conviction. Accordingly, the Mississippi Supreme Court's

adjudication of this claim was neither contrary to nor an unreasonable application

of clearly established federal law, and it was not based on an unreasonable

determination of the facts.

### 6.  Failure to Retain an Expert

Finally, Keller claims that his trial counsel provided ineffective assistance by

not retaining experts to testify about his psychological and neurological functioning.

He contends that his school records and Dr. Smallwood's report put his trial counsel

on notice that further testing was needed.

The Mississippi Supreme Court's adjudication of this claim was reasonable.

Dr. Smallwood recommended that Keller's trial counsel obtain "a mitigation study

regarding this man's psychological functioning." [23-18] at 38–39. His trial counsel,

Ms. Collums, testified that she "factored in" Dr. Smallwood's advice in determining

how to proceed, [24-59] at 48, but nothing in her interactions with him led her to

believe that he had any psychological impairments. *Id.* at 49. She added that if she had "felt that way, we would [have] asked for more testing." *Id.* She said, "having dealt with Jason, he can communicate well," but "[h]e obviously had a raging drug problem when this offense occurred." *Id.* at 58. She did not believe, though, "that necessarily implies that he's got some type of mental deficiency." *Id.* And she testified: "[W]e did everything that we thought could be done to be helpful for him." *Id.* at 65.

As previously noted, "[t]here are no 'strict rules' for counsel's conduct beyond 'the general requirement of reasonableness.'" *Trottie*, 720 F.3d at 242 (quoting *Pinholster*, 563 U.S. at 196). So there is no "per se rule that a particular type of mental health expert is required in death penalty cases." *Carter*, 443 F.3d at 526. The Court must assume that counsel's decision not to "present a particular line of argument or evidence" was a strategic choice, "defer to the state court's factual findings, and deny relief if there is *any* reasonable argument that counsel satisfied *Strickland's* deferential standard." *Trottie*, 720 F.3d at 243–44 (cleaned up).

Here, Keller's counsel testified that she "factored in" Dr. Smallwood's advice to obtain a mitigation study on psychological functioning, but she ultimately decided that it was unnecessary because her direct experience with him did not indicate that additional testing was needed. This implies that she made a strategic choice to forgo additional experts. The record supports her decision, in that the expert opinions presented in post-conviction would not have fit the mitigation case that Keller's trial counsel elected to present during the sentencing phase of trial.

Keller's trial counsel tried to portray him as a generally good person who made bad choices because of his drug problem. This theme was summarized in Keller's own mitigation testimony. *See* [22-6] at 133. On redirect, his attorney asked him if he tried to be "helpful with the officer" when he gave a confession statement. *Id.* Keller responded, "As much as I could, yes. . . . It was the right thing to do." *Id.* His testimony ended with the following exchange:

> Q.    Jason on drugs did bad things, right?
>
> A.    Yes.
>
> Q.    Jason off drugs how do you act?
>
> A.    Very good person.
>
> Q.    [The prosecutor] spent a lot of time trying to get you to agree that the fault was someone else's. Whose fault was this?
>
> A.    It was my fault.
>
> Q.    Okay. Anybody else's?
>
> A.    No, ma'am.

*Id.*

Keller's stance—when speaking for himself—has consistently been one of grief and contrition. As noted above, his attempted suicide-by-cop, confession statement testimony during the sentencing phase of trial, and comments to the trial judge in the post-conviction hearing show that he regrets the pain he has caused other people. So the Court concludes that Keller's trial counsel did not provide deficient representation by electing a mitigation strategy that emphasized his contrition and played to the strengths of his sentencing profile. It was a reasonable

decision considering the potential strength of such arguments in front of a Mississippi jury.

Even if it were deficient representation for Keller's trial counsel not to obtain psychological experts and develop evidence about his alleged neuropsychological issues, the error was harmless. It is unlikely that the added expert testimony would have altered the outcome of the sentencing phase of trial considering the evidence against him, particularly the evidence demonstrating the brutal and senseless nature of the crime. A mitigation case blaming the murder on alleged brain deficiencies outside the common knowledge and experience of the jurors could have prejudiced them, rather than elicited their sympathy—particularly if the experts implied that Keller could not refrain from murdering Nguyen, as Woods and Watson did. And the evidence would have been cumulative. The upshot of Woods and Watson's testimony was that Keller could not regulate his own actions. Smallwood testified at trial that Keller's chronic drug use had the same effect. *See* [22-6] at 144–45.

For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable. Its decision was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts.

B.  Ground 1b: Trial Court Error in Conducting Independent Research

Keller claims that the state post-conviction trial court violated his due process rights by conducting independent factual research, outside the hearing

record on his petition for post-conviction relief. [45] at 42–43. This claim is meritless, as "errors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief." *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999); *see also Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (collecting cases).

C.  Ground 2a: Trial Court Error in Excluding Keller from Proceedings

Keller argues that the trial court erred by not allowing his presence during various bench and chambers conferences, some of which were not recorded. [40] at 30. He claims that he was excluded from bench conferences during jury selection, including the voir dire of 11 jurors, one of whom eventually served on the jury. *Id.* at 30–31. He also claims that he was excluded from other conferences outside the presence of the jury, such as those which occurred at the bench or in chambers. *Id.* at 31. He contends that this violated his Sixth and Fourteenth Amendment rights and prejudiced his defense. *Id.* at 30.

The State responds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of established Supreme Court precedent. [49] at 62.

The Mississippi Supreme Court cited its own precedent that a "criminal defendant's right to be present at 'critical stages' does not include the right to be present during bench conferences and the conference on jury instructions, since those matters are purely legal and the criminal defendant can do little to aid his defense. It is sufficient that his counsel is present." *Keller I*, 138 So. 3d at 837

(quoting *Jordan v. State*, 786 So. 2d 987, 1022 (Miss. 2001)). It therefore held that this claim was meritless. *Id.*

      1.  Facts Relevant to this Claim

During jury selection, the trial court instructed the jurors:

> If you have an answer that you feel like you need to give and it is an answer that you are not comfortable giving out in front of everyone or that would embarrass you, a family member[,] or someone in our community[,] let me know that. You can come up to the bench and answer that question with just me and a couple of the lawyers instead of having to tell everybody in the room.

[22-4] at 29. It appears to be undisputed that the attorneys conducted some voir dire of 11 potential jurors at the bench according to this procedure. *See, e.g., id.* at 29–31, 34, 43, 53–56, 110, 124–31.

Of those 11, the defense exercised a peremptory strike on at least two of them, Mr. Majerus and Mr. Burke. [22-9] at 32–33. Majerus advised the court during a bench conference that "his stepfather . . . or maybe his father had physically abused his mother even before he was born," and he did "not think that would affect him one way or the other in this case." [22-4] at 54. Burke "advised that he had a brother who had been convicted of aggravated assault and felt that he could set that aside and it would not affect him one way or the other." *Id.*

One of the 11 jurors who participated in a bench conference, Mr. Kinard, answered many questions in open court before he asked for a bench conference. First, he sought leave to be excused because he had his own business and "a contract to perform certain work four nights a week," and he did not want to be sequestered. *Id.* at 8, 119. The court denied the request. [22-3] at 128. Kinard also

told the court that "[a]bout 15 years ago[,] some friends of [his] and [he] were assaulted by a couple of off-duty investigators" in California, but he assured the court that he could still be fair to both sides of the case. [22-4] at 33–34. Kinard later told the court that he was "a victim of an assault last year in Biloxi that involved some . . . of the Biloxi police officers . . . ." *Id.* at 51. He did not know if it was any of the officers involved in Keller's case, and he assured the court that it would not affect his deliberations. *Id.* at 52.

Kinard eventually asked for a bench conference and asked the court whether the jury would be given instructions "on how to reach [their] verdict" during a potential sentencing phase. *Id.* at 110–11. The court advised that they would be given "separate instructions . . . if [they] get to that portion of the case." *Id.* at 111. The prosecution eventually challenged Kinard for cause, arguing that he "would not be able to give it his full attention with the sequestration problem," and the defense had no objection. *Id.* at 127. Accordingly, the court struck Kinard for cause. *Id.*

The defense accepted one of the 11 jurors who participated in a bench conference, Ms. Sekul, and she eventually served as a juror. *Id.*; [22-5] at 54. At the bench conference, Sekul had advised the court "that both she and her husband had been accused of domestic violence on each other, but that it had never gone to court and she did not think that would affect her in any manner in being fair in this case." [22-4] at 54.

None of these bench conferences were recorded by the stenographer, and later —during a lunch break outside the presence of the jury—the court recited the

veniremen's answers on the record in Keller's presence. *Id.* at 53–56. Keller's counsel did not object to this procedure or to the court's descriptions of the veniremen's testimony during the bench conferences. *Id.* at 56. The trial court and attorneys later reconstructed part of the jury selection process that had not been transcribed, and the court acknowledged, "My notes are very messy, and I take them while I'm talking . . . ." [22-9] at 19. Keller's counsel did not substantively dispute the trial court's recollection of the events described here.

On top of the bench conferences during jury selection, there were many bench and chambers conferences to argue objections and to discuss other evidentiary, scheduling, and procedural issues throughout the trial. *See, e.g.,* [22-5] at 59–63, 137; [22-6] at 18, 58, 73–74, 144; [22-7] at 11, 45, 73–74. Of these, the record reflects that Keller was not present for an exchange about marking the State's exhibits for identification and which ones would be subject to defense objections. [22-5] at 59–63. No objections were argued, or substantive decisions made, and the trial court explained to Keller what had occurred in his absence. *Id.* The record does not indicate whether Keller was present during the rest of the evidentiary/procedural discussions in chambers or at the bench.

2.   Discussion

"The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment," but it is also "protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526

(1985) (per curiam). "[A] criminal defendant has a due-process right to be present at a proceeding only where his presence might affect his opportunity to defend against the charge or thwart the possibility of a fair and just hearing." *United States v. Sanders*, 952 F.3d 263, 283 (5th Cir. 2020) (cleaned up); *see also Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934).

"[T]he impaneling of the jury is one such stage" because "it is a stage at which the defendant can provide meaningful assistance to counsel." *United States v. Thomas*, 724 F.3d 632, 642 (5th Cir. 2013) (cleaned up). The Fifth Circuit has therefore recognized two requirements arising from a defendant's right to presence during jury selection: "(1) The defendant must be present for the substantial majority of the jury-selection process; and (2) the defendant must be present in the courtroom at the moment when the court gives the exercise of peremptory challenges formal effect by reading into the record the list of jurors who were not struck." *Id.* at 643 (cleaned up). "[I]f a defendant is given an opportunity to register his opinions with counsel after juror questioning and is present when the exercise of strikes is given formal effect, then his constitutional right to be present is satisfied." *Id.* (cleaned up). But "if a defendant is not present during the reading of the list of jurors not struck (the moment the strikes are given 'formal effect') then the absence is in derogation of his constitutional right to be present." *Id.*

The Constitution, however, does not "assure[ ] the privilege of presence when presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 106–07. "Thus, a defendant is guaranteed the right to be present at any stage of the

criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see also Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam) (holding that violations of right to presence may be subject to harmless-error analysis).

Keller argues that his exclusion from the phases of trial referenced above prejudiced his defense. He primarily argues that he was prejudiced by his exclusion from the bench conferences during voir dire. [45] at 55–60. He contends that the trial court denied him the opportunity to observe the veniremen's "facial expressions, demeanors, tone of voice[,] and other subliminal responses," *id.* at 56, depriving "him of crucial information relevant to" jury selection. *Id.* at 57. He argues that being deprived of this opportunity is inherently prejudicial. *Id.*

But Keller was only entitled to be present at critical stages of his trial "if his presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 745. In other words, if his absence did not "thwart the possibility of a fair and just hearing," he had no right to be there. *Sanders*, 952 F.3d at 283 (cleaned up). Likewise, if there was nothing Keller could have contributed to his own defense during a particular stage of the proceedings, he had no right to be present. *Gagnon*, 470 U.S. at 527. Accordingly, Keller had no right to be present during any bench or chambers conferences regarding evidentiary, scheduling, or procedural matters. There is nothing that he could have contributed to his own defense in such discussions, and he has not attempted to demonstrate such. *See Thomas*, 724 F.3d

at 644 (noting that defendant was unlikely to provide meaningful assistance to counsel in chambers discussion involving a question of law).

As for jury selection, Keller has not shown that the outcome of his trial would have been different if he had been present for the bench conferences during jury selection. Of the 11 jurors who were questioned at the bench, he has not shown that the ones who did not serve would have been more favorable to his defense than the seated jurors. *See Luna v. Davis*, 793 F. App'x 229, 234–35 (5th Cir. 2019) (per curiam) (explaining that any error in excluding defendant from voir dire was harmless because he had not shown that an excused veniremen was more favorable to his defense than those who sat on the jury). And he has not shown that other veniremen would have been more favorable to his defense than the one seated juror who was questioned at the bench. *Id.*

Even if Keller had shown that a change in the jury would have altered the outcome of his case, he has not shown that his presence during the bench conferences would have altered the jury makeup. *Id.*; *Thomas*, 724 F.3d at 646 (finding no due process violation where defendant failed to show that her presence would have resulted in a more favorable jury or altered the outcome of the trial). Finally, Keller has not shown or argued that he was excluded from most of the jury selection process, and he does not deny that he was present during the final seating of the jurors—the moment that peremptory strikes were given formal effect. *Thomas*, 724 F.3d at 643. Indeed, the trial court recited the answers that the

73

veniremen gave during the bench conferences on the record in Keller's presence. [22-4] at 53–56.

For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable. It was not contrary to or an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of facts.

### D. Ground 2b: Ineffective Assistance of Trial Counsel in Not Objecting to Keller's Absence from Proceedings

Keller also claims that his trial counsel provided ineffective assistance by not objecting to his exclusion from the bench and chambers conferences just discussed. The State responds that Keller cannot prove that his absence from bench and chambers conferences was attributable to his counsel, and that his absence from the bench and chambers conferences did not prejudice the defense.

Keller exhausted this claim by presenting it to the Mississippi Supreme Court on direct appeal, [22-20] at 38–39, but the Mississippi Supreme Court did not address it. *See Keller I*, 138 So. 3d at 877. So this Court reviews the claim de novo. *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003).

As noted above, to demonstrate ineffective assistance of counsel, Keller must "show both that counsel rendered deficient performance and that counsel's actions resulted in actual prejudice." *Rhoades*, 852 F.3d 431. To prove prejudice, he must show "a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id.* at 432. In the context of a habeas case, the Court's review is "doubly deferential because counsel is strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Russell*, 68 F.4th at 272 (cleaned up). "[I]f there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard, the state court's denial" of the claim "must be upheld." *Rhoades*, 852 F.3d at 432 (cleaned up).

First, counsel's failure to object to Keller's exclusion from chambers and bench conferences discussing evidentiary, scheduling, procedural, and other legal issues was not deficient performance because, as discussed above, Keller had no right to be present during those stages of trial; he could not have contributed anything to his own defense. *Thomas*, 724 F.3d at 644. And counsel's failure to object to Keller's absence from those stages of trial did not result in actual prejudice because (1) Keller has not shown that the trial court would have sustained any objection, and (2) even if the trial court had permitted Keller to be present, he could not have contributed anything to his own defense there.

As for jury selection, the Court finds that Keller has not shown that he was prejudiced by his attorney's failure to object to his exclusion from bench conferences when jurors were questioned. Keller has not shown that the trial court would have sustained any objection, and he has not shown that his presence at the bench conferences would have made any difference in the outcome of his trial. Finally, Keller was present for much of the jury selection process, and he was present at the moment the peremptory strikes were given formal effect, during the final seating of the jurors. *Id.* at 643. For these reasons, the Court finds that this claim is meritless.

E.  Ground 3: Trial Court Error in Limiting Voir Dire

Keller claims that the trial court erred by limiting his voir dire on the venire's ability to deliberate during the sentencing phase of trial. The State responds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

1.  Relevant Facts

During voir dire, defense counsel questioned the jury about their ability to deliberate in the two phases of trial:

| | |
|---|---|
| MR. RISHEL: | . . . Ladies and gentlemen, this is a two-part trial. . . . [I]f you should render a verdict of guilty in this case then we would go and move onto the punishment part. And . . . you then will be instructed by the Court to decide whether the defendant should be punished by sentencing him to death or sentencing him to life without possibility of parole. And . . . a sentence of life imprisonment without parole means you die in prison. It doesn't mean you get out in 10 years from now. There's no parole, there's no early release, you die in prison. . . . You will be required . . . individually, each of you individually, will be required to decide whether this defendant is so far beyond redemption that he should be killed. |
| MR. LUSK: | Objection to that, Your Honor. |
| THE COURT: | Sustained. |
| MR. RISHEL: | Let's think about it this way, okay. . . . [T]his decision will not be made by somebody up there. The judge won't make that decision. No other appeal court is going to make this decision. |
| MR. LUSK: | Object to that, Your Honor. |

THE COURT:        Sustained. Mr. Rishel, Mr. Lusk.

[22-4] at 108–09. The court then held a bench conference with the attorneys off the record. *Id.* at 109. After the conference, defense counsel continued: "In any case that is the real decision that you will be required to make, and you must make this decision individually. It takes, and [the] court will instruct you, that it takes 12 of you to impose either sentence." *Id.*

Later, defense counsel continued to explore this topic: "You also should be clear on the fact that you are not required to leave your personal opinions, your convictions and your good common sense outside. You bring all of that with you. You bring your life's experiences with you." *Id.* at 111. He continued:

> You know when you're asked to do something tough you ought to know where you are, you ought to know what the consequences are and what you're looking at, what you have got to do. Essentially what you are being asked to do is to make a decision about whether somebody lives or dies if the State proves its case beyond a reasonable doubt. You have a right to know that that's what is going to be asked of you. The State of Mississippi is going to ask you to make that decision. And I think I should tell you that because I would want to know that if I had to make that decision. . . . I want to emphasize to you that this is a decision that you will make individually. Why do I say that? Because . . . when you go back into the jury room to decide whether or not a person should be sentenced to life without parole or death, one person says it's life without and refuses to change his mind[,] then it is life without because there is something else that you need to know. There are three choices that you have when you go back into jury room[:] death, life without[,] and we can't make up our minds. When you say we can't make up our minds the judge is required under the law to give the defendant life without.

*Id.* at 112–13. The State objected to this line of questioning, and the trial court held another bench conference with the attorneys off the record. *Id.* at 113. The trial

court sustained the objection and instructed the venire: "The jurors are to disregard the question and disregard the contents of the question." *Id.*

> Defense counsel returned to the topic later:

> [Y]ou are not required by the law to return a death penalty sentence no matter how many aggravating factors there are. Does everyone understand that? Does anyone disagree with that, think that that's wrong? Does anyone here believe that you cannot vote for life without parole for whatever reason that you may choose to vote for it? Does anyone believe that you are confined, you must vote for death if the defendant is found guilty? . . .

> Do each of you tell me that you will go back to the jury room, you will debate this matter, and that you will have respect for each other's views? . . . [T]hat you will question the other person's views if they happen to be different from yours, and that once you have heard what they have to say and considered it and discussed it that you will then respect that person having that view? Is that right? Do any of you believe that you must reach a verdict when you go back and decide what the sentence will be? That you must decide one way or the other. That all 12 of you must decide that way. Do any of you believe that to be true?

*Id.* at 116–17. The State again objected, and the court again sustained the objection. *Id.* at 117. The defense asked to approach, and the court held another bench conference with the attorneys off the record. *Id.* After the bench conference, defense counsel rephrased the question:

> Ladies and gentlemen, you understand that you are not required by the law to go back into the jury room after you've reached a verdict and you're deciding on a sentence, you're back there to decide life or death, that you are not required to reach a verdict of death. Do you understand that? Does everyone understand that? That's the point that I was trying to make.

*Id.* at 118.

After the venire was excused that evening, the court and attorneys made a record of what was said during the bench conferences:

MR. LUSK:          Judge, I don't know if . . . when Mr. Rishel and I approached during the voir dire if you need to put that on the record.

THE COURT:        I think that's up to you guys. . . . Mr. Rishel, is there any record that you want to make on any of the objections or during any of the voir dire?

MR. RISHEL:       Yes, ma'am. Several objections were raised by the State regarding some of the questions that I was asking, and for the record we would like to take exception. They made the objection, . . . and the Court . . . sustained their objections, and we would like the record to show . . . that I . . . attempted to explain the law—explain to the jury what I thought they needed to know in order to make decisions regarding their answers on voir dire. And because the State objected and the Court sustained those objections that we think that it is proper and fitting that the jury be instructed . . . during the punishment phase, that is, that the jury can decide for the death penalty, they can decide for life without parole or they can, in fact, just simply not agree, and if they don't agree that then the Court is bound by law to impose the life without parole sentence on the defendant. . . . [I]t is our opinion that the jury should be aware of that fact and that that would weigh on their ability to answer questions during voir dire as to whether or not they could be fair and impartial in their decision-making during that part of the trial. We were not allowed to do that. And . . . while we understand that there is an instruction that will be given . . . before the jury goes out to make the decision regarding punishment . . . it is now that we select the jury and that . . . the jury needs to know those things, and . . . there is nothing in the court's instruction that was read to the jury that would let them know that there is a third option, and that . . . to reach a decision . . . that they will not agree is, in fact, accomplishing their purpose for being here. To decide that they will disagree and place it back into the court's hands for sentencing is fulfilling their duty as jurors.

THE COURT:    Mr. Rishel, explain to me exactly because you didn't argue this at the bench. All you argued at the bench was that you wanted the jury to understand that they did not have to impose the death penalty.

MR. RISHEL:    Yes, ma'am.

THE COURT:    So now you're saying that there is a third option. Explain to me how knowing that if they fail to reach a verdict that the Court will sentence, how does that impact on their ability to be fair and to be jurors and participate in this case?

MR. RISHEL:    Because, Your Honor, I think when a person is asked to do something as important as this that they . . . should be advised of all the consequences of whatever actions that they may take including the action of not reaching a verdict. The jury, in my opinion, should not be put in a position where they think that they are required by law. That they have no choice, they must reach a decision, they must reach a verdict, and that's just not true. They don't have to reach a verdict. If they go in there and sit down as . . . individual jurors and say . . . this is what I think should be done in regards punishment.

THE COURT:    Mr. Rishel, is this not closing argument? Is this not something that you would argue during jury instructions and for closing arguments because otherwise we would be voir diring and saying, and by the way we can also hang up and we can try this thing on another day.

MR. RISHEL:    That's not what I was referring to as far as the verdict is concerned, Judge. I'm talking about only punishment, only punishments. I wasn't at all referring to the verdict.

THE COURT:    That's why I'm trying to follow you on this, Mr. Rishel, since it wasn't in the earlier argument with regard to how that impacts on their ability to be jurors. I fully agree with you that it is something that you can cover in closing if you get to the sentencing phase. And I fully agree with you that it's

going to be in the jury instructions. I'm just not sure how it impacts on the jury selection process. If you can explain that to me or give me a case that says that all is not lost because those jurors will all be coming back in the morning if those questions still truly need to be asked. At this point I'm not aware of a case that says, first of all, that that is permissible in voir dire. And secondly, I'm just not seeing    how that impacts on their ability to be fair and impartial knowing that they could hang up either on the guilt phase or the sentencing phase. You're talking about sentencing.

MR. RISHEL:      . . . I would never argue in voir dire or make a statement in voir dire that they can hang up on the guilt phase.

THE COURT:      I don't think you would. I'm just using that as an example because I'm just having trouble figuring out . . . where you're going with your argument . . . . I don't understand how that impacts on whether they are fair and impartial jurors. I will give you that opportunity. . . . [I]f you can find me something that says that's permissible I will be more than happy to let you reopen and ask that in the morning. If the State has some follow-up or thinks that it's improper they can also give me a case on that.

MR. RISHEL:      Your Honor, I don't intend to take it any further other than to make a record. I think that a lot of this stuff is kind of new and the Supreme Court may have not ever considered this. I don't know of any case where they talked about voir dire as far as these sort of questions. It just seems to me that if you are a juror you should know as much as you possibly can before you're asked questions about whether or not you would impose the death penalty. And . . . it may change your mind if you knew that I can go into the jury room and decide that this person should live and all that I have to do is stick to my guns and that person will, in fact, live. I think that would affect how you might answer questions on voir dire.

THE COURT:    I think, Mr. Rishel, you did point that out to them and very ably. Also for the purposes of the record Mr. Rishel did go into some questions about—and I don't remember exactly how he phrased them, but in terms of you will be the ones making the decision, not the judge, not an appeals court. The State did object to that and I think Mr. Rishel had already asked and received answers on that at that point in time, but I did let him go forward because I did think it was fair game for him to make sure the jury understood they will be the ones who will be making this decision. So that objection was overruled.

[22-5] at 13–19.

The trial court's preliminary instructions to the venire included a general overview of how the trial would be conducted in two stages, if necessary. [22-2] at 10–13. After the close of evidence during the guilt phase of trial, the trial court instructed the jury that they were expected to use their own "good common sense and sound honest judgment in considering and weighing the testimony of each witness who ha[d] testified," drawing from their own experience. *Id.* at 15. It also instructed them that it was their "duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to your individual judgment." *Id.* at 17. It said: "In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest convictions . . . solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." *Id.* The sentencing instructions at the end of the trial specifically instructed the jury that they had three options: (1) unanimous agreement that the sentence should be death; (2) unanimous agreement that the sentence should be life imprisonment

82

without parole; and (3) in the event that they could not "unanimously agree on the sentence, the Judge will sentence the Defendant to life imprisonment without parole . . . ." *Id.* at 64–65.

  2.  Analysis

Keller made a general argument related to this claim and several sub-arguments. He generally argues that his counsel's line of questioning on this topic was "appropriate voir dire concerning each juror's ability to follow clearly established black-letter Mississippi law regarding the process of sentencing as to which the jury was going to be instructed . . . ," and that the trial court erred in disallowing it. [45] at 67–68. He contends that the Eighth Amendment requires jurors to (1) make "*individual* reasoned moral response[s] to sentencing phase evidence," and (2) understand and comply with the statutory method Mississippi law has implemented for doing so. *Id.* at 71–72. According to Keller, the trial court "thwarted all attempts by the defense to conduct voir dire necessary to delve into these matters." *Id.* at 72.

Keller presented this claim to the Mississippi Supreme Court on appeal, and it held:

> Given the considerable discretion the trial judge has in voir dire, where the voir dire proceedings as a whole indicate Keller was able to inquire as to the venire's opinions on the death penalty, and the court informed the jury that it had a duty to make decisions about Keller's fate on an individual basis, and that the death penalty was not required, there is no error in the judge refusing a line of questioning (which actually reads more like jury instructions) that is a misstatement of the law or that the trial court believed would confuse jurors.

*Keller I*, 138 So. 3d at 844–45. The Mississippi Supreme Court also noted that the trial court had instructed the jury that it would impose a sentence of life without parole if they could not agree on a sentence. *Id.* at 845. Therefore, it found no error in the trial court's decision to disallow this line of questioning. *Id.*

In reviewing claims arising from a trial court's limitations on voir dire, the Court's ability to grant relief is "limited, of course, to such limitations that rise to the level of a constitutional violation." *Soria v. Johnson*, 207 F.3d 232, 241 (5th Cir. 2000). The Constitution "does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). This does not mean that trial courts must permit defense counsel to ask the venire every question that "might be helpful." *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991). Rather, "[t]rial judges are afforded much latitude in determining how voir dire should be conducted." *Soria*, 207 F.3d at 241. They have discretion "as to the form and number of questions" on a subject, "including the decision whether to question the venire individually or collectively." *Turner v. Murray*, 476 U.S. 28, 37 (1986). A trial court's limitation on voir dire only raises constitutional concerns if it "render[s] the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 426.

"Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Id.* at 431. As the Fifth Circuit has described it, the purpose of voir dire is to

"discern[ ] bias or prejudice in prospective jurors." *United States v. Fambro*, 526 F.3d 836, 848 (5th Cir. 2008) (cleaned up). In other words, the main purpose of voir dire is to gather the information necessary to seat an impartial jury, not to provide information to the venire in the form of instructions or argument. *See, e.g.*, *United States v. Walters*, No. 2:19-CR-51, 2020 WL 1881352, at *2 (S.D. Miss. Apr. 15, 2020). It is unclear what specific information Keller's counsel wanted to gather from the venire. In fact, his attorney plainly stated that he just wanted the jury to know that the court would impose a sentence of life without parole if they hung because it might affect their answers to other questions. [22-5] at 14–15.

In any event, Keller has not shown that providing this information to the venire was necessary to seat an impartial jury—much less that clearly established federal law required the trial court to do so. To be clear, habeas relief is available only if the Mississippi Supreme Court's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). In this context, "clearly established Federal law" is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision," *Poree*, 866 F.3d at 246 (cleaned up), and "includes only the holdings, as opposed to the dicta, of [the] Court's decisions." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (cleaned up). None of the cases Keller cited require trial courts to permit voir dire of this sort. So the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Keller also contends that the trial court's instruction to disregard the question during voir dire nullified the trial court's instruction at the end of the sentencing phase of trial. [45] at 68. Accordingly, Keller claims that the trial court impeded the jury's ability to properly consider the matters consigned to it, violating the Sixth and Fourteenth Amendments. *Id.* First, the Court disagrees with the premise that the trial court's instruction to disregard the attorney's question "nullified" its later instruction. If anything, the trial court ultimately provided the jury with the precise information that the defense wanted them to have. Still, if Keller's complaint is that he was prevented from conducting an adequate voir dire, then he has not shown how the alleged nullification of a sentencing instruction provided at the end of trial prevented him from doing so. Second, *Groppi v. Wisconsin*, 400 U.S. 505 (1971), cited in support of this sub-argument, is wholly inapplicable here. In *Groppi*, the Supreme Court held that a state law categorically forbidding a change of venue for a jury trial in a misdemeanor case violated the Fourteenth Amendment's guarantee of a trial by an impartial jury. *Id.* at 511.

Keller also argues that the trial court violated the Eighth Amendment by affirmatively misleading the jury regarding its role in the sentencing process and preventing his attorney from exploring the jurors' ability to fulfill their duties, citing *Romano v. Oklahoma*, 512 U.S. 1 (1994). [45] at 68. This is simply not so. No fairminded jurist, upon reading Keller's trial transcript, would conclude that the trial court "affirmatively misled" the jury. *Id.* at 1. Indeed, the trial court ultimately gave the jury the precise instruction that Keller's counsel thought they should be

given. [22-2] at 65. In any case, *Romano* did not address voir dire. There, the Supreme Court held that the admission of evidence on a capital defendant's prior death sentence did not impermissibly undermine the sentencing jury's sense of responsibility and thus violate the Constitution. *Romano*, 512 U.S. at 9–10.

Keller also claims that the trial court "directed" his counsel to "question the jury about this only in a manner that was affirmatively misleading regarding its role in the process and the permissible outcomes its deliberations could reach under" Mississippi law. [45] at 68–69. This is not supported by the record.[17] After an off-the-record bench conference, Keller's counsel told the jury: "[T]hat is the real decision that you will be required to make, and you must make this decision individually. *It takes, and* [*the*] *court will instruct you, that it takes 12 of you to impose either sentence*." [22-4] at 109 (emphasis added). Keller objects to the second sentence, arguing that it is an inaccurate statement of Mississippi law, but he has not pointed to any evidence that the trial court directed his counsel to say it. Indeed, the record contains no such evidence.

In summary, Keller contends that the Constitution requires jurors to (1) make "*individual* reasoned moral response[s] to sentencing phase evidence" and (2) understand and comply with the statutory method Mississippi law has implemented

---

[17] Keller also separately argues that the trial court's "reconstruction" of what happened during the bench conferences was incorrect, but it is unclear to this habeas Court how he contends the trial court misstated what had occurred. *See* [45] at 72. No record evidence suggests that the trial court's representations of what occurred during the bench conferences were incorrect. In fact, Keller's trial counsel did not object to the trial court's characterization of the bench conferences, and the trial court noted that Keller's counsel had made a different argument off the record than he did later outside the presence of the jury. [22-5] at 15.

for doing so. [45] at 71–72. Nothing in the record suggests that the trial court's actions thwarted those goals. Indeed, the trial court specifically instructed the jurors as to their individual responsibility to weigh the evidence and hold to their own honest convictions, and it accurately instructed them as to the sentencing options under Mississippi law. [22-2] at 17, 65. Keller has not directed the Court to any clearly established federal law requiring more. And he has not set forth any rational explanation for why it was necessary for his counsel to effectively provide an instruction during voir dire to achieve these goals. For these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of fact.

F.  Ground 4: Trial Court Error in Excluding Prospective Jurors

Keller argues that the trial court erroneously excluded two members of the venire—Mr. Ellis and Ms. Cherry—from consideration as potential jurors because they had moral or religious scruples against the death penalty. [40] at 45–47. He contends that this violated his constitutional rights as established by *Witherspoon v. Illinois*, 391 U.S. 510 (1968). There, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522. Keller contends that the two veniremen in question gave

"ambiguous answers suggesting they would lean toward life without parole, but neither would rule out the death penalty." [45] at 77.

The State responds that this claim is procedurally barred. [49] at 68. Alternatively, the State argues that the Mississippi Supreme Court reasonably determined that the record supported the trial court's determination that the prospective jurors' views on the death penalty would prevent them from carrying out their duties as jurors. *Id.* at 69.

     1.  Procedural Bar

When addressing this claim, the Mississippi Supreme Court first summarized Keller's argument and stated that his desired remedy was a new trial. *Keller I*, 138 So. 3d at 845. Then it said:

> To the contrary, the State argues that Keller did not argue before the trial court that *Witherspoon* had been violated; thus, he is procedurally barred from making the argument on direct appeal. Out of an abundance of caution, and because the defense objected to the removal of Jurors E and C from the venire, we will address the issue notwithstanding any procedural bar that may apply.

*Id.* (citations omitted). The Mississippi Supreme Court then addressed the merits of the claim. *Id.* at 845–46.

The State argues that the state court thus held that the claim was procedurally barred for failure to contemporaneously object, and that its merits analysis was an alternative ruling. [49] at 68. Keller contends that the state court's opinion was ambiguous, at best, and the Court is not barred from reviewing the claim under Section 2254(d). [53] at 22. The Court agrees with Keller.

A federal habeas claim is procedurally barred where "the last state court to review the petitioner's claims *unambiguously* based its denial on a state procedural bar." *Mullis*, 47 F.4th at 387–88 (emphasis added) (cleaned up). "A state court must be explicit in its reliance on . . . a procedural default" to preclude federal habeas review. *Winfield v. Cain*, No. 99-30834, 2001 WL 85816, at *2 (5th Cir. Jan. 15, 2001) (unpublished table decision) (per curiam). Here, the Mississippi Supreme Court did not explicitly state that it was relying on a procedural bar. Rather, it described the State's argument, and it said it would address the merits of the claim out of an abundance of caution because Keller had, in fact, objected to the trial court's exclusion of the jurors.

    2.  Relevant Facts

During jury selection, the trial court asked the jurors the following question: "Is there anybody who, if you believed that the State has met their burden of proof and you've found the defendant guilty of capital murder, anyone that would automatically impose the death penalty simply because the defendant has been found guilty of that charge?" [22-4] at 35. After questioning a few jurors, the trial court asked, "Is there anyone who for any reason would just automatically give life without parole? In other words, no matter what the proof is, no matter what the instructions are if this person is found guilty of capital murder you would automatically impose the sentence of life without parole?" *Id.* at 37. Venireman number 13, Ms. Cherry, responded:

MS. CHERRY:    I don't think I could give the death penalty.

| | |
|---|---|
| THE COURT: | Well, are you telling me that you would never give it under any facts or any circumstances? |
| MS. CHERRY: | It would be very hard. |
| THE COURT: | Well, I understand that, ma'am. And . . . it's always very difficult for anyone to impose any sentence . . . on anyone. But let me ask you this. If the facts, the evidence, and the instructions led you to believe that the death penalty was a proper penalty in a case would [you] be able to vote for that? |
| MS. CHERRY: | I really doubt it. |

*Id.* at 38. Later, the attorneys conducted their own voir dire of Ms. Cherry:

| | |
|---|---|
| MR. LUSK: | I believe that you stated during one of the answers that you gave that you did not think that you could give the death penalty and that you doubt that you could give the death penalty, is that correct? |
| MS. CHERRY: | I think so. |
| MR. LUSK: | You think so? |
| MS. CHERRY: | I'm sure. |
| MR. LUSK: | You're sure? |
| MS. CHERRY: | I just couldn't do that. |
| MR. LUSK: | You could not give the death penalty under any circumstances? |
| MS. CHERRY: | I don't think so. |
| MR. LUSK: | Okay. Well, now we're back to I don't think so. |
| MS. CHERRY: | It would be very, very difficult for me to do that. |
| MR. LUSK: | Okay. And with the difficulty that you are having here would you feel uncomfortable sitting on the jury and having to make that decision. |

| MS. CHERRY: | Yes. |
|---|---|
| MR. LUSK: | Is there any circumstance where you believe that you would give the death penalty? |
| MS. CHERRY: | I just really can't think of one. |
| | .            .            . |
| MR. RISHEL: | Are you telling the Court that you would not consider the death penalty? |
| MS. CHERRY: | Well, I guess I would have to consider it if I were on the jury, but I just don't believe that I could vote for it. |
| MR. RISHEL: | But you would consider it? You would talk to the other jurors about it? |
| MS. CHERRY: | Well, I would certainly have to listen to what they had to say and make my comments. |

[22-5] at 2–3.

Based on these answers, the State challenged Ms. Cherry for cause. *Id.* at 9. The court asked the defense if there was any objection, and Keller's attorney answered: "I think she said it would be very hard, very, very difficult, so she probably should be struck for cause also." *Id.* Accordingly, the trial court struck Ms. Cherry for cause. *Id.* at 10.

One of the prosecutors, Mr. Lusk, later asked the venire, "Do any of you have any strong personal feelings or any moral, religious or conscientious scruples against the imposition of the death penalty? . . . Anybody have any beliefs whatsoever against the imposition of the death penalty?" [22-4] at 93–94. Veniremen number 56, Mr. Ellis, answered: "Due to my religious belief it would be

difficult . . . , but I don't feel that it would keep me from making a fair judgment."

*Id.* at 95. The attorneys later conducted individual, sequestered voir dire of Mr. Ellis:

| | |
|---|---|
| MR. LUSK: | Mr. Ellis, yesterday you, I believe it was during my questioning, you had raised some indication that you do not feel that you could vote for the death penalty, is that correct? |
| MR. ELLIS: | That's correct. |
| MR. LUSK: | Could you visualize any circumstances under any fact pattern where you would consider the death penalty? |
| MR. ELLIS: | I can't say—well, due to my Catholic beliefs and everything that the Catholic church teaches there is no shadow of a doubt it's against the death penalty, and my beliefs are very strong. |
| MR. LUSK: | So, you're opposed to the death penalty based on your religious beliefs? |
| MR. ELLIS: | Correct. |
| MR. LUSK: | And that is your belief, correct? |
| MR. ELLIS: | Correct. |
| MR. LUSK: | Is there—the Catholic church—see, I apologize, I'm not Catholic. The whole church opposes the death penalty? |
| MR. ELLIS: | Correct. |
| MR. LUSK: | So, you're just following along with the church's guidelines? |
| MR. ELLIS: | As a member of the Catholic church, right. |
| MR. LUSK: | So, these are your own thoughts in accordance with your Catholic upbringing? |

MR. ELLIS:      That's correct.

MR. LUSK:       And you do not believe under any circumstances that you would impose the death penalty?

MR. ELLIS:      As a member of the Catholic church we—it's not something that we do to question the teaching of our church.

MR. LUSK:       So, you would not feel comfortable?

MR. ELLIS:      I would not.

MR. LUSK:       You would—would you not be able to get back there and deliberate with the other jurors?

MR. ELLIS:      No, I believe that I could. You know, I wouldn't want to impose my beliefs on them, you know, but I would definitely be able to deliberate. It's not to say that I would be swayed by them either.

MR. LUSK:       But you would deliberate, but you would not vote in favor of the death penalty?

MR. ELLIS:      I don't believe that I would.

.     .     .

MR. RISHEL:     You say that you don't believe you would. Is there—are you saying that there are possibly circumstances where you might—

.     .     .

MR. ELLIS:      I would lie to you if I didn't say when I saw some type of crime committed that . . . my human nature that there is some type of gratification that you want to see somebody punished, . . . but in talking to one of my closest friends of mine who's a priest he said that when you sentence somebody to life imprison[ment] they will suffer much more spending the rest of their life in prison than they will in a cemetery.

| | |
|---|---|
| MR. RISHEL: | Okay. So, you're saying that you're not excluding the possibility of voting for the death penalty, are you? |
| MR. ELLIS: | I have never been put in this position before, therefore, I can't really say—I mean, based on my upbringing and based on my Catholic faith it's 99.9 percent chance I don't believe that I could do it. |
| MR. RISHEL: | Because of your faith and upbringing you believe that you are leaning towards life without? |
| MR. ELLIS: | Yes. |
| MR. RISHEL: | Okay. But that doesn't mean that you have totally exclude[d] the possibility of the death penalty, have you? |
| MR. ELLIS: | Correct. |
| MR. RISHEL: | That's all. |
| MR. LUSK: | But you've excluded it to a degree of 99.9 percent? |
| MR. ELLIS: | I think so at this point, yes. |

[22-5] at 25–29.

Based on this testimony, the State challenged Ellis for cause. *Id.* at 48. The defense objected: "We don't think there is good cause for striking him. . . . I think he said that it would be difficult for him, and he would have a hard time doing it. That's the impression that I got, but he didn't say that he would outright exclude it." *Id.* The trial court observed that "Mr. Ellis advised that he 99.9 percent would not give the death penalty and that he would lean toward life automatically." *Id.* at 48–49. Therefore, the trial court granted the State's challenge of Mr. Ellis "because they have to have an open mind to vote alternatives if they get to a sentencing phase, and he has made it pretty clear that he does not." *Id.* at 49.

95

3.  Analysis

In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. The Supreme Court later clarified this rule, holding that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 420 (cleaned up); *see also id.* at 424.

The *Wainwright* standard "does not require that a juror's bias be proved with 'unmistakable clarity,'" as "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* at 424. "[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Id.* at 424–25.

Despite the "lack of clarity" in a bare transcript, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425–26. Therefore, "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426. "[W]hen there is ambiguity in the prospective juror's statements, the

96

trial court, aided as it undoubtedly is by its assessment of the veniremen's demeanor, is entitled to resolve it in favor of the State." *Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (cleaned up). Accordingly, the Fifth Circuit has "repeatedly . . . deemed proper a lower court's dismissal for cause of a prospective juror who has wavered or given conflicting or ambiguous signals as to whether he or she could sentence a defendant to death." *United States v. Snarr*, 704 F.3d 368, 379 (5th Cir. 2013) (collecting cases).

Despite these clear precedents holding that a trial court has the latitude to exclude a prospective juror for cause when they give conflicting or ambiguous answers on whether they could follow the court's instructions regarding imposition of the death penalty, Keller argues that *Gray v. Mississippi*, 481 U.S. 648 (1987), provides that ambiguous answers during voir dire cannot justify striking a veniremen for cause.

In *Gray*, the Mississippi Supreme Court had held that the trial court erred in a capital case by excluding a veniremen for cause, but that the error was harmless. *Id.* at 656–57. The Supreme Court took the case to address "whether the improper excusal of a juror for cause can be harmless." *Id.* at 657. In doing so, it set out the general rule established by *Witherspoon* and *Wainwright*, *id.* at 658, and it observed that "[e]very Justice of the Mississippi Supreme Court expressly stated that" the disputed veniremen "was clearly qualified to be seated as a juror" under the applicable criteria. *Id.* at 659 (cleaned up). The Supreme Court said, "We agree," *id.*, and it then held that harmless-error analysis does not apply to *Witherspoon*

97

violations. *Id.* at 668. It did not expand on the veniremen's qualification to serve on the jury.

*Gray* does not provide, as Keller argues, that "[g]iving ambiguous answers . . . is insufficient to constitute cause to strike a juror under *Witherspoon*." [45] at 76. Rather, *Gray* provides that harmless-error analysis does not apply to *Witherspoon* violations, and it does not otherwise address juror qualification in capital cases. Even so, a subsequent Supreme Court decision explicitly provides, as cited above, that "when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7 (cleaned up).

The Mississippi Supreme Court addressed the merits of this claim on direct appeal. *Keller I*, 138 So. 3d at 845. First, it recited the applicable law. *Id.* (citing *Wainwright*, 469 U.S. at 424). Then, it recited specific answers that the disputed jurors had provided during voir dire. *Id.* at 845–46. Finally, it concluded that "the trial court had ample bases for excluding these venire members given their responses to questioning as to whether their personal beliefs regarding capital punishment would prevent or substantially impair them from carrying out their duties as jurors. The issue is without merit." *Id.* at 846.

Despite Ms. Cherry's affirmation that she would consider the death penalty if put on the jury, she plainly stated that she did not think she could give the death penalty under any circumstances. [22-5] at 2–3. And, despite Mr. Ellis's assurance that he could deliberate with the other jurors, he plainly stated that he was 99.9%

certain that he would not impose the death penalty. *Id.* at 27–28. These answers were arguably not even ambiguous. Rather, one could reasonably conclude that Mr. Ellis and Ms. Cherry held views that "would prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath." *Wainwright*, 469 U.S. at 424 (cleaned up). But even if the answers were ambiguous, as Keller argues, the trial court was in the best position to judge the issue, having observed and listened to the veniremen in person. *Uttecht*, 551 U.S. at 7. Accordingly, the Mississippi Supreme Court appropriately deferred to the trial court's judgment. *Wainwright*, 469 U.S. at 426. For these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable.

G.  Ground 5a: Trial Court Error in Striking a Prospective Juror for Cause

Keller argues that the trial court erred by striking venireman Mr. Bell for cause because he had moral or religious scruples against the death penalty. [45] at 74 n.13, 80. As in the previous claim, he contends that this violated his constitutional rights as established by *Witherspoon* because Mr. Bell clearly stated that he would not "automatically rule out the death penalty," and that he could "deliberate with the jurors and come to a conclusion depending on the evidence." *Id.* at 80 (cleaned up). Keller also argues that the Mississippi Supreme Court did not address the merits of this claim, and so this Court's review is de novo. *Id.*

The State responds that the Mississippi Supreme Court did, in fact, address the merits of the claim, and so this Court must apply Section 2254(d)'s

reasonableness standard. [49] at 79. The State further argues that the Mississippi Supreme Court's adjudication of this claim was reasonable. *Id.* at 80–84.

Keller presented this claim to the Mississippi Supreme Court in his petition for post-conviction relief, [23-9] at 149–52, and it summarily found that the claim was meritless, without any discussion. *Keller II*, 229 So. 3d at 716.

1.  Standard of Review

AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [Section] 2254(d)(1) and (2). There is no text in the statute requiring a statement of reasons. The statute refers only to a 'decision,' which resulted from an 'adjudication.'" *Harrington*, 562 U.S. at 98. Therefore, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for [Section] 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.* This Court must "determine what arguments or theories could have supported the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Trottie*, 720 F.3d at 241 (cleaned up).

2.  Analysis

During jury selection, the trial court told the venire that they would be sequestered for "24 hours a day for the three or four days of the trial." [22-4] at 7. It

asked them whether any of them would be unable to do that. *Id.* Venireman number 12, Mr. Bell, raised his hand, and the trial court questioned him:

| | |
|---|---|
| THE COURT: | And then did I have Mr. Bell. Did you have your card up? |
| MR. BELL: | Yes, ma'am. My honest answer, Judge, my wife would absolutely freak out. |
| THE COURT: | She might be happy, Mr. Bell, you don't know? |
| MR. BELL: | One would think, but no. |
| THE COURT: | I hate to ask you this, but is she just afraid to be home by herself? |
| MR. BELL: | Somewhat. I would say that she is—I wouldn't say neurotic, but I'd say nervous. |

*Id.* at 9–10.

Later, the trial court explained that guilt and sentencing are addressed in two phases of a capital trial, *id.* at 24–26, and it asked the jurors whether any of them would automatically impose the death penalty in the event of a guilty verdict, *id.* at 35, or automatically give a sentence of life imprisonment without parole in the event of a guilty verdict. *Id.* at 37. Eventually, the trial court asked the venire:

| | |
|---|---|
| THE COURT: | Is there anyone who knowing that you may have to participate in a sentencing phase would hesitate with regard to the guilt or innocence phase? In other words, you're going to have that on your mind in judging the facts and the evidence in determining whether or not Mr. Keller is guilty of the crime charged. Anybody that's not going to be able in your own mind to separate those two functioning? Anyone knowing that potentially the death penalty and life without parole would be the two sentences that you just simply couldn't reach a verdict one way or the other? Number 12, Mr. Bell, do you think that you |

|  |  |
|---|---|
|  | wouldn't be able to follow the instructions and just make up your mind on the guilt phase knowing that there may be a sentencing phase? |
| MR. BELL: | Well in just honestly answering, Judge, I'm really not sure. I'm not sure how I would decide knowing what the consequences may be. |
| THE COURT: | And you think that would affect your ability to make a fair and just verdict on the guilt or innocence phase? |
| MR. BELL: | Again I can't say honestly whether it would or not. |

*Id.* at 40–41. The State eventually challenged Mr. Bell for cause:

|  |  |
|---|---|
| MR. LUSK: | Mr. Bell, number 12. I believe he indicated that he would vote for life only and he was worried about sequestration issues also, Your Honor. |
| THE COURT: | Defense? |
| MR. RISHEL: | Your Honor, Mr. Bell—I have a note here that says he doesn't know if he could vote for—doesn't know what he would do basically [is] what I got from him. We would ask that he be brought in for questioning. |
| THE COURT: | All right. I will add Mr. Bell. What he actually says is he doesn't think he could do the guilt phase knowing that he had to do the penalty phase. I think it's pretty close to cause but we'll question him later. |

*Id.* at 128–29.[18] The trial court sequestered Mr. Bell for individual voir dire:

|  |  |
|---|---|
| THE COURT: | Mr. Bell, as I explained to you guys this is—nobody is in trouble, nobody is trying to change your mind, |

---

[18] Keller argues that the trial court mischaracterized Mr. Bell's testimony here. Keller is mistaken. The trial court said that Mr. Bell did not "know if he could vote for— doesn't know what he would do basically . . . ." [22-4] at 129. Earlier, he had stated that he was not "sure how [he] would decide knowing what the consequences may be." *Id.* at 41. He could not say whether the fact that the death penalty could be imposed would affect his ability to reach a fair verdict in the guilt phase. *Id.* Therefore, the trial court's characterization of Mr. Bell's testimony was fair, and it corrected the State's mischaracterization of the testimony.

they just needed to probe a little further and they didn't want to do that with everyone else in [there] present where they could hear. Mr. Lusk, did you have any additional questions?

MR. LUSK:     I did, Your Honor. . . . Mr. Bell, you had indicated about sequestration that it would be, I don't want to say an awful burden, but it would be a burden put upon you because your wife would, I believe you said, freak out?

MR. BELL:     Yes, sir. That's a direct quote.

MR. LUSK:     And that is, I guess, because you would not be home?

MR. BELL:     Exactly. As I was trying to explain without getting into a lot of depth at the time, I wouldn't consider her to be neurotic, but she's a very nervous woman, and being home alone would be a little bit upsetting to her.

MR. LUSK:     Would that be in the back of your mind while you were sitting up here trying to serve on this jury?

MR. BELL:     Honestly I think I could put that aside. I believe that I could be a fair juror, but I made another answer. I don't know if they are not asking the question yet, Judge, but I would like to go ahead and expound on it because I feel like it's going to come up. That I answered that knowing that a guilty verdict—if I voted for a guilty verdict may mean the death penalty, that would be a heavy burden, and I don't know how—I cannot honestly say that it wouldn't influence me as to how I would vote.

MR. LUSK:     So you're saying that it's possible that you would not even vote during what we would call the guilt phase to find the defendant either guilty or not guilty based upon the potential sentence of the death penalty that he could receive?

MR. BELL:     I'm saying that I don't really know how I would react. I know that's a vague answer, but I've never

|  | been in that position, and I don't know, Mr. Lusk, if I would react. |
|---|---|
| MR. LUSK: | You had previously, I believe, stated that you would only consider life without parole the possibility, that you would not— |
| MR. BELL: | No, sir. I didn't say that. |
| MR. LUSK: | Okay. |
| MR. BELL: | It's not as though I have a problem with death penalties, it's just I don't know how I would react if the burden were on my shoulders as far as if knowing that a guilty verdict might possibly lead to a death sentence of a man. |
| MR. LUSK: | And you're saying that you don't know how you would react. Well I hate to tell you this but this is the situation that we're in now? |
| MR. BELL: | Right. |
| MR. LUSK: | So are you saying that . . . after the aggravating factors were weighed and the mitigating factors were weighed that you could deliberate with your jurors to come up with a sentence for the defendant or do you feel that you would not be able to do that? |
| MR. BELL: | I feel like I could deliberate with the jurors and come to a conclusion depending on the evidence. . . . |
| MR. LUSK: | Okay. So you would not automatically rule out the death penalty? |
| MR. BELL: | No, sir. |
| MR. LUSK: | And you would not automatically vote for life imprisonment without parole? |
| MR. BELL: | No, sir. |
| MR. LUSK: | You would use the balancing factor? |

MR. BELL:         I would like to think that I would be balanced, let me phrase it that way.

*Id.* at 147–50. The defense also questioned Bell:

MR. RISHEL:       Mr. Bell, I'm a little confused. You seem to be vacillating back and forth.

MR. BELL:         I do, yes, sir. I understand that, and that's because I don't know what the hell I would do.

MR. RISHEL:       Let me ask you this. Let's say the State's evidence was pretty close to what you thought was necessary for you to vote . . . guilty. Would the fact that if you voted for him to be guilty that might lead to the death penalty, would that affect your decision making?

MR. BELL:         Well it's a tough question to answer right here on the spot like that.

MR. RISHEL:       That's what you have to do.

MR. BELL:         I know. I don't know. I honest to God don't know. I don't know.

MR. RISHEL:       Might influence you, it might not?

MR. BELL:         Yes, I mean.

MR. RISHEL:       Well wouldn't it be fair to say that because you seem to be struggling with it?

MR. BELL:         Yes.

MR. RISHEL:       That it would in all probability influence you?

MR. BELL:         I guess that would be fair to say. Yes, sir.

.         .         .

MR. RISHEL:       Right. So if the decision to find him guilty may lead to him being killed, given the death penalty, that

would affect your ability to vote that way, wouldn't it?

MR. BELL:          Yes, sir. I would say yes.

*Id.* at 150–51.

After individual voir dire, the court asked the attorneys about Mr. Bell. [22-5] at 9. Keller's counsel, Ms. Collums, answered: "My only comment on Mr. Bell is that Mr. Lusk was apparently rehab[b]ing him and he was no rehab[b]ing." *Id.* The court agreed and granted the State's challenge for cause. *Id.*

As noted above, a juror may not be challenged for cause based on his views about capital punishment unless those "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 420 (cleaned up). Juror bias does not have to be proven with "'unmistakable clarity,'" though, *id.* at 424, and "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426. Therefore, "when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7 (cleaned up).

Mr. Bell first said that sequestration would be a problem for him because his wife would be "nervous" staying home alone. [22-4] at 10. Later, he stated several times that he did not know whether he could reach a verdict in the guilt phase, knowing that he would then be asked to choose a sentence. *Id.* at 41, 148–51. Moreover, defense counsel asked the final question of Mr. Bell: "So if the decision to find him guilty may lead to him being killed, given the death penalty, that would

affect your ability to vote that way, wouldn't it?" *Id.* at 151. He responded: "Yes, sir. I would say yes." *Id.* The defense ultimately did not oppose the State's challenge, specifically noting that despite the State's attempt to rehabilitate Mr. Bell's testimony, he continued to waffle on whether he could reach a verdict. [22-5] at 9.

Therefore, regardless of Mr. Bell's earlier assurance that he could deliberate with the other jurors and that he would not automatically impose or oppose the death penalty, [22-4] at 149–50, the trial court was within its discretion to strike him for cause. *Uttecht*, 551 U.S. at 7. When taken as a whole, his testimony was ambiguous. In these circumstances, the trial court was in the best position to judge Mr. Bell's credibility, having viewed and heard him in person. *Id.* The Mississippi Supreme Court's adjudication of this claim was reasonable. It was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of fact.

### H. Ground 5b: Ineffective Assistance of Trial Counsel by Not Objecting to Trial Court's Striking a Juror for Cause

Keller claims that his counsel provided ineffective assistance by not objecting to the trial court's decision to strike venireman number 12, Mr. Bell. [45] at 78. He argues that it is "clear that juror . . . Bell should not have been struck for cause given his statements that he would faithfully and impartially discharge his duties" and that, therefore, his trial counsel should have objected to the State's challenge. *Id.* at 80–81.

Keller presented this claim to the Mississippi Supreme Court in his petition for post-conviction relief, [23-9] at 149–52, and it summarily found that the claim

was meritless, without any discussion. *Keller II*, 229 So. 3d at 716. He argues that the Mississippi Supreme Court's decision was based on an unreasonable determination of the facts in that it overlooked evidence that Mr. Bell stated he would deliberate with the other jurors and not automatically impose or oppose the death penalty. [45] at 80. He also argues that the Mississippi Supreme Court unreasonably applied clearly established federal law by striking Mr. Bell. *Id.* at 81. He further argues that this Court's review of the claim is de novo because the Mississippi Supreme Court did not address its merits. *Id.* at 80.

The State responds that the Mississippi Supreme Court did, in fact, address the merits of the claim, and so this Court must apply Section 2254(d)'s reasonableness standard. [49] at 79. The State further argues that the Mississippi Supreme Court's adjudication of this claim was reasonable. *Id.* at 80–84.

Again, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. Therefore, this Court must "determine what arguments or theories could have supported the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Trottie*, 720 F.3d at 241 (cleaned up).

"An ineffective assistance of counsel claim requires a showing that (1) counsel's performance was legally deficient, and (2) the deficiency prejudiced the

defense." *Bernard*, 762 F.3d at 471 (citing *Strickland*, 466 U.S. at 687). "Applying AEDPA deference to *Strickland's* already deferential standard, [the Court] must deny relief if there is any reasonable argument that . . . counsel satisfied *Strickland's* deferential standard . . . ." *Higgins v. Cain*, 720 F.3d 255, 265 (5th Cir. 2013) (cleaned up).

As explained above, the trial court was within its discretion to strike Mr. Bell from the venire. Accordingly, any objection would have been meritless, and "failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (cleaned up). Still, Keller has not shown that his counsel's failure to object prejudiced his defense because he has not shown that the result of the trial would have been different if Bell had been on the jury. *Bonds v. Lumpkin*, No. 19-11318, 2022 WL 59894, at *6 (5th Cir. Jan. 6, 2022) (requiring petitioner to affirmatively prove prejudice). Nothing in the transcript indicates that Mr. Bell would have been more favorable to the defense.

The cases Keller[19] cited are distinguishable in that they predate *Wainwright* and therefore apply the more "restrictive *Witherspoon* standard." *Stevens v. Epps*, No. 2:04-CV-118, 2008 WL 4283528, at *36 (S.D. Miss. Sept. 15, 2008). Even so, the trial court did not strike Mr. Bell because of "nervousness, emotional involvement, [or] inability to deny or confirm any effect whatsoever" on his deliberations. *Adams*, 448 U.S. at 50. Rather, the trial court struck him because he stated multiple times that he did not know whether he could reach any verdict at all, thus casting doubt

---

[19] *Adams v. Texas*, 448 U.S. 38 (1980); *Burns v. Estelle*, 592 F.2d 1297 (5th Cir. 1979).

on his ability to perform "his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424 (cleaned up).[20] For these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable. It was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of fact.

I.   Ground 6: Trial Court Error in Seating Juror Number 5

Keller claims that the trial court deprived him of his right to a fair and impartial jury by seating juror number 5, Mr. Anderson, who did not reveal material information during jury qualification and voir dire. [45] at 84.

1.   Facts Relevant to this Claim

Jury selection began on Monday, October 5, 2009. [22-3] at 3. During jury qualification, the trial court explained to the venire that in some circumstances they could be excused from jury service and advised them that the trial would last a "week. . . . We're not going to be here for months and month[s]." *Id.* at 118. At this time, the court did not inform the venire that it was a capital trial. *See id.* The judge then called individual jurors up to the bench one-by-one and listened to their excuses off the record, excusing some and asking others to remain. *Id.* at 119–20. The clerk then administered the first oath. *Id.* at 120–21.

---

[20] As for Keller's claim that the Mississippi Supreme Court based its decision on unreasonable determinations of fact, he has specified no determinations of fact that were unreasonable. Indeed, the Mississippi Supreme Court made no determinations of fact, in that it summarily held that the claim was meritless without explanation. *Keller II*, 229 So. 3d at 716.

During a short break, the judge met with the parties in chambers and made a record of the veniremen who came forward and what their claimed excuse was. *Id.* at 121–25. The court said that venireman number 4, Ms. Dick, "approached the bench and presented the [c]ourt with some documents indicat[ing] that she is to leave town on a business trip Thursday morning going to Tampa, Florida." *Id.* at 124. The judge proposed that they leave Ms. Dick on the venire, but Keller's counsel said, "Well if Ms. [Dick] thinks that she's got to be out of town by Thursday I think she's probably going to be antsy even if we don't intend to go that far, expecting it to, so I would ask to excuse her." *Id.* at 128. The State had no objection, *id.*, and the trial court excused her. *Id.* at 141, 144.

At the beginning of voir dire, the court explained to the venire that they had been called to hear a criminal case, but it did not reveal that it was a capital murder case. *Id.* at 146. Later, the judge advised the venire that they would be sequestered for the rest of the trial, which was expected to be three or four days. [22-4] at 7. The judge asked whether anyone had a problem with that, *id.*, and Mr. Anderson did not respond. *Id.* at 7–14. Eventually, the judge read a portion of the indictment to the venire, explaining that they had been summoned to hear a capital murder trial, *id.* at 15, and it later revealed that the State was seeking the death penalty. *Id.* at 23.

During the defense's voir dire, counsel asked the venire:

Is there some question that we haven't asked that you need answered that would affect your ability to be fair and impartial in this case? Anybody? Is there some reason, whatever it is?

You know, I know it's not April 15th, but around April 15th a lot of people have trouble thinking about anything else but Uncle Sam. I know

> sometimes I do. And if you have somebody who's in the hospital who's sick or you have a family problem, some kind of happening in your family, everybody does, okay. I'm not trying to pick on anybody. It makes it difficult for you to think about anything else. You know, you can't concentrate on the matter that you have at hand because you're thinking about this other thing. It keeps popping up in the back of your mind no matter how hard you try to keep it out. Is there anything like that that would get in the way of you being able to pay attention and concentrate on this matter and be fair and impartial?

*Id.* at 118–19. Mr. Anderson did not respond to this question. *Id.* at 118–20.

Jury selection was completed on the morning of Tuesday, October 6, 2009. [22-3] at 4. When Mr. Anderson came up in the selection order, the defense had peremptory strikes remaining, but the defense accepted him as a juror. [22-9] at 33–34. The trial court seated 12 jurors and two alternates. [22-5] at 54. Mr. Anderson was juror number 5. *Id.*

After the clerk had administered the second oath, *id.* at 55, but before opening statements, the trial court stated on the record outside the jury's presence:

> Counsel on both sides were advised that Mr. Anderson, I believe, who is now [J]uror [N]umber [F]ive on this venire, did advise the bailiff during the break that he has a wedding to attend on Saturday and a rehearsal dinner, and that he for some reason had not told anybody that during the voir dire. So at this point that is simply for record purposes to confirm that that was told to everyone.

[22-5] at 64. The defense did not object to Mr. Anderson serving as a juror or move that he be excused, *see id.*, despite the seating of two alternates. *Id.* at 54.

The State presented its entire guilt-phase case on Tuesday, October 6, 2009, and Keller presented no evidence in the guilt phase of trial. [22-3] at 4–5. Accordingly, the jury heard closing arguments, received instructions, deliberated, and reached a guilt-phase verdict on Wednesday, October 7, 2009. *Id.* at 5. The

jurors began their deliberation at 10:23 a.m., [22-6] at 48, and they returned a guilty verdict shortly before 11:00 a.m. *Id.* at 51. The court polled the jury, and Mr. Anderson responded affirmatively. *Id.* at 52.

The State and defense presented their sentencing-phase evidence on the same day—Wednesday, October 7, 2009. [22-3] at 5–6. The jury heard closing arguments, received sentencing instructions, deliberated, and reached a sentencing verdict on Thursday, October 8, 2009. *Id.* at 6–7. The jury found that Keller should be sentenced to death, and when the judge polled the jury, each of them—including Mr. Anderson—responded affirmatively. [22-7] at 75–76.

2. Analysis

Keller argues that Mr. Anderson did not provide a complete and honest response to the questions during jury qualification and voir dire. [45] at 85. He contends that this failure prejudiced his ability to receive a fair trial. *Id.* He notes that the trial court excused another member of the venire, Ms. Dick, because she was scheduled to leave on a business trip later in the week. *Id.* Keller argues that if his counsel had known about Mr. Anderson's wedding before the jury was seated, counsel would have challenged him for cause or used a peremptory challenge to strike him from the panel. *Id.* Finally, he notes that the jury deliberated for only a half hour before returning a verdict. *Id.* The State responds that the Mississippi Supreme Court's decision was reasonable and not contrary to or an unreasonable application of clearly established Supreme Court precedent. [49] at 85.

Keller presented this claim to the Mississippi Supreme Court on appeal, arguing that *Morgan v. Illinois*, 504 U.S. 719 (1992), required reversal of his conviction. [22-20] at 86–88. The Mississippi Supreme Court held that *Morgan* was inapplicable to Keller's case. *Keller I*, 138 So. 3d at 846. Citing its own precedent, the court held that Keller had not shown that he was prejudiced by the juror's failure to inform the trial judge earlier about his weekend plans. *Id.* at 847. The Mississippi Supreme Court noted that Keller did not object to Mr. Anderson remaining on the jury, and that the juror's purported scheduling conflict never came into play as the trial concluded after four days, as scheduled. *Id.* Finally, the Mississippi Supreme Court held that Keller's argument was based on mere speculation, as he had did not show from the record that the jury's decision stemmed from Mr. Anderson's alleged haste. *Id.*

To obtain a new trial based on a juror's failure to disclose material information during voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *see also Craaybeek v. Lumpkin*, 855 F. App'x 942, 946 (5th Cir. 2021). Accordingly, "[a]llegations based on 'subjective,' 'vague[,] and ambiguous' questions are insufficient" to state a cognizable claim. *Granier v. Hooper*, No. 22-30240, 2023 WL 4554903, at *2 (5th Cir. July 17, 2023) (per curiam) (quoting *Hatten v. Quarterman*, 570 F.3d 595, 602 (5th Cir. 2009)). Courts start with "the presumption that the

juror is impartial, and it is incumbent upon the defendant to prove otherwise."
*United States v. Collins*, 972 F.2d 1385, 1403 (5th Cir. 1992) (cleaned up). In the
habeas context, the petitioner's hill is even steeper, as the Court must give broad
deference to the state court's conclusions of law and findings of fact. *Engle*, 33 F.4th
at 790.

Here, Keller has not shown that Mr. Anderson failed to provide a complete
and honest response to any question asked during voir dire. The judge's first
question about circumstances that could prevent one from serving focused on issues
like "serious financial hardship" and illness within one's family. [22-3] at 118. Mr.
Anderson was scheduled to attend a wedding rehearsal dinner on Friday evening
and a wedding on Saturday. *See* [22-5] at 64. One could reasonably conclude that
this potential scheduling conflict was not responsive to the judge's first question.

Later, the judge specifically told the jurors that the trial would last three to
four days, which meant it would be over by Thursday. [22-4] at 7. She advised the
venire that they would be sequestered for the rest of the trial and asked if that
would be a problem. *Id.* Again, one could reasonably conclude that it was not
incumbent on Mr. Anderson to disclose the wedding and rehearsal dinner at this
point, as they were not scheduled to begin until Friday evening.

Finally, the questions Keller contends Anderson should have responded to
were quite broad. Defense counsel asked, "Is there some question that we haven't
asked that you need answered that would affect your ability to be fair and impartial
in this case," and "Is there anything . . . that that would get in the way of you being

able to pay attention and concentrate on this matter and be fair and impartial?" [22-4] at 118–19. Mr. Anderson's failure to disclose the wedding and rehearsal dinner in response to these questions was not necessarily dishonest because the judge had specifically told the venire that the trial would last three to four days. Therefore, Anderson had no reason to believe there was a scheduling conflict.

Even if the record demonstrated that Anderson did not honestly answer a material question on voir dire, Keller has not shown that his response would have provided a valid basis for a challenge for cause. First, Keller's own counsel did not object to keeping Anderson on the jury once the purported scheduling conflict was disclosed. Second, the trial was only scheduled to last three to four days, meaning it was expected to end before Mr. Anderson's wedding obligations. In fact, it ended on Thursday, precisely as the judge advised the venire. Third, Keller has not directed the Court to any evidence in the record that Mr. Anderson's alleged scheduling conflict affected his deliberations. In that respect, the Mississippi Supreme Court was correct in its characterization of this claim as pure conjecture.

Finally, *Morgan v. Illinois*, cited by Keller, does not apply to this claim. There, the Supreme Court held that a state trial court may not refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of a capital defendant. 504 U.S. at 733–34. In reaching this conclusion, the Supreme Court recited general principles of due process in capital cases, such as the principles that a defendant may challenge for cause any juror who "will automatically vote for the death penalty" or "fail in good faith to consider the

evidence of aggravating and mitigating circumstances," and the empaneling of such a juror requires vacatur of the sentence. *Id.* at 729. Keller does not claim that Mr. Anderson had his mind already made up on the appropriateness of the death penalty, and *Morgan* does not address a juror's alleged failure to disclose other less inflammatory but still material information during voir dire.

For these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable.

### J. Ground 7: Trial Court Error in Not Ensuring All Proceedings were Recorded

Keller argues that the trial court violated his right to due process by not recording all lower court proceedings. [45] at 87. Specifically, he contends that several aspects of the trial—including bench conferences, conferences with the court during recess, portions of jury selection, and the court's handling of jury notes—were conducted off the record, despite the trial court entering an order for all proceedings to be transcribed. *Id.*

The State responds that this claim has not been exhausted, in that Keller did not argue to the Mississippi Supreme Court that the trial court's failure to record all proceedings violated the Constitution or laws of the United States. [49] at 87. Alternatively, the State argues that the claim is procedurally barred and meritless. *Id.* at 88.

#### 1. Exhaustion

AEDPA requires federal habeas petitioners to "exhaust all claims in state court prior to requesting federal collateral relief." *Smith*, 515 F.3d at 400; *see also*

28 U.S.C. § 2254(b)(1)(A). This "exhaustion requirement is satisfied when the substance of the federal claim is fairly presented to the highest state court on direct appeal or in state post-conviction proceedings, even if the state court fails to address the federal claim." *Johnson v. Cain*, 712 F.3d 227, 231 (5th Cir. 2013) (cleaned up). A federal claim "is fairly presented when the petitioner asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* (cleaned up). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citation omitted). Rather, "the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006).

The State argues that Keller did not exhaust this claim because he did not argue to the Mississippi Supreme Court that the trial court's failure to record all proceedings violated the Constitution or laws of the United States, as he claims in this federal habeas case. [49] at 87. Rather, the State argues, Keller only argued that the failure to record all proceedings violated a trial court order and his rights under state law. *Id.* In reply, Keller contends that he exhausted the claim by generally asserting that the failure to record all proceedings violated his right to a fair trial and citing a Supreme Court decision in his state-court briefing. [53] at 24.

In his briefing before the Mississippi Supreme Court, Keller argued that the trial court's failure to ensure that all proceedings were conducted on the record violated the Mississippi Supreme Court's "longstanding condemnation of conducting off-record proceedings" and an "express order sought and obtained by the defendant in pretrial proceedings . . . ." [22-20] at 33. In support of this argument, Keller cited many Mississippi Supreme Court decisions. *Id.* at 33–35.

But Keller cited only one United States Supreme Court decision, and not for the principle that failure to transcribe all aspects of a criminal trial violates the Constitution or laws of the United States. *Id.* at 34. Rather, he cited *Murray*, 477 U.S. at 488, to support his argument that counsel was not required to contemporaneously object to the failure to transcribe proceedings to preserve the issue for appeal. [22-20] at 34. *Murray* does not address the failure to transcribe proceedings; it addresses whether an attorney's error can constitute sufficient cause to excuse procedural default. 477 U.S. at 487–89.

Therefore, in Keller's briefing before the Mississippi Supreme Court, he did not assert that the failure to record all aspects of his trial violated the Constitution or laws of the United States. Instead, his claim turned on alleged violations of state law, and that is the legal theory under which the Mississippi Supreme Court addressed it. *See Keller I*, 138 So. 3d at 835–37. Because Keller did not exhaust this claim by presenting it to Mississippi's highest state court, this Court cannot address it.

To the extent that Keller intended to assert a habeas claim premised upon an alleged violation of state law, "[t]he habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam) (cleaned up). Accordingly, "federal habeas corpus relief does not lie for errors of state law." *Id.* (cleaned up). Therefore, even if the trial court violated Mississippi law by not transcribing all aspects of Keller's trial, this Court has no authority to grant relief on that basis.

### 2. Procedural Bar

Alternatively, the State argues that this claim is procedurally barred because the Mississippi Supreme Court dismissed it based on two independent and adequate state-law procedural rules. Specifically, the Mississippi Supreme Court held that Keller did not preserve this issue for appeal because (1) his trial counsel did not make a contemporaneous objection and (2) he did not comply with the Mississippi Rule of Appellate Procedure governing an incomplete record on appeal. *Keller I*, 138 So. 3d at 836–37.

The Fifth Circuit has held that Mississippi's contemporaneous objection rule is an adequate and independent state bar. *Wiley v. Puckett*, 969 F.2d 86, 103 (5th Cir. 1992). Keller does not contest this. Rather, he argues in reply that the Court should excuse his default because his trial counsel provided ineffective assistance by not making a contemporaneous objection. [53] at 24.

The Court may review the merits of a procedurally barred claim "where the petitioner is able to demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Garza*, 738 F.3d at 675 (cleaned up). In this context, "cause" is "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 582 U.S. at 528 (cleaned up). "[A]ttorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel." *Id.* But "the exhaustion doctrine generally requires that a claim for ineffective assistance of counsel be presented to the state courts as an independent claim before it can be used to establish cause for procedural default." *Hatten*, 570 F.3d at 605 (cleaned up).

On direct appeal, Keller raised his trial counsel's alleged ineffective assistance for not objecting to the trial court's failure to record all proceedings. [22-20] at 35.[21] The Mississippi Supreme Court did not address it, *Keller I*, 138 So. 3d at 836–37, and it held that all ineffective assistance claims not addressed should be "reserved for Keller's subsequent post-conviction-relief petition." *Id.* at 877. Keller did not raise the issue in post-conviction. [23-9] at 2–4; [23-40] at 2–3; [23-46] at 1–31; [24-66] at 3; [24-69] at 2.

"[A] complete verbatim transcript is not always required to ensure that a defendant's right to meaningful appellate review is satisfied." *Higginbotham v.*

---

[21] In briefing, Keller specifically asserted that he is not asserting an independent ineffective-assistance claim arising from his trial counsel's failure to object to the trial court's failure to record proceedings. [40] at 55.

*Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) (per curiam) (cleaned up). "[T]he record is adequate for full appellate review so long as it contains the portions necessary to address the alleged errors below." *Id.* (cleaned up). Habeas "claims based on incomplete transcripts must show that the absence of such a transcript prejudiced the defendant's appeal." *Id.* (cleaned up).

Therefore, to succeed on this claim, Keller must show that the result of his appeal would have been different if his attorney had objected to the trial court's failure to record every phase of the trial. He has not done so or tried to do so. Accordingly, he has not established cause and prejudice for his procedural default. *Cf. Higgins*, 720 F.3d at 261–62 (rejecting ineffective-assistance claim where petitioner failed to demonstrate prejudice resulting from failure to obtain copy of a transcript); *Goodwin v. Johnson*, 132 F.3d 162, 176 (5th Cir. 1997) (rejecting ineffective-assistance claim where counsel failed to include transcript but it would not have made a difference in appeal outcome).

For these reasons, the Court finds that Keller's claim that the trial court violated his constitutional rights by not recording all proceedings is unexhausted. Alternatively, the Court finds that the claim is procedurally defaulted.

K.  Ground 8: Trial Court Error in Not Suppressing Recorded Statement

Next, Keller claims that the trial court erred by not suppressing the third confession statement he provided to investigators in the hospital's ICU. He asserted several arguments in support of this claim, blending them together at points. In broad terms, he argues that the third confession statement admitted at trial was

"fruit of the poisonous tree," derived from the first two suppressed statements in violation of his *Miranda* rights. [45] at 100. He also argues that police coerced the third statement and that it was taken under circumstances that otherwise rendered it involuntary. *Id.* at 105–06. Finally, he argues that he never specifically waived his *Miranda* rights, and the Mississippi Supreme Court unreasonably inferred a waiver. *Id.* at 103–04.

Before the Court addresses these issues, it will discuss the relevant facts. It will then provide a general overview of the law governing *Miranda* claims before it addresses each of Keller's arguments.

    1.  Facts Relevant to this Claim

When Biloxi Police Department officers apprehended Keller, he brandished a shotgun choke at them as if it were a gun. [23-14] at 11–12; [56]. They shot him in the right side of his chest. [56]; [22-13] at 24, 27, 33. Shortly before midnight on June 21, 2007, paramedics transported Keller to Biloxi Regional Medical Center for treatment. [22-3] at 22. Sergeant Rick Allen rode in the ambulance. *Id.* at 47.

After Keller arrived at the hospital, a doctor noted that Keller's behavior was "inappropriate," and he appeared "anxious, nervous, hostile, [and] agitated." [22-13] at 27. He, however, was "[a]lert to staff and [his] surroundings," and he stayed so throughout the night. *Id.* at 27–30. At that time, Keller told the doctor that he was experiencing pain of "10 on a [1 to 10] scale." *Id.* at 27. So hospital staff gave him morphine and other medication at intervals throughout the night and the next day. *Id.* at 20, 26, 31; [22-16] at 176–77, 179; [22-13] at 60. They also took "suicide

precautions," given his attempted suicide-by-cop. [22-16] at 227. CT scans of Keller's spine, head, abdomen, and pelvis showed no evidence of fracture, dislocation, or acute trauma. *Id.* at 414–17. But X-rays revealed three broken ribs on his right side, where he had been shot. *Id.* at 418, 422.

Minutes after Keller arrived at the hospital, Craig Shows, an investigator with the Biloxi Police Department, interviewed him for about 10 to 15 minutes in a treatment room of the hospital's ER. [22-3] at 22–25, 36–37. Two other officers were present: Sergeant Rick Allen and Investigator David Perry. *Id.* at 23. The trio identified themselves as law enforcement officers, *id.*, and Shows read Keller his *Miranda* rights. *Id.* at 24. According to Shows, Keller responded that he understood his rights and said that he would speak to the officers. *Id.* at 25–26.

The interview was not initially recorded. *Id.* at 27. Keller admitted that he had killed Hat Nguyen, and he told Shows that the gun was at a crack house in Gulfport where he had sold it. *Id.* at 29. He also admitted that he had stolen the gun from a pawn shop the day before. *Id.* After another officer brought in a recorder, Shows went over some of the same questions again, and Keller gave the same answers. *Id.* at 29–30. Shows later testified that during the recording, "his pain was getting worse," and he started "moaning . . . even louder." *Id.* at 30–31. Keller never asked for an attorney, and he never invoked his right to remain silent. *Id.* at 26, 50. Neither Shows nor anyone else present during the interview promised anything to Keller, threatened him, or coerced him, although they did tell him they would try to get him a drink of water after he answered their questions. *Id.* at 26–27, 39; [56].

According to Shows, his primary concern was finding the murder weapon. [22-3] at 27.

In the recording of the interview, Keller's speech is mostly unintelligible. [56]. He was groaning in obvious pain—at times, almost screaming. *Id.* There was substantial background noise, presumably the sound of activity in the emergency room. *Id.* Shows testified during the trial court's suppression hearing that Keller "wasn't yelling and screaming . . . initially," but "it progressively got worse towards the end of the interview." [22-3] at 24. Shows also testified that Keller "kept on saying that he was thirsty," and "that he wanted this all to be over with." *Id.* Still, Shows maintained that Keller appeared to understand what was happening around him, he appeared to understand the questions, his speech was "coherent," and he did not appear to be under the influence of drugs or alcohol. *Id.* at 24–25. Shows said that he did not see "Keller be administered any medication or . . . treatment while . . . conducting the interview with him." *Id.* at 37.

After the first interview, Sergeant Rick Allen stayed to guard Keller while the other officers went to retrieve the murder weapon. *Id.* at 33. At some point after the other officers left, Keller "called [Allen] over to the bedside" because he was "concerned with the safety of the officers that had left" because "there was another weapon that he remembered at that scene where they were going to, and it was some type of advanced weapon." *Id.* at 50; [56]. Allen asked Keller about the specific locations of the weapons in the crack house, thanked him for the information, and then called the other officers to warn them. [22-3] at 51; [56]. According to Allen,

Keller was "constantly wanting me to come over there to tell me things," despite Allen not questioning him. [22-3] at 53.

At around 1:20 a.m., medical personnel inserted a tube into Keller's chest to drain fluid from it. [22-13] at 26, 31; [22-3] at 56.

Sometime between one and three in the morning on June 22, 2007, Investigator Michael Brown took a second recorded statement from Keller. [22-3] at 58–59, 61, 64–65. Sergeant Allen was present. *Id.* at 59. They did not provide Keller with a *Miranda* warning before questioning him this time. *Id.* at 73. According to Brown, Keller was "[a]lert, able to somewhat speak," but he "seemed to be in a lot of pain." *Id.* at 60. Brown later testified that Keller was "moaning" and "groaning." *Id.* Despite the pain, Keller "tried to answer questions." *Id.* at 61. He never asked for an attorney or invoked his right to remain silent. *Id.*

Keller admitted that he went into the "store in Biloxi" to get cigarettes. [56]. He asked Brown if they could "talk about this later," and Brown responded, "We can, but I . . . need just a little bit of information now, if you can give it to me." *Id.* Keller replied, "I can't think straight." *Id.* Brown asked him whether he had fired the gun when he robbed the store, and Keller said, "You tell me. . . . You seen it, didn't you?" *Id.* Keller said, "You got me hurting . . . talking," and he admitted that he took money from the store. *Id.* Brown asked him, "Do you remember how many times you shot the lady?" *Id.* Keller responded: "Probably like four." *Id.* Brown then ended the questioning. *Id.*

Keller groaned in pain throughout the second interview. [56]. His speech was more intelligible in the second recording than it was in the first one, but it was still somewhat muffled and slurred. *Id.* There was far less background noise. *Id.* But Brown often had to repeat his questions and regain Keller's attention. *Id.* Neither Brown nor anyone present during the interview promised anything to Keller, coerced him, or threatened him. *Id.*; [22-3] at 62.

Keller was discharged from the emergency room and admitted to the intensive care unit at around 3:15 a.m. [22-13] at 31. At that time, he told hospital staff that he was experiencing pain of "6 on a 1–10 scale in [his] chest." *Id.*

Later that day, Investigator Brown took a third recorded statement from Keller. [22-3] at 65; [23-14] at 3–25. The interview occurred around 2:00 p.m. on June 22, 2007— about a day and a half after the murder, 13 hours after the first recorded statement, and 11 hours after the second recorded statement. [22-3] at 65; [56]; [23-14] at 3. Investigator David Shoemaker was also present. [22-3] at 76. According to Brown, Keller was "surprisingly upbeat" and "laying in the bed awake and alert" when the investigators got there. *Id.* at 65–66. Brown said Keller was "very calm, very cooperative, spoke to us, answered every question that we needed him to answer." [22-5] at 115; *see also id.* at 123. Likewise, Shoemaker said that Keller appeared "coherent and basically in his right mind, spoke and everything fine." [22-3] at 76. In fact, before the officers began recording the conversation, Keller "indicated that he would want to talk to [them] and cooperate, [and] he asked

. . . about his mom, if there was a possibility . . . he could see her some time or another." *Id.* at 74. Brown "told him [they] would talk about that later." *Id.*

After Brown had read Keller his rights, Keller again admitted that he had shot and killed Hat Nguyen during an armed robbery. [23-14] at 3–6; [22-5] at 114. He told Brown everything he had admitted before, including that he had stolen two trucks belonging to his stepfather, traded the rolled coins for cash at the bank, thrown the spent shell casings off a bridge, gone to a crack house to smoke crack cocaine after murdering Nguyen, and sold the gun to someone at the crack house. [23-14] at 3–4, 8–10.

Once again, Brown did not ask for an attorney or invoke his right to remain silent. *Id.* at 3–25; [22-3] at 67–68. In fact, Keller was "very willing to talk . . . , very cooperative," and investigators found nothing to contradict what he told them. [22-5] at 123. In the recording of the statement, Brown was lucid, and he spoke clearly without any groaning, slurred speech, or complaints about pain. [56]; *see also* [22-3] at 66. No one coerced him, threatened him, or promised him anything. [56]; [22-3] at 67, 76.

After Brown had questioned Keller for over 26 minutes, he went out to make a phone call. [23-14] at 23. A hospital staff member entered the room, and Keller complained of pain when he coughed. *Id.*; [56]. Keller asked, "Is it time for some medicine yet? About time, ain't it?" [56]. The hospital staff member exited the room to check Keller's chart, and then he returned and administered medication. *Id.*; [22-11] at 99; [22-13] at 60.

128

On June 25, 2007—three days after Keller was apprehended and admitted to the hospital—his urine tested positive for cocaine and marijuana. [22-13] at 69. He was discharged from the hospital on July 1, 2007. [22-16] at 228.

After Keller was indicted, his counsel filed many pretrial motions, including a motion to suppress the statements he made to officers while in the hospital. [22-1] at 35–40, 86–101. On August 27, 2009, the trial court held an omnibus hearing on Keller's pretrial motions. [22-3] at 9–110. As for the motion to suppress, the court heard testimony from the four officers involved in the murder investigation: Craig Shows, Rick Allen, Michael Brown, and David Shoemaker. *Id.*[22] It also listened to the recordings of Keller's statements and considered his medical records from the hospital stay. *Id.* at 31–32, 40, 42, 52–53, 56, 70, 80; [22-13] at 78.

The trial court found that the first two statements taken in the emergency room "were not the product of a free, voluntary or intelligent waiver of Keller's *Miranda* [r]ights" because he had been shot, was receiving morphine for the pain, had tested positive for cocaine, and was undergoing the insertion of a chest tube. [22-13] at 80. The trial court noted that Keller was audibly groaning and moaning in the recordings, and that his speech was "slurred and at times, practically inaudible." *Id.* But the court found that the third statement—taken after Keller had been stabilized and transferred to a room in the intensive care unit—"was freely and voluntarily given after an intelligent and knowing waiver of [his] rights under *Miranda*." *Id.* The trial judge noted that Keller's demeanor reflected that he was

---

[22] The Court incorporated the officers' testimony from the suppression hearing and Keller's medical records into its discussion above of what occurred at the hospital.

"alert, aware[,] and responding clearly and appropriately to the questions presented" by the officers. *Id.* Accordingly, the trial court granted the motion to suppress as to the first two recorded statements but denied it as to the third. *Id.* at 80–81.

During the penalty phase of trial, Keller testified in his own defense. [22-6] at 99–133. On redirect, his attorney asked him if he tried to be "helpful with the officer" when he gave the third confession statement. *Id.* at 133. Keller responded, "As much as I could, yes." *Id.* He explained why he confessed: "Because they had to know what was going on. I knew it was the wrong decision, you know. The best to help their case and mine, you know. It was the right thing to do." *Id.* Keller's testimony ended with the following exchange:

> Q.   Jason on drugs did bad things, right?
>
> A.   Yes.
>
> Q.   Jason off drugs how do you act?
>
> A.   Very good person.
>
> Q.   [The prosecutor] spent a lot of time trying to get you to agree that the fault was someone else's. Whose fault was this?
>
> A.   It was my fault.
>
> Q.   Okay. Anybody else's?
>
> A.   No, ma'am.

*Id.*

On appeal, Keller argued that the trial court had erred in denying his motion to suppress the third confession statement. [22-20] at 4–5. The Mississippi Supreme

Court found that the trial court had admitted Keller's third confession statement "into evidence without discussion or analysis of the coercive circumstances of the first two confessions, or their possible effect upon the third statement." [22-10] at 60. Accordingly, it retained jurisdiction of the appeal but remanded the case to the trial court "to conduct an evidentiary hearing to determine whether—because of the circumstances under which they were taken—any of the three statements made by Jason Lee Keller to law enforcement was coerced and, if so, whether any information learned in a coerced confession was used to gain additional information from Keller." *Id.* at 61 (footnote omitted).

The trial court held an evidentiary hearing on April 5, 2013. [22-11] at 33–35. Keller called Dr. Joe Jackson, an expert in neurology and psychiatry. [22-11] at 51–52. Prior to the hearing, Jackson authored a report in which he stated:

> It would be my opinion to a reasonable medical probability that [Keller] was not able to competently give information or answer questions during any time he was questioned and spoke with police in the Emergency Room or in the ICU, and certainly would not be able to comprehend his *Miranda* rights nor understand the exact nature of the questions which are being asked and the significance they subsequently may have acquired.

[22-13] at 61. In coming to this opinion, Jackson reviewed the officers' testimony from the suppression hearing and trial, Keller's recorded statements, and Keller's medical records from Biloxi Regional Medical Center. *Id.* at 58.

Jackson specifically noted that Keller had been administered "14 mg. of [m]orphine while in the emergency room" in three separate doses at a few minutes after midnight, 1:30 a.m., and 2:58 a.m. *Id.* at 59. Jackson said that, by the time

Investigator Brown took the third recorded statement, Keller had received another 16 milligrams of morphine in four separate four-milligram doses at 4:00 a.m., 5:15 a.m., 8:25 a.m., and 10:45 a.m. *Id.* at 60. Then, at around 2:20 p.m., during a break in the third recorded statement while Brown went out to make a phone call, a hospital employee gave Keller another four-milligram dose of morphine. *Id.; see also* [56]. Jackson stated: "Clearly, . . . [this was] a large amount of morphine and anyone receiving this amount of morphine would not have mental clarity and certainly would not have the capability of fully understanding the circumstances and situation[,] much less the questions." [22-13] at 60.

Jackson also noted that Keller's sleep was "interrupted frequently" during the interval between the second statement and the third statement "for medical monitoring and treatment." *Id.* He also saw that Keller's urinalysis results from a few days later tested positive for cocaine and marijuana. *Id.* Finally, he explained that nurses' description of Keller as "coherent" throughout the charts was not an indicator of his actual cognitive state. *Id.* at 60–61. He said:

> [T]he fact that he was able to carry on a conversation, and not its content[,] would be the basis for those notations by nursing staff, rather than any finding that Keller was in fact sufficiently cognitively capable of comprehending his *Miranda* [r]ights or understanding the exact nature of the questions which are being asked or any significance they may later have acquired.

*Id.*

At the remand hearing, Jackson likewise testified that, in all three statements, Keller was not "competent to be giving . . . his *Miranda* rights away" because "[h]e was clearly under significant discomfort, in a lot of pain, and I don't

believe he was in a circumstance where he could have possibly comprehended the circumstances and the nature of what he was doing as he was doing it." [22-11] at 55.

When asked to pinpoint the time when Keller purportedly lost his competence to waive his rights, Jackson elaborated, describing the first recorded statement:

> I'm not sure I know at which point or that there was any point that I didn't think he was susceptible. It was clear from the beginning of that first recording that the patient is in extreme pain. He, at several occasions, tries not to answer questions and is encouraged or pushed to do so, even after he has asked not to . . . . His answers are often difficult to hear on that tape, but what you can hear still sound[s] confused. He doesn't sound capable of really understanding what's going on and transpiring at that time. And one wouldn't expect you could with that kind of pain level, which the records reveal he had.

*Id.* at 56. Jackson had more objections to the officers' questioning in the first recording. At one point, Keller asked for water, but medical staff would not allow the officers to give him any because he was expected to require surgery. *Id.* at 57. Jackson testified that "there is no question that one would feel as if one is being pressured to answer" the officers' questions in that situation. *Id.* at 58. Jackson believed that the officers' suggestion that Keller "didn't know what the next few minutes or hours would hold in store" for him was "the most inappropriate one because it sort of set up, this is your last chance, you've got to confess or you may be dead." *Id.*

Jackson dismissed Keller's desire to talk to officers about the murder. *Id.* He said, "It was very evident, both then and later, that Mr. Keller was attempting to

ingratiate himself into the officer's favor. That he was trying . . . to be as helpful as he possibly [could]." *Id.* at 58–59. Jackson said Keller was "obviously [in a] hyper-suggestive state" because of "the level of pain, suffering, the medicines, which at that time he had already received some morphine." *Id.* at 59. According to Jackson, opiates affect "higher cortical functioning" and "significantly impair one's ability to make appropriate judgments and appropriate decisions." *Id.*

Jackson noted that Keller had received more doses of morphine by the second recorded statement, as well as a local anesthetic when hospital staff put in the chest tube. *Id.* at 60. Jackson said: "The second statement was even worse than the first statement. He was more confused. He was perhaps in a little less pain, but not much. And he continued . . . demonstrating significant difficulty in processing the information and generating responses." *Id.* at 60–61. As for Keller's request to talk to the police later, Jackson said:

> It may have been voluntarily given, but whether he had the capability of voluntarily making that decision would be where my problem would arise. He was obviously under the influence of significant morphine and cocaine. He was in significant degree of pain. He had already . . . been pushed several times to give information when he had not wanted to. So I'm sure that that would all play into his agreement to give testimony later.

*Id.* at 61.

Jackson described Keller's probable pain level: "I think his pain was incredibly intense throughout, and I would doubt seriously it changed until after he had received—actually, the third dose of morphine seemed to be when it finally began to decrease. And that was, of course, after the thoracentesis and the chest

tube had been inserted." *Id.* at 62. He theorized that Keller "may well have received more than the 16 milligrams [of morphine] that I can definitely account for," based on certain notations in the nurses' charts. *Id.* at 63.  it would not have made "a big difference" if Keller had. *Id.* at 91.

As for the third recorded statement—the one admitted at trial—Jackson testified:

> At that point he had received at least 30, possibly 34 milligrams of morphine. He had not slept, of course. He still had cocaine in his system. I still would not have allowed him to give testimony. I wouldn't have allowed him to consent. So in my opinion, based on the way I think about things in terms of how we do it medically, he would not have been able to make a free and clear decision to either testify or not to testify.

> .     .     .

> He was significantly better, and he was significantly clearer than he had been earlier. There's no question that there was a significant integral improvement both in terms of pain, in terms of the clarity of how he answered things, his speech . . . . He still remained confused. He still couldn't recall details . . . . And he is still under the effect of the high amounts of morphine, which lowers your ability to make those kinds of critical cognitive decisions.

> .     .     .

> He seemed even more eager to try to please the officer. He made some comments during the tape about the fact that he would be off the street and he would have a place to sleep . . . , and that he would be able to eat regularly or something like that. . . . And then, of course, he said, did I do a good job, or something similar to that. Did I give you everything, you know. It's the whole truth . . . . He said that at the end. It was clear he was trying to ingratiate himself. At one point he had cried about the person who he had shot . . . .

> So, there was evidence that he was—during that time of feeling a need, basically, to state what he had felt, what had happened, but not necessarily with the clarity of thought that one would have if they were not under the influences of these medicines and drugs.

*Id.* at 65–66.

Jackson also noted specific times in the first recording when Keller asked if the police could talk to him later, and Investigator Shows kept asking questions. *Id.* at 68. Jackson said, "that seems to . . . be the officer encouraging him to answer even when he is in a situation where he doesn't want to," and he believed there was a "carryover effect" to the third recorded statement. *Id.* at 68–69.

In summary, Jackson believed that Keller "voluntarily provided" the confession statement, but "he felt, in a way, or he seemed to feel in a way as if he was helping them, as if he was doing it for them to make them like him." *Id.* at 70. But Jackson also said that Keller was unable to "understand fully the consequences of what happened if [he] did waive those [*Miranda*] rights," and he was incapable "at that time of making that kind of higher processing critical decision making." *Id.* at 71.

On cross-examination, Jackson admitted that while a standard dosage of morphine can range as high as 10 milligrams, "it's usually somewhere between two to four milligrams per hour." *Id.* at 77. He also clarified that "[m]orphine's half-life, given IV, is several hours, . . . but it is cumulative. So as you administer it in repetitive doses, it's staying longer and lasting longer." *Id.* at 80. Therefore, while specific dosages depended on the particular patient, doctors often prescribe "two to four milligrams every hour to two hours, usually two hours, to supplement, or we give an IV drip." *Id.* Jackson maintained, however, that "what is important is the total dosage received over the period of time and what that total dose would do to

anyone." *Id.* at 83. Accordingly, he stated that Keller "wasn't ever under enough morphine" during the first and second recorded statements "to be pain controlled." *Id.* He clarified:

> He obviously wasn't getting enough medicines. It had more to do with his pain state and his basic ability to function . . . under the circumstances . . . and with the severity of pain . . . . The issues with pain medicines only come with the third taped recording . . . . Until that time, I don't think pain medicine made any significant difference at all.
>
> .     .     .
>
> I described the total dose he received before the 2:00 recording . . . . And that's a cumulative dose. And yes, it was a significantly high cumulative dose over the 11 hour period of time that he received it. Still, it was wearing off . . . because he was having increasing pain and actually got injected during the time that they were taking that [statement].
>
> .     .     .
>
> But that doesn't mean he isn't still under the influence and effects of the morphine. He is.

*Id.* at 89–90.

Jackson also admitted that Keller "never showed any significant abnormalities on the Glasgow Coma Scale," which is "a scale that's used to determine people who are presenting in coma, giving a rough idea of the severity of the brain injury." *Id.* at 84. Doctors assess different factors, such as the ability to answer questions, pupillary response, and motor response to give a score on the scale. *Id.* Jackson also admitted that nurses had recorded several times that Keller was "[a]lert, oriented to person, place, and time," *id.* at 85–88, but he said:

> They are talking to him . . . . But they are only making very simple assessments. Is he awake enough to talk. Does he know roughly where he is. Does he know the date. Does he know the circumstance. Those are

> the kinds of questions they are doing. Can he open his eyes. Can he close
> his eyes. Does he know who he is. Can he move his arms. Can he move
> his legs. These are very simplistic assessments that deal only with
> patients in deep coma. It's not appropriate, nor are any of these
> questions appropriate for what we are addressing here . . . .

*Id.* at 89. Jackson admitted that Keller's medical records did not indicate that he did not know where he was, that he did not know what was happening, that he was delirious, that he was incoherent, or that he was hallucinating. *Id.* at 102.

Jackson also reconsidered his earlier statement about the amount of morphine that Keller was given. He had stated earlier that Keller was given 20 milligrams of morphine after he left the emergency room, in four-milligram doses at 4:00 a.m., 5:15 a.m., 8:25 a.m., 10:45 a.m., and 2:20 p.m. during a break in the third recorded statement. [22-13] at 60; [56]. On cross-examination, he admitted that the medical records reflected that Keller was not given morphine at 4:00 a.m.; Keller instead was given Toradol, which Jackson said, "affects mentation just like morphine." [22-11] at 94, 96, 114. He also admitted that although medical records showed Keller was given an IV at 2:20 p.m., there was no documentation that it was morphine. *Id.* at 99. But he said discrepancies in hospital records are "not uncommon," and it did not alter his opinion. *Id.* at 113, 117.

As for the urinalysis results from June 25, 2007, Jackson admitted that there was no way to tell from the test results how much cocaine and marijuana were in Keller's system. *Id.* at 106–07. He also specifically noted that the test was done "several days after [Keller] was in the hospital," *id.* at 107, and he did not know how

much crack Keller had smoked before he was arrested or how much cocaine was in it. *Id.* at 111–12.

Jackson also admitted on cross-examination that he had never met Keller and therefore could not say whether Keller's willingness to help the officers was his general demeanor all the time. *Id.* at 108. As for Keller's testimony during the penalty phase of trial, Jackson said, "[I]t is evident that he is at that point understanding that he wanted to do the right thing and was trying to do the right thing. I don't know that he wasn't trying to do the right thing to start with. The question was . . . whether he had the full capability of understanding the consequences of making that action." *Id.* at 110. According to Jackson, the officers' actions "were having significant psychological effects, particularly" if Keller was "a people pleaser to start with." *Id.* at 114.

On redirect, Jackson emphasized that hospital records typically had discrepancies. *Id.* at 117. He also said that the Glasgow Coma Scale is a "very primitive, very simple assessment[ ]" that has "little to nothing to do with high executive functioning. The things that make you capable of testifying or not testifying, of understanding or not understanding, and that would be well beyond the nurse's abilities to assess anyway." *Id.* at 117. And he testified that the suicide prevention charts that stated Keller was "coherent" were "just there to show the nurse went, saw him, and the patient hadn't killed himself during that time. They are not meant to be anything more than that." *Id.* Finally, Jackson said that the brief intervals of sleep Keller had in the ICU before the third statement were "very

superficial" because they were too short, and he would have been disturbed by medical personnel. *Id.* at 118.

The State called Dr. Gregory Bredemeier, a staff physician at Keesler Air Force Base and expert in emergency medicine. *Id.* at 120–21. He was the emergency room doctor who treated Keller on the night of June 21, 2007. *Id.* at 122–23. He testified that the only injury Keller had was the gunshot wound to his chest, *id.* at 123, but he considered the wound to be a "major trauma." *Id.* at 124. He described the treatment provided: "Once we determined that the gunshot wound had punctured the lung, treatment for that is to place a chest tube immediately to reinflate the lung . . . ." *Id.*

> The chest tube is about the thickness of your thumb. And the purpose of that is to get any air out or blood out, one. To reinflate the lung, and to see how much bleeding is going on. . . . So you just numb up the area with some lidocaine, and after you clean it up with betadine usually. And then make a small incision with the scalpel and take a hemostats or some tools, some spreaders that you push through the chest wall and then spread it open to open up the intercostal muscles. And . . . you just push the tube on through and then suture that in to the skin around it tight so you will get a seal. And put a dressing on that. And [it] reinflates the lung and sucks out whatever air and/or blood is present.

> .    .    .

> Once the lung is reinflated, a patient gets immediate relief from that feeling of they can't breathe. . . . Of course, there is the discomfort of the tube being in there, which is painful. But the draining of the blood, which in a way can be more important because you are trying to find out how much lung has been injured. That's obviously still going to cause some pain.

*Id.* at 131–33. Bredemeier testified that Keller provided consent for the chest tube

procedure after a verbal conversation. *Id.* at 141. In Keller's case, a chest tube was

enough to reinflate the lung, and he did not have to undergo surgery. *Id.* at 125.

Keller was in a C-collar and on a backboard when paramedics brought him

into the ER. *Id.* at 150. Bredemeier described Keller's state when he arrived:

> He was in pain and he was a little bit agitated. But his vital signs were
> good at that time. Oxygen saturation was good. . . . [H]e was alert. And
> we could get pretty good information from him. Our concern right then
> was his stability. . . . And at that time he was alert enough to give us the
> information he needed.

*Id.* at 125. He added, "I don't recall any problems communicating with him." *Id.* at

125; *see also id.* at 137. He continued: "I believe he was aware of the seriousness of

his injury and what we were doing." [22-12] at 4. "In my communication with him, I

believe we were communicating and he was telling me where he was hurting and I

pretty much told him what we were going to do. And . . . that a surgeon was going to

be coming. So I believe we understood each other." [22-11] at 137–38. He said Keller

was cooperative, but he appeared to be "agitated, and I think legitimately scared

about what was going to happen to him." *Id.* at 138.

Bredemeier testified that the typical dosage of morphine for a 70-kilogram

adult was anywhere from 2 to 15 milligrams every 4 hours by IV. *Id.* at 127.[23] He

described how morphine affected a patient:

> Morphine is a narcotic and, of course, it's an analgesic and it helps the
> pain. It can depress respirations, it can lower your blood pressure, and
> it can be sedating. . . . [E]arly on you tend to not give large doses because
> right up front you don't know what all is wrong with him. So . . . we tried

---

[23] Keller weighed 87.5 kilograms. *Id.* at 78.

> to just essentially relieve some pain and—but not alter what we're going
> to do as far as taking care of him or observing him.

*Id.* at 126. He said that a morphine IV was about "twice as potent as hydrocodone

given by mouth." *Id.* at 129. But, according to Bredemeier, five milligrams of

morphine would not render a patient incoherent or deprive them of their ability to

understand what was going on around them. *Id.* at 126–27. So there was no

indication that Keller had lost consciousness or his ability to understand what was

going on around him after his first dosage of morphine. *Id.* at 127.

Bredemeier also testified that "as soon as . . . any medicine is injected, it

starts to be metabolized, so it decreases." *Id.* at 129. And, he said, "[I]n a trauma

case, . . . I tend to and . . . a lot of physicians tend to give lower doses because you

don't want to lose the blood pressure. . . . You don't want to decrease the

respirations or make them too sedated." *Id.* at 130–31. Bredemeier did not consider

the amount of morphine given to Keller in the emergency room to be "significant,"

*id.* at 131, and it did not alter Keller's ability to communicate with hospital staff. *Id.*

at 135; [22-12] at 4. He testified that half of the first dose would have been

metabolized within an hour and a half, and that the amount of morphine in Keller's

system would have kept decreasing by half every hour and a half. [22-11] at 139.

Bredemeier admitted on cross-examination that "mental clouding and depression"

are potential side effects of morphine, *id.* at 151, and he testified that he would not

have advised Keller to "make any major decisions on business or legal matters"

while in the emergency room. [22-12] at 3. He did not see any signs of mental

clouding in Keller, though. *Id.* at 6.

Bredemeier did not know how much cocaine Keller had in his system when he arrived at the hospital, or the chemical composition of the drugs Keller had used earlier that day. [22-11] at 134. He testified that cocaine is a "stimulant. So . . . it's going to increase your heart rate, increase your blood pressure, keep you awake." *Id.* He said that cocaine would not render one incoherent or unable to understand what was happening to them. *Id.*

The State also called David Perry, a former investigator in the Biloxi Police Department who assisted on Keller's case. [22-12] at 7. Perry rode in the ambulance with Keller and Investigator Rick Allen after they apprehended Keller. *Id.* at 9. He was also present in the emergency room with Keller, Allen, and Investigator Rick Shows, and he witnessed the first recorded statement. *Id.* at 10–11, 14. According to Perry, Shows read Keller his rights twice, and Keller never asked to speak to a lawyer or invoked his right to remain silent. *Id.* at 10–11. Perry also said that no one threatened Keller, promised him anything, or coerced his confession. *Id.* at 11– 12. According to Perry, they were "focused on getting as much information from Mr. Keller in that brief time as we could," given he had been shot. *Id.* at 33; *see also id.* at 21–22.

Perry testified that Keller was handcuffed to the hospital bed, *id.* at 28, and he was "very conscious." *Id.* at 12. Keller was "screaming in pain intermittently" throughout the interview, and he asked for water several times. *Id.* at 29–30. Although Keller was moaning and "writhing in pain," *id.* at 12, he responded to questions in a manner that showed he understood them. *Id.* at 21. His eyes were

open throughout the interview, and he did not appear to be confused or unable to understand what was happening. *Id.* at 12–13. In fact, Perry testified that Keller was very cooperative, and that his answers to their questions about the murder weapon's location were very specific and detailed. *Id.* at 16–17. In summary, he described Keller's demeanor as "consistent the whole time. He was in a lot of pain and very focused on that injury, but I think he was mentally aware." *Id.* at 20.

Finally, the State called Investigator Michael Brown, the officer who took the second and third recorded statements. *Id.* at 34. Brown related all the independent information the investigators received that led to them settling on Keller as the primary suspect. *Id.* at 40–45. Specifically, Keller's family had reported that he was on crack, had stolen a truck, and intended to "go out in a blaze of glory." *Id.* at 40, 58. Keller's ex-girlfriend had reported that he smoked the same brand of cigarettes found on the floor at the crime scene. *Id.* at 41. Keller was already a suspect in the theft of a .22 revolver from a local pawn shop, and it appeared from Hat Nguyen's wounds that the murder weapon was a small caliber firearm. *Id.* at 43. Also, there were no shell casings at the scene, indicating that murder weapon was a revolver. *Id.* Finally, the clerk at a local Subway restaurant—without being solicited or otherwise prompted—had asked an officer whether Keller had been arrested yet for "the murder of the Vietnamese lady." *Id.* at 44.

Brown admitted that the police gained information that they did not previously know from the first recorded statement. *Id.* at 57–58. They learned the

location of the murder weapon. *Id.* at 57. They also learned that Keller had taken the stolen rolled coins to Keesler Federal Credit Union. *Id.* at 51, 57.

When Brown took the second recorded statement from Keller, he had to wake Keller up. *Id.* at 46. Brown testified that he did not threaten Keller, coerce him, or promise him anything in exchange for the second statement. *Id.* Brown admitted, though, that Keller was "pretty much out of it" during the second statement. *Id.* at 46–47. Brown also admitted that Keller repeatedly asked to talk later, but Brown at first continued to ask questions. *Id.* at 59. Eventually, Brown left and came back later to take the third recorded statement — the one admitted at trial. *Id.* at 47. Brown said that he would not have come back to take the third statement if Keller had invoked his rights at the time of the second statement. *Id.* at 60.

Brown read Keller his rights before taking the third statement. [23-14] at 3. Brown admitted that he did not check with medical personnel before taking Keller's third recorded statement. [22-12] at 61. Brown testified that he did not threaten Keller, coerce him, or promise him anything in exchange for the statement. *Id.* at 47. Investigator Shoemaker was also present, and Brown did not see Shoemaker threaten Keller, coerce him, or promise him anything. *Id.* at 48.

According to Brown, Keller was "very alert," "[v]ery cooperative," "very coherent," and "[v]ery talkative." *Id.* at 48. Keller did not appear to be in pain, and he appeared to understand Brown's questions. *Id.* Keller even corrected Brown when he made a mistake about what Keller was holding when the officers shot him. *Id.* at 48–49. Keller had previously told them where to find the murder weapon, but

during this statement he clarified the sequence of events and his and Nguyen's movements at the murder scene. *Id.* at 50. He also clarified his movements and actions after he left the scene. *Id.* at 50–51. Keller was unsure how many times he had shot Nguyen, but the autopsy results were generally consistent with what he told Brown. *Id.* at 52–53. Keller was otherwise able to understand and answer all Brown's questions. *Id.* at 52. In fact, Keller specifically corrected Brown about the location of one of Nguyen's gunshot wounds, and the autopsy corroborated Keller's statement. *Id.* at 53.

Brown admitted on cross-examination that he did not know that Keller had asked the medical staff for pain medication when Brown exited the room to make a phone call. *Id.* at 63. Brown also admitted that before they started recording the confession, Keller had asked if he could see his mother. *Id.* at 64. Brown testified that he had said, "like I would [for] anybody else, that I would try to work that out." *Id.* Brown clarified on redirect that he did not place any conditions on him trying to arrange for Keller to see his mother. *Id.* at 67.

On May 3, 2013, the trial court entered its decision. [22-10] at 69–80. It found (1) that "the totality of the circumstances establishes that none of the statements given by Jason Lee Keller were 'coerced' by the improper actions of the investigating law enforcement officers"; (2) that the "third statement was freely and voluntarily given after an intelligent and knowing waiver of Keller's rights under *Miranda* and sufficiently removed and distinguishable from the conditions present during the first two statements to be 'purged of the primary taint,' if any, of those statements";

and (3) "that the information obtained in the first two statements was not 'used to obtain additional information' from Keller in the third statement." *Id.* at 80.

The Mississippi Supreme Court agreed, affirming Keller's conviction and sentence. *Keller I*, 138 So. 3d at 850. As for the confession statement admitted at trial, the Mississippi Supreme Court held that the "record supports the trial court's finding that Keller intelligently, knowingly, and voluntarily confessed." *Id.* Even if the first two confessions were obtained in violation of *Miranda*, it had previously rejected "the notion that an illegally obtained confession necessarily requires the exclusion of a subsequent voluntary confession." *Id.* at 849. It also held: "Nothing in the record supports a theory that the statements made in Keller's two suppressed interrogations were exploited to secure a subsequent confession." *Id.* at 850.

The Mississippi Supreme Court also held that the trial court's finding that none of the statements were coerced was "supported by the record . . . ." *Id.* at 851. It elaborated: "It may be questionable that the police interrogate a suspect while he is being treated in an emergency room setting absent extraordinary circumstances; however, there is no evidence suggesting that the police officers did so to coerce Keller." *Id.* And it found no error in the trial court's finding that, considering the totality of the circumstances, "the third statement was obtained by means sufficiently distinguishable to be purged of the primary taint" of the officers' earlier *Miranda* violations. *Id.* at 852 (cleaned up).

The Mississippi Supreme Court also found that even if Keller had invoked his right to remain silent during the first statement to Shows, he reinitiated contact

with Investigator Allen after Shows left the emergency room. *Id.* at 853. Also, his statement to Brown that he wanted to talk later could not reasonably be interpreted as an invocation of the right to remain silent. *Id.* Finally, the Mississippi Supreme Court found that even if Keller did not explicitly say that he waived his *Miranda* rights, his "demeanor and responses . . . throughout the interview were sufficient to convey an implied waiver and willingness to confess to police." *Id.* at 854.

The court also rejected Keller's argument that his waiver was involuntary, observing that there was no evidence of "coercion, pressure, or promise of reward on the part of the interrogating officer," and the record demonstrated he was "alert and coherent." *Id.*

Keller did not raise the issue of the third statement's admission in his post-conviction proceeding. [23-9] at 2–4; [23-40] at 2–3; [23-46] at 1–31; [24-66] at 3, 5; [24-69] at 2.

### 2. *Miranda*, in General

Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005) (cleaned up). "[T]he *Miranda* safeguards are most commonly satisfied by giving the defendant the customary *Miranda* warnings: That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will

be provided for him if he cannot afford to hire one." *Id.* (cleaned up). *Miranda*'s

exclusionary rule "sweeps more broadly" than the Fifth Amendment's protection

against self-incrimination. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). While the

Fifth Amendment "prohibits use by the prosecution in its case in chief only of

*compelled* testimony," any statements by a defendant prior to receiving a *Miranda*

warning must be excluded, even if voluntarily given. *Id.* at 306–07.

Once an adequate warning has been given, "a suspect may knowingly and

intelligently waive his *Miranda* rights and agree to answer questions." *Cardenas*,

410 F.3d at 292. There are two requirements for a valid waiver:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it.

*Id.* at 293 (quoting *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

Voluntariness is assessed "on a case-by-case basis and is viewed under the totality

of the circumstances surrounding the interrogation. A crucial aspect is the presence

or absence of coercive behavior on the part of the government." *Id.* (citation

omitted).

An explicit waiver "is usually strong proof" of its validity, but it "is not

inevitably either necessary or sufficient to establish waiver." *North Carolina v.*

*Butler*, 441 U.S. 369, 373 (1979) (cleaned up). Rather, "waivers can be established

even absent formal or express statements . . . ." *Berghuis v. Thompkins*, 560 U.S.

370, 383 (2010). "As a general proposition, the law can presume that an individual

who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385. And the totality of the circumstances may render an express waiver involuntary or unknowing. *See Cardenas*, 410 F.3d at 293. But "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004) (plurality opinion).

   3.   Fruit of the Poisonous Tree and *Seibert*

Keller presented several interrelated arguments on the confession statement admitted at his trial. The Court will address each one in turn.

First, Keller argues that the third confession statement was "fruit of the poisonous tree," derived from the first two suppressed statements in the emergency room. [45] at 100. He claims that the trial court unreasonably applied clearly established law by undertaking a "new and separate analysis of the circumstances" surrounding the third confession statement without reference to the first two suppressed statements. *Id.* at 101. He argues that there was an "unbroken ca[us]al connection between the two involuntary statements and the [third] statement" because officers exploited "products" of the first two statements, *id.* at 102, and that the Mississippi Supreme Court unreasonably decided that the circumstances of the third statement were removed enough from the first two to purge any remaining

taint. *Id.* at 107. He also contends that the Mississippi Supreme Court unreasonably applied *Missouri v. Seibert*, 542 U.S. 600 (2004). *Id.* at 108.

The State responds that the Mississippi Supreme Court correctly identified and applied relevant Supreme Court precedents governing valid *Miranda* waivers following invalid waivers. [49] at 91. Specifically, the State argues that the "fruit of the poisonous tree" doctrine is inapplicable because the state court correctly found that the first two statements were not coerced, despite Keller's inability to knowingly, voluntarily, and intelligently waive his *Miranda* rights under the circumstances. *Id.* at 91, 93. It also argues that *Seibert* is inapplicable to the facts here, and that the relevant precedent is *Elstad.* [49] at 95–96.

The Mississippi Supreme Court addressed this claim on appeal. *Keller I*, 138 So. 3d at 847–50. First, it declined to apply *Seibert*, holding that the decision "applies only to a single-interview scenario where police fail to warn, question a suspect, obtain a confession, then administer a *Miranda* warning in hopes of having the accused repeat the confession given prior to the *Miranda* warning." *Id.* at 849. It found that "police questioned Keller a third time the day after he had been transported from the ER to the ICU, police readministered a *Miranda* warning, and police approached the interview anew without relying on anything revealed in the first two interrogations." *Id.* at 850. The record therefore did not support "a theory that the statements made in Keller's two suppressed interrogations were exploited to secure a subsequent confession." *Id.*

Even if the third statement were tainted by the two excluded statements, the Mississippi Supreme Court noted that it was taken 14 hours after Keller arrived at the hospital, after he had been transferred out of the emergency room. *Id.* at 852. Moreover, during the third interview, "Keller gave no indication of the pain or distress he had exhibited in the emergency room," and he "gave a detailed statement without coaxing by the officer," which was corroborated by other evidence independent of the statements. *Id.* Accordingly, the Mississippi Supreme Court found that any taint from the first two statements was sufficiently purged from the third. *Id.*

In *Elstad*, the Supreme Court held that the Constitution does not require "the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." 470 U.S. at 303, 318. It explained that a *Miranda* violation "does not mean that the statements received have actually been coerced, but only that courts will presume" the defendant did not intelligently waive the privilege against compulsory self-incrimination. *Id.* at 310. Therefore, a *Miranda* violation "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" does not "so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309.

Under *Elstad*, "[t]hough *Miranda* requires that [an] unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in

these circumstances solely on whether it is knowingly and voluntarily made." *Id.*
But "[w]hen a prior statement is actually coerced, the time that passes between
confessions, the change in place of interrogations, and the change in identity of the
interrogators all bear on whether that coercion has carried over into the second
confession." *Id.* at 310.

In *Seibert*, the Supreme Court specifically addressed the police "technique of
interrogating in successive, unwarned and warned phases." 542 U.S. at 609. It said:
"[I]t would . . . be unrealistic to treat two spates of integrated and proximately
conducted questioning as independent interrogations subject to independent
evaluation simply because *Miranda* warnings formally punctuate them in the
middle." *Id.* at 614. Thus,

> postwarning statements that are related to the substance of prewarning
> statements must be excluded unless curative measures are taken before
> the postwarning statement is made. Curative measures should be
> designed to ensure that a reasonable person in the suspect's situation
> would understand the import and effect of the *Miranda* warning and of
> the *Miranda* waiver. For example, a substantial break in time and
> circumstances between the prewarning statement and the *Miranda*
> warning may suffice in most circumstances, as it allows the accused to
> distinguish the two contexts and appreciate that the interrogation has
> taken a new turn.

*Id.* at 622 (Kennedy, J., concurring in the judgment).[24]

The Fifth Circuit explained the difference between the two decisions: "*Seibert*
requires the suppression of a post-warning statement only where a deliberate two-

---

[24] Justice Kennedy's opinion concurring in the judgment provided the narrowest
grounds of decision agreed upon by five members of the Court, and so this Court applies it,
rather than the four-Justice plurality opinion. *United States v. Courtney*, 463 F.3d 333, 338
(5th Cir. 2006).

step strategy is used and no curative measures are taken; where that strategy is not used, the admissibility of postwarning statements continues to be governed by the principles of *Elstad*." *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007) (cleaned up). Therefore, if the first statement is "obtained in violation of *Miranda*, the next inquiry is" "whether a deliberate two-step strategy was used." *Courtney*, 463 F.3d at 338. If the police used a "deliberate two-step strategy," the trial court should decide whether sufficient curative measures were taken to remedy the earlier *Miranda* violation. *Id.* at 339; *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). If a "deliberate two-step strategy" was not used, *Elstad* applies. *Nunez-Sanchez*, 478 F.3d at 668. Under *Elstad*, when the first statement was not coerced, but merely taken in violation of *Miranda*, "the relevant inquiry is whether . . . the second statement was also voluntarily made." *Id.* at 669 (cleaned up).

"A court considers whether a confession was voluntary based on a totality of the circumstances, which include the length of detention, length of questioning and its location, the use of physical punishment, and whether the accused is informed of his constitutional rights." *United States v. Shows Urquidi*, 71 F.4th 357, 369 (5th Cir. 2023). A statement is involuntary if, "due to state action," the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Id.* (cleaned up). Therefore, a "crucial aspect is the presence or absence of coercive behavior on the part of the government. '[T]he voluntariness of a waiver of [*Miranda* rights] has always depended on the absence of police overreaching, not on "free

154

choice" in any broader sense of the word.'" *Cardenas*, 410 F.3d at 293 (second alteration in original) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)).

Here, the record does not show that officers used a deliberate two-step interrogation strategy. Brown specifically testified that there was no "tactic used to get a statement." [22-12] at 67. The record, when considered as a whole, does not show that the officers took the first two statements intending to exploit the information to get a later admissible statement. Rather, the officers consistently testified that they were "focused on getting as much information from Mr. Keller in that brief time" as they could because he had been shot and they did not know whether he would live or die. *Id.* at 33; *see also id.* at 21–22. Nor did the officers employ a "technique of interrogating in successive, unwarned and warned phases," *Seibert*, 542 U.S. at 609, in that it is undisputed that they read Keller his rights before the first interview. [22-3] at 24. Accordingly, the Mississippi Supreme Court correctly determined that *Seibert* was inapplicable here.

Even if the officers had employed a deliberate two-step interrogation strategy, there were sufficient curative measures to remedy the earlier *Miranda* violation. The third recorded statement took place about 11 hours after the second one. *Compare* [22-3] at 58–59, *with* [23-14] at 3. Keller had been transferred out of the emergency room and into the ICU. [22-3] at 65. He had eaten and taken fluids. [22-11] at 105. He had rested. *Id.* at 104–05. His pain level had decreased. *Compare* [22-13] at 27, *with id.* at 31. He felt well enough to watch television. [56]. In summary, his condition had improved substantially.

155

The difference in Keller's condition between the first two statements and the third one is obvious in the recordings. During the first and second recordings, Keller groaned in pain, and he was unresponsive to many of the investigators' questions. *Id.* His speech was slurred and, at times, unintelligible. *Id.* But in the third recording, Keller spoke coherently to Investigator Brown. *Id.*; [23-14] at 3–25. His responses to Brown's questions showed that he fully understood what was happening and what Brown was asking him. [56]; [23-14] at 3–25. He even corrected Brown at points in the conversation. [23-14] at 5, 8, 11. The difference in the recordings cannot be overstated.

### 4.  Coercion and the Two Excluded Statements

Because the officers did not employ a deliberate two-step interrogation strategy, the Court applies the analysis from *Elstad*. *Nunez-Sanchez*, 478 F.3d at 669. Under *Elstad*, when the first statement was not coerced, but merely taken in violation of *Miranda*, "the relevant inquiry is whether . . . the second statement was also voluntarily made." *Id.* (cleaned up). Therefore, the Court must address whether the first two statements were coerced.

The Mississippi Supreme Court's determination that the first two statements were not coerced was reasonable. No evidence shows that the officers threatened or tricked Keller. And no evidence suggests that they conditioned Keller's receipt of medical treatment on his cooperation or promised him anything in exchange for a

confession.[25] Every officer denied that they had coerced, threatened, or promised anything to Keller, or that they had witnessed anyone do so. [22-3] at 26–27, 67, 76; [22-12] at 11–12. Investigator Brown specifically testified that he placed no conditions on him trying to arrange for Keller to see his mother, and that he would have done the same for anyone. [22-12] at 64, 67. Indeed, Brown told Keller that he could not "promis[e] . . . anything." [23-14] at 25. Nothing in the record disputes this testimony.

The only evidence supporting Keller's coercion argument is the testimony of Dr. Joe Jackson. Jackson stopped short of explicitly saying that the offices coerced the first two statements. Rather, he said that the officers acted "inappropriate[ly]" by telling Keller that they "didn't know what the next few minutes or hours would hold in store," because "it sort of set up, this is your last chance, you've got to confess or you may be dead." [22-11] at 58. He implied that the officers took advantage of Keller while he was in a "hyper-suggestive state" because of his pain and medication. *Id.* at 59. Finally, he said that the officers encouraged Keller to talk to them "even when he is in a situation where he doesn't want to." *Id.* at 68–69.

The Court finds that none of what Jackson cited qualifies as coercion. It is true that "[s]tatements obtained through either physical or psychological coercion of a defendant in police custody violate that defendant's Fifth Amendment privilege against self-incrimination, and thus cannot be used against him at trial." *Hamilton*

---

[25] At one point in the first recorded statement, Keller asked for some water, and the officers said they would try to get him some. [22-3] at 39; [56]. The officers were not withholding water until he answered their questions. Rather, medical personnel would not give Keller water in case he had to undergo surgery. [22-11] at 57.

*v. Lyons*, 74 F.3d 99, 103 (5th Cir. 1996). But the Fifth Circuit has rejected claims of "psychological coercion" where a defendant has not established "police overreaching, the crucial element in a voluntariness analysis." *United States v. Sauseda*, 526 F. App'x 349, 353 (5th Cir. 2013) (per curiam) (cleaned up). "[T]here is nothing inherently wrong with efforts to create a favorable climate for confession. Neither mere emotionalism and confusion, nor mere trickery will alone necessarily invalidate a confession." *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992) (cleaned up). "Trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *United States v. Alvarado-Palacio*, 951 F.3d 337, 341 (5th Cir. 2020) (cleaned up).

Here, there is no evidence of threats, intimidation, trickery, or deceit. And there is no evidence officers deprived Keller of knowledge essential to the intelligent exercise of his Fifth Amendment rights. Their statement to Keller that they did not know what would happen was true. Keller had been shot, and the extent of his injuries was unknown. Keller even testified during the sentencing phase of trial that he gave the statement because he wanted to be "helpful with the officer." [22-6] at 133. He said, "they had to know what was going on. I knew it was the wrong decision, you know. The best to help their case and mine, you know. It was the right thing to do." *Id.*

Again, officers are allowed to "create a favorable climate for confession," *Self*, 973 F.2d at 1205 (cleaned up), and playing on a suspect's emotions is not inherently

coercive. *United States v. Duke*, 858 F. App'x 770, 771 (5th Cir. 2021) (per curiam).

Officers may express sympathy or kindness, and even express their opinion about

future events beyond their control. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1139 (5th

Cir. 1988). The crucial factor is whether the officers "override" the suspect's will or

"deprive him of knowledge he needed to understand his *Miranda* rights or the

consequences of waiving them." *Duke*, 858 F. App'x at 771–72 (first citing *Cardenas*,

410 F.3d at 297; and then citing *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002)

(en banc)). In other words, it is the officers' actions that matter, rather than the

particular suspect's susceptibility to questioning. *Sauseda*, 526 F. App'x at 353.

Here, the record contains no evidence that the officers overrode Keller's will

or deprived him of essential information. Accordingly, the Mississippi Supreme

Court's determination that the first two statements were not coerced was

reasonable.

### 5. Voluntariness of the Third Statement

Because the first two statements were not coerced, but merely taken in

violation of *Miranda*, the relevant question in deciding the third statement's

admissibility is whether it was voluntarily made. *Nunez-Sanchez*, 478 F.3d at 669.

Keller argues that the Mississippi Supreme Court unreasonably decided that his

waiver of rights was voluntary. [45] at 108. He contends that the Mississippi

Supreme Court unreasonably decided that he was alert and coherent during the

third statement. *Id.* at 96. According to Keller's expert, he could not make a "free

and clear decision" to waive his rights and speak to investigators, *id.* (cleaned up),

and he fabricated the content of the confession statement in response to the officers' leading questions, to ingratiate himself to them. *Id.* at 99. The State responds that the state court reasonably determined that Keller provided a valid waiver of his *Miranda* rights before the third confession statement. [49] at 96–97.

The Mississippi Supreme Court addressed this claim on appeal. *Keller I*, 138 So. 3d at 850–54. It observed that the "record supports the trial court's finding that Keller intelligently, knowingly, and voluntarily confessed." *Id.* at 850. It noted that he did not invoke his right to remain silent or ask for counsel. *Id.* And it held that the record did not support Keller's argument that "statements made in [the] two suppressed interrogations were exploited to secure a subsequent confession." *Id.*

The Mississippi Supreme Court acknowledged that it "may be questionable that the police interrogate a suspect while he is being treated in an emergency room setting absent extraordinary circumstances; however, there is no evidence suggesting that the police officers did so to coerce Keller." *Id.* Considering the totality of the circumstances, the Mississippi Supreme Court found that "the third statement was obtained by means sufficiently distinguishable to be purged of the primary taint" of the officers' earlier *Miranda* violations. *Id.* at 852 (cleaned up). The court wholly rejected Keller's argument that his waiver was involuntary, observing that there was no evidence of "coercion, pressure, or promise of reward on the part of the interrogating officer," and that the record demonstrated he was "alert and coherent." *Id.* at 854.

"A court considers whether a confession was voluntary based on a totality of the circumstances, which include the length of detention, length of questioning and its location, the use of physical punishment, and whether the accused is informed of his constitutional rights." *Shows Urquidi*, 71 F.4th at 369. A statement is involuntary if, "due to state action," the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Id.* (cleaned up). Therefore, a "crucial aspect is the presence or absence of coercive behavior on the part of the government. The voluntariness of a waiver of *Miranda* rights has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Cardenas*, 410 F.3d at 293 (cleaned up). In short, "[a] statement cannot be involuntary in the absence of coercive police activity." *United States v. Mendez*, 885 F.3d 899, 910 (5th Cir. 2018); *see also Connelly*, 479 U.S. at 167.

The Court has already mentioned many noteworthy factors in the voluntariness analysis. The third recorded statement took place around 11 hours after the second one. *Compare* [22-3] at 58–59, *with* [23-14] at 3. Keller had been transferred out of the emergency room to the ICU. [22-3] at 65. He had eaten and taken fluids. [22-11] at 105. He had rested. *Id.* at 104–05. His pain level had decreased. *Compare* [22-13] at 27, *with id.* at 31. He felt well enough to watch television. [56]. His condition improved substantially during the interval between the second and third statements, and the difference is obvious in the recordings. During the first and second recordings, Keller groaned in pain, and he was unresponsive to many of the investigators' questions. [56]. His speech was slurred

161

and, at times, unintelligible. *Id.* In the third recording, Keller spoke clearly and coherently, carrying on a conversation with Investigator Brown. *Id.*; [23-14] at 3–25. His responses to Brown's questions showed that he fully understood what was happening and what Brown was asking him. [56]; [23-14] at 3–25. He corrected Brown at points in the conversation. [23-14] at 5, 8, 11. His demeanor was genuinely remorseful about what he had done. *Id.* at 14. He admitted that he had tried to commit suicide-by-cop, *id.* at 12, and he seemed glad that now he was "off the streets" and could not "hurt nobody else." *Id.*

Keller relies heavily on the expert testimony of Dr. Jackson to support his argument that he could not make a "free and clear decision" to waive his rights and speak to investigators. [45] at 96 (cleaned up). He claims that he fabricated the content of the confession statement in response to the officers' leading questions, to ingratiate himself to them. *Id.* at 99. The Court provided a thorough summary of Jackson's testimony in its discussion of the facts relevant to this claim. In broad terms, Jackson believed that Keller was "not able to competently give information," "answer questions," "comprehend his *Miranda* [r]ights," or "understand the exact nature of the questions which are being asked and the significance they subsequently may have acquired" at the time of the third recorded statement because he had been given morphine; there was still cocaine and marijuana in his system; he was still in pain; and his sleep had often been interrupted. [22-13] at 60–61.

The primary problem with Keller's argument that his third confession statement was involuntary is that he has not shown any overreaching by Investigator Brown. As noted above, "[a] statement cannot be involuntary in the absence of coercive police activity." *Mendez*, 885 F.3d at 910. In other words, it is the officers' actions that matter, rather than the suspect's susceptibility to questioning. *Sauseda*, 526 F. App'x at 353. Officers may play on a suspect's emotions. *Duke*, 858 F. App'x at 771. Truthful statements about the potential outcome of a case are not inherently coercive. *Id.*; *Hawkins*, 844 F.2d at 1139. Nor are expressions of sympathy or kindness. *Hawkins*, 844 F.2d at 1139. Again, the record does not show that the officers engaged in coercive conduct. There is no evidence of threats, intimidation, trickery, or deceit. And no evidence that officers deprived Keller of knowledge essential to the intelligent exercise of his Fifth Amendment rights or otherwise compromised his capacity for self-determination.

Even so, the Fifth Circuit has rejected arguments that confessions were involuntary because of intoxication in similar situations. In *United States v. Smith*, the defendant argued that his confession was involuntary because he was deprived of sleep and "highly intoxicated and under the influence of prescription medication" at the time of interrogation. 609 F. App'x 180, 186 (5th Cir. 2015) (per curiam) (cleaned up). The Fifth Circuit noted that the "trial testimony and transcripts of the interviews reveal[ed] that he understood his rights, was cooperative, listened to questions and responded, and gave detailed accounts of the" offenses. *Id.* And an officer had testified that he "did not appear to be under the influence of drugs or

alcohol," and "after listening to the recorded interviews," the district court found that Smith did not sound "'highly intoxicated.'" *Id.* at 186–87. Accordingly, under the totality of the circumstances, the confession was voluntary. *Id.* at 187.

Likewise, in *United States v. Reynolds*, the defendant argued that "his having taken methamphetamine an hour before he was arrested and not having slept for three days at the time of his arrest made his confession to the arresting officers involuntary." 367 F.3d 294, 297 (5th Cir. 2004) (per curiam). The record showed that "throughout the interview, Reynolds was cooperative, listened to questions, and responded appropriately." *Id.* at 299. He provided detailed information, and the officers testified at trial that "in their experience, neither believed that [he] was under the influence of any drug or alcohol." *Id.* Accordingly, the district court did not err in declining to suppress the confession. *Id.*

Here, Investigator Brown—the officer who took the third recorded statement—testified that Keller was "awake and alert when we got there." [22-3] at 65–66. He specifically testified that Keller did not appear to be under the influence of any narcotics. *Id.* at 66. He said that Keller "was talking, you know, plain as day. . . . I understood him perfectly fine." *Id.* Keller's speech was not slurred. *Id.* He spoke in coherent sentences and even corrected Brown during the conversation. *Id.* Brown said: "He was that alert to where he knew exactly what was going on and what he was saying . . . ." *Id.* Indeed, this Court has listened to the recordings of the three statements, and the vast difference between Keller's condition during the first two recorded statements and his condition during the third recorded statement is

obvious. [56]. So, it was not unreasonable for the Mississippi Supreme Court to give less weight to Jackson's testimony than the other evidence.

Finally, the Court notes that Keller received a dose of pain medication at the end of the third recorded statement, while Investigator Brown exited the room to make a phone call. [56]; [23-14] at 23. Therefore, when Keller gave Brown all the cogent information, he was at the end of a dosage cycle. Additionally, the test that revealed cocaine and marijuana in Keller's urine was on a sample taken June 25, 2007—three days after Keller was apprehended and admitted to the hospital, and over two days after the confession. [22-13] at 69. Assuming that Keller had no access to cocaine and marijuana while hospitalized, urinalysis results from two days after the confession have little bearing on the voluntariness of his confession. *See* [22-13] at 14 (stating during third recorded statement that Keller's "high" was "gone now").

For all these reasons, the Court finds that the Mississippi Supreme Court reasonably determined that Keller's third recorded statement was voluntary. Its adjudication of this issue was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on unreasonable determinations of fact.

### 6.   Whether Keller Waived His *Miranda* Rights

Keller also argues that he never specifically waived his *Miranda* rights because (1) the officer never specifically asked him to waive them, and (2) his response to the officer was ambiguous. [45] at 103. He contends that the Mississippi

Supreme Court unreasonably inferred a waiver from the circumstances, misapplying the law and misapprehending the facts. *Id.* at 103–04. The State responds that the state court reasonably determined that Keller provided a valid waiver of his *Miranda* rights before the third confession statement. [49] at 96.

At the beginning of the third recorded statement, Investigator Brown said: "I'd like to read you your rights. I know you said you would agree to talk to us, but I gotta do that anyway." [23-14] at 3. Brown then advised Keller of his rights and asked, "Do you understand all that?" *Id.* Keller responded, "I understand." *Id.* Brown then asked Keller about the sequence of events right before the murder of Hat Nguyen. *Id.* Keller answered Brown's questions, fully cooperating throughout the interview. *Id.* at 3–25.

The Mississippi Supreme Court addressed Keller's argument on appeal. *Keller I*, 138 So. 3d at 853–54. It held that "[e]ven if 'I understand,' is not an express waiver, the demeanor and responses of Keller throughout the interview were sufficient to convey an implied waiver and willingness to confess to police." *Id.* at 854.

As noted above, an explicit waiver "is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373. "[W]aivers can be established even absent formal or express statements . . . ." *Berghuis*, 560 U.S. at 383. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their

exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385.

Here, Keller received the *Miranda* warning, said that he understood it, and then answered all the officer's questions. [23-14] at 3–25. His demeanor was cooperative throughout the interview, *id.*, and he expressed remorse for his actions. [23-14] at 14. The totality of the circumstances discussed above reflect that Keller understood his rights and voluntarily waived them. *See, e.g. Duke*, 858 F. App'x at 771; *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009). Accordingly, the Mississippi Supreme Court's determination of this issue was reasonable. It was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on unreasonable determinations of fact.

    7.   Whether the Confession Was Coerced

Keller argues that the Mississippi Supreme Court unreasonably found that the third statement was not the product of coercion. [45] at 105–06. He contends that the circumstances of the statement—his injuries, the medication he had been given, the drugs he had taken the day before, and the mental pressure he was under—dictate a finding of coercion. *Id.* The State responds that the state court reasonably determined that Keller provided a valid waiver of his *Miranda* rights before the third confession statement. [49] at 96.

The Mississippi Supreme Court addressed this claim on appeal. *Keller I*, 138 So. 3d at 850–54. It found that "[t]here was no evidence of coercion, pressure, or

promise of reward on the part of the interrogating officer" in the third statement. *Id.* at 854.

For all the same reasons addressed above in its discussion of the voluntariness of Keller's third recorded statement, the Court finds that the confession was not coerced. There is no evidence of coercive or overreaching police conduct. There is no evidence that they threatened him, physically abused him, promised him anything, or otherwise critically impaired his capacity for self-determination. Accordingly, the Mississippi Supreme Court's determination of this issue was reasonable.

L.   Ground 9a: Prosecution's Reference to Suppressed Statement

Keller claims that the prosecution violated his right to due process by referring to the two suppressed recorded statements. During the State's opening statement, the prosecutor explained that Keller was charged with capital murder, and she described the victim and setting. [22-5] at 65. She then gave the jury a summary of the offense, describing what Keller did and what some witnesses were expected to testify. *Id.* at 65–67. While doing so, the prosecutor said: "Now this is what's going on in the store, but you're also going to hear testimony from the investigator as to what the defendant was doing. He provided *statements* to law enforcement once he described it." *Id.* at 67 (emphasis added). The defense did not object. *Id.* The prosecutor then described what happened after Keller left the convenience store. *Id.* at 67–68.

Keller argues that the prosecutor's use of the plural "statements"—rather than a singular "statement"—was intentional defiance of the trial court's suppression order. [45] at 110. He contends that the prosecution wanted to suggest to the jury that there were multiple confession statements, rather than the one confession statement that the trial court admitted at trial. *Id.* at 109. The State responds that this claim is procedurally barred and, alternatively, that the Mississippi Supreme Court's adjudication of the claim was neither contrary to nor an unreasonable application of clearly established federal law. [49] at 98–99.

### 1. Procedural Bar

Keller presented this issue to the Mississippi Supreme Court on direct appeal. [22-20] at 133–34. The State argued that the claim was procedurally barred because Keller did not contemporaneously object. [22-21] at 81. Keller conceded that his counsel had not objected, but he argued that the trial court's error in allowing the prosecutor to refer to multiple recorded statements was still reviewable as plain error. [22-20] at 134.

The Mississippi Supreme Court observed that "[a]rguments made by counsel during opening statements do not constitute evidence," and that the trial court specifically instructed the jury that they were to disregard anything the attorneys said during opening statements which had no basis in the evidence. *Keller I*, 138 So. 3d at 861. The claim therefore did not "rise to the level of plain error." *Id.* at 861.

The State argues that, although it did not explicitly say as much, the Mississippi Supreme Court necessarily found that this claim was procedurally

barred because it said the trial court's inaction was not plain error. [49] at 98. In other words, there would be no reason for it to address plain error unless the claim was procedurally barred because Keller's counsel failed to object at trial. This argument is reasonable. But "[a] state court must be explicit in its reliance on . . . a procedural default" to preclude federal habeas review, *Winfield*, 2001 WL 85816, at *2, and the Mississippi Supreme Court did not explicitly rely on a procedural default. So this claim is not procedurally barred.

     2.  Analysis

Citing *New Jersey v. Portash*, 440 U.S. 450, 459 (1979), Keller argues that any use of an involuntary statement constitutes a denial of due process. [45] at 110–11. There, the defendant had testified before a grand jury under immunity granted by state law, and he was later charged with crimes described in the immunized testimony. *Portash*, 440 U.S. at 451–52. Before he was tried on those charges, the trial court ruled that the prosecution could use the immunized testimony for impeachment purposes. *Id.* at 452. He declined to testify and was convicted. *Id.* The Supreme Court ultimately ruled that his grand jury testimony given under a grant of immunity could not be used against him in a later criminal trial, citing the Fifth Amendment's prohibition of compulsory self-incrimination. *Id.* at 459–60.

The Mississippi Supreme Court correctly observed that *Portash* does not address the circumstances here—where a single word (indeed, a single letter) uttered by a prosecutor during an opening statement violates a court's suppression

order. *Keller I*, 138 So. 3d at 860. Keller has cited no other clearly established

federal law addressing similar circumstances.

Even if the trial court erred,[26] any alleged error was harmless. Right before

the State's opening statement, the trial court told the jury:

> [T]he first step in the process is what is called opening arguments, and
> this is simply the arguments of counsel. It's intended to kind of give you
> a road map or a cliff-note version of what they expect the proof to show.
> Reminding you that what the attorneys say is not evidence, this is
> simply their best estimate of what you are about to see in the proof.

[22-5] at 64. Later, the trial court instructed the jury:

> The evidence which you are to consider consists of the testimony and
> statements of the witnesses and the exhibits offered and received. . . .
> Arguments, statements and remarks of counsel are intended to help you
> understand the evidence and apply the law, but are not evidence. If any
> argument, statement or remark has no basis in the evidence, then you
> should disregard that argument[,] statement[,] or remark.

[22-2] at 15–16. It is undisputed that no evidence of the first two recorded

statements was admitted at trial, and Keller has not directed the Court to any

evidence that the jurors considered the prosecutor's utterance to be evidence of

multiple confession statements. "[J]urors are presumed to follow their instructions."

*Sheppard v. Davis*, 967 F.3d 458, 470 (5th Cir. 2020). Accordingly, the Court finds

that the Mississippi Supreme Court's adjudication of this claim was not contrary to

or an unreasonable application of clearly established federal law.

---

[26] To be clear, Keller has not asserted what the trial court should have done in the
absence of an objection and motion for relief.

M. Ground 10a: Prosecutorial Misconduct Regarding Expert Testimony

Next, Keller claims that the trial court erred by admitting testimony from the State's forensic pathology expert, Dr. Paul McGarry. Keller contends that the "prosecution elicited unnecessary evidence regarding Ms. Nguyen's degree of pain, functionality, and ability to perform tasks requested of her after each of the four gunshot wounds she suffered." [45] at 113. He claims that the State elicited this testimony to "argue improperly that Ms. Nguyen's death was 'brutal' and 'unnecessary' because Keller could have robbed her without killing her." *Id.* at 113–14. Keller also contends that the "most egregious of Dr. McGarry's testimony" was "not supported by the evidence or proper application of reliable methods and principles." *Id.* at 114. Keller argues that three specific sections of McGarry's testimony failed to satisfy the admissibility requirements of Mississippi Rule of Evidence 702. *Id.* at 114–15.

The State responds that this claim is procedurally barred. [49] at 100. And Keller did not address that issue in reply. [53] at 31–32.

Keller presented this issue to the Mississippi Supreme Court on direct appeal. [22-20] at 122–33. As here, he argued that the State "elicited unnecessary evidence from the pathologist concerning Ms. Nguyen's degree of pain, functionality, and ability to perform tasks requested of her after each of the four gunshot wounds she suffered." *Id.* at 124. Also, as here, he argued that the purpose of eliciting this testimony was to establish "that Ms. Nguyen's death was 'brutal' and 'unnecessary,' because Keller could have robbed her without killing her . . . ." *Id.* at 124–25

(citation omitted). Keller also argued on appeal that "the most egregious of Dr. McGarry's testimony . . . was simply not supported by the evidence or proper application of reliable methods and principles to it." *Id.* at 131.

As for the "victim impact evidence," the Mississippi Supreme Court held that Keller had "waived his right to raise the argument for failure to object contemporaneously at trial." *Keller I*, 138 So. 3d at 857–58. And as for Keller's argument on the unreliability of McGarry's testimony, the Mississippi Supreme Court noted that Keller did not object to the specific testimony, object to McGarry's qualification as an expert, or otherwise raise a *Daubert* challenge. *Id.* at 859. It therefore held that he had waived the claim for not objecting contemporaneously at trial. *Id.* at 860.

A federal habeas claim is procedurally barred where "the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar." *Mullis*, 47 F.4th at 387–88. The Fifth Circuit has held that Mississippi's contemporaneous objection rule is an adequate and independent state bar. *Wiley*, 969 F.2d at 103. So the Court finds that this claim is procedurally barred, as the last state court to address it unambiguously based its denial on Mississippi's contemporaneous objection rule.

The Court also finds that Keller's claims premised upon alleged violations of Mississippi Rule of Evidence 702 should also be dismissed because "federal habeas corpus relief does not lie for errors of state law." *Swarthout*, 562 U.S. at 219 (cleaned up).

N. Ground 10b: Ineffective Assistance of Trial Counsel in Not Objecting to State's Expert Testimony

Keller also argues that his trial counsel provided ineffective assistance by not objecting to portions of McGarry's testimony. Before setting out Keller's specific claims, the Court will provide the relevant portions of McGarry's testimony.

1. Relevant Facts

The prosecution first qualified Dr. McGarry by asking questions about his experience and credentials. [22-5] at 132–34. McGarry testified that he was a board-certified forensic pathologist who had performed "more than 13,000" autopsies in his career. *Id.* at 132. He had worked in the coroner's office in Orleans Parish, Louisiana, for over 25 years, and in that time, he had done autopsies on about 2,500 gunshot victims. *Id.* at 133. Accordingly, the State tendered McGarry as an expert in forensic pathology. *Id.* at 134. The defense did not object. *Id.*

McGarry conducted Hat Nguyen's autopsy. *Id.* He found that she suffered four gunshot wounds: one entering the center of her abdomen above the naval ("Wound C"); one entering the right side of her head but not breaching the skull ("Wound A"); one entering the left side of her head from close range and going into her brain ("Wound D"); and one entering the base of her skull from close range, going into her brain and severing the brain stem from her spinal column ("Wound B"). *Id.* at 135, 138–39, 143–46, 149–50; [22-6] at 2–3.

The State elicited testimony from McGarry on Wound A's effect on Nguyen:

Q.    . . . What would the power of the gunshot be to someone as Ms. Nguyen?

A. Under the gunshot wound, although it did not go through the bone there was a bruise of the brain, so there was an impact enough to be like a hard blow to the right side of the head. It would be likely to knock her down but not to kill her.

Q. So she would be able to live with this gunshot wound?

A. Yes.

Q. Would she be able to function in the movements surrounding this gunshot wound immediately thereafter?

A. I would expect that the vast majority of her brain was still intact. She would be able to move, she would not be paralyzed, she would not be seriously brain damaged. She would probably be stunned and knocked down but still would be able to move her body around and probably, although somewhat stunned, would be able to know what was going on.

Q. Okay. Would she able to talk?

A. Yes.

Q. Would she be able to perform tasks if requested upon her?

A. Yes.

[22-5] at 138–39.

Later, the State elicited testimony from McGarry on Wound D's effect on

Nguyen:

Q. . . . With this wound, Doctor, would Ms. Nguyen still have been conscious?

A. This is a more serious wound. It's actually the bullet going into the brain itself, would probably cause some degree of decreased consciousness, either totally unconscious or brain damaged enough to be less than fully conscious and fully able to do things, but still no central vital structures destroyed. She would, I expect, still be alive. She would be unable to think clearly, unable to know what was going on but probably not fully comatose. She would still be able to move, her muscles and the nerves that go to her

extremities would still be intact, and she would still be probably moving.

Q.    Doctor, would she be able to make rational decisions at this point in time?

A.    That would probably not be possible at the highest level of thinking. She probably would be very confused if not stuporous.

Q.    Would she be able to talk?

A.    She'd be able to make noises and say words, yes.

Q.    Would she be able to struggle or put up a fight?

A.    Yes.

.    .    .

Q.    Would she be able to resist—would she be able to resist a struggle to still protect her store or would she basically—

A.    She would be altered, she would not be as in good condition as she was after the second wound, but she would not be totally disabled, and I would expect if she were strongly motivated that she would still be struggling.

Q.    Because this is, Doctor, I believe would you say based upon what you have so far that this would have been the third gunshot wound that she would have suffered?

A.    I don't know for sure. If I put these four wounds together with whatever information is available I think I can make a judgment as to what order at least the first and the last were. The two in the middle I would not be as sure of.

Q.    . . . If given the set of circumstances where you were told that the victim after being shot twice in the head ran out of the store would that coincide with wound C and A or would that—would this wound here, would the victim be able to get up and run out of the store?

A.    I would not expect that. I would expect with the wound of the abdomen certainly she would be able to run. With the wound to

the right side of the head she might still be able to, but I think she would be knocked down by the wound of the right side of the head. . . . The wound to the left[]side of the head I think she would definitely be down but not dead.

Q.    So . . . this is wound A, if she were struck with the bullet and knocked down, in your expert opinion, would she be able to get up and run out of the store?

A.    That would be possible with that wound.

Q.    In your expert opinion would she be able to get up and run out of the store with wound D . . . —

A.    That's much less likely because she has a bullet in her brain in that one.

Q.    Okay. Doctor, do you have an opinion as to whether Ms. Nguyen in this photograph, wound D, based upon the angle, whether she would be standing or sitting or laying?

A.    I can't tell. It depends on where the shooter was. The shooter is close to her head, the gun is in this direction. She could be standing up, but that's unlikely. She would be more likely crouched down or down close to the floor and being shot down on.

*Id.* at 146–48.

The State also elicited testimony from McGarry about how long that the

overall sequence of events would have taken:

Q.    . . . Doctor, this event—this is a four gunshot event with some[]time during the middle of it the victim running out of the store and coming back in. Would you expect that this was a quick, quick set of circumstances or would this event have taken some[]time?

A.    Well it would have taken some[]time because the bullet wounds are at different ranges, going into the body in different directions, going both upward, downward, leftward, into the body indicating that there was a change of position between the person being shot and the shooter, and the change in the range or distance between the two. The gunshot wound of the abdomen would certainly allow

her to have full function. She has no damage to her head at all. She has no interference with using her legs and her arms, and that one I feel sure she would be able to open a door and run out.

[22-6] at 3.

McGarry testified that "for the abdominal wound and the wound that is in the scalp I would expect [Nguyen] to be aware of what's happening." *Id.* at 3–4. He said she would still be able to function. *Id.* That is, she would have still be able to "comply with any request or demands made upon her," talk, or "run out of the store," with the "abdominal wound and very possibly . . . with the superficial wound of the scalp." *Id.* at 4. Once she received Wound D, though, McGarry could not be as certain. He said, "This wound actually goes into her brain. I would expect her to be knocked down by this wound, but not killed. And I would expect her to be able to still move around, struggle, be obviously alive . . . . [W]hether she could comply with a request[,] I don't know." *Id.* at 5. He clarified: "She would be able to move, she would be able to struggle, . . . but she would be brain damaged. . . . I think she would be seriously stunned. She would probably be on the floor . . . . But she would not be able to keep somebody from doing what they wanted to do." *Id.* at 5–6.

McGarry testified that Nguyen would have progressively become more disabled with each gunshot. He said:

If they are in the order that I think they are the abdomen is minimally disabling. The gunshot wound that hits her head hard but doesn't go into her brain would be like a blow to the head, like getting punched or hit by a stick or something like that. She would still be able to do what she needed to do in an emergency, possibly clearly thinking. The wound that goes in the left-side and actually goes in her brain, and this is certainly a more disabling wound but not fatal. She would still be able to move. None of her major brain parts that are necessary for movement

are damaged there. So she would still be able to move around. . . . The final gunshot she can't do anything after that.

[22-6] at 6.

During guilt-phase closing argument, the State highlighted McGarry's

testimony:

> Dr. McGarry testified, the forensic pathologist, he testified about the four gunshot wounds that we have; the one in the abdomen, the one in the right front scalp, the one in the left scalp above the ear, and then the fatal shot, that kill shot to the back of the neck. He testified that Ms. Nguyen was a woman 5′5″, 130 pounds. He testified that—I think he testified that Ms. Nguyen could have actually lived with the first shot to her abdomen even if she had never received any medical attention, she could have lived. Could have lived with the second shot, the one in the scalp. The third shot not so much. That one was going to be bad, but he did testify that she could have lived with the third shot. She would have been in pretty bad shape. This is the one that would have knocked her to the ground. She would have been on the ground, not really struggling, just laying there, and then after that the defendant shoots her for a fourth time for no reason. He testified that her pain would be increasing during this time. She would become more and more incapacitated, unable to perform duties, unable to talk, unable to speak, unable to resist. His expert opinion was that Ms. Hat died as result of the gunshot wound to her head, and that is the final element that Jason Keller did kill . . . Hat Thi Nguyen.

[22-6] at 41–42.

The State also highlighted McGarry's testimony during its penalty-phase

closing argument:

> The third aggravating factor that we have is that the defendant did this and committed the killing with the intent to avoid arrest. And as you can draw reasonable inferences, and as you use your common sense and think about what's going on in this case, in January he's caught on a bank robbery. So this time, six months later, June of 2007, as he's walking around looking for the opportunity he finds Ms. Hat Nguyen. He could have robbed her, he could have gotten the money and he could have left. She ran out the store. He could have gotten the money and he could have left but he didn't. He brought her back into the store and got

179

her down on her knees and executed her for the purpose of avoiding arrest. That, ladies and gentlemen, is the third aggravating factor, and is another reason by itself that you can consider and return a verdict of death.

The fourth aggravating factor that the State has provided to you through the evidence and the witnesses is that [the] crime was especially heinous, atrocious and cruel. The court has a separate instruction that defines those words because some of them—cruel is really easy to think about. There you will need to go back and recall what Dr. McGarry said about how the injuries happened and how the victim is shot. And he said when the victim is shot the first time besides the initial pain that she had she's also got the shock, and the pain that's going on in her head because she knows what's going on. With the second shot she still knows what's going on and how this is going to affect her. And she's able to run out of the store and try to get away from the situation. We've got this defendant in the store with a gun, she's already been shot, there's a good chance of getting away, and why does she go back. The mental torture to the victim, the infliction of the mental pain was that she as a parent had to return to the store. There she's shot again even after she's already said I'm going to give you the money.

[22-7] at 55–56.

2. Analysis

Keller contends that his trial counsel should have objected to, rebutted, or otherwise challenged McGarry's testimony on (1) Nguyen's capabilities after each gunshot wound, (2) the order in which the shots were fired, and (3) the relative positions of Keller and Nguyen. [45] at 115–16. Citing *Harrison v. State*, 635 So. 2d 894 (Miss. 1994), and two news reports involving an autopsy McGarry performed in another case, Keller contends that "it was well known in the legal community at the time that Dr. McGarry had a reputation for providing unreliable and inadmissible testimony." [45] at 117.

Keller contends that his trial counsel's failures were particularly prejudicial because "Dr. McGarry's testimony was the most significant piece of evidence

supplied by the State in its effort to argue Mr. Keller killed Ms. Nguyen to avoid arrest, the third aggravating factor noticed against him." *Id.* at 119. During the sentencing phase of trial, Keller denied that he had killed Nguyen to avoid arrest. *Id.* Keller thus argues that without McGarry's testimony, the State would not have been able to argue that "Keller brought Ms. Nguyen back into the store and got her down on her knees [and] executed her for the purpose of avoiding arrest." *Id.* (cleaned up).

Keller presented this issue to the Mississippi Supreme Court in post-conviction. [23-9] at 140–47. The Mississippi Supreme Court summarily denied it as meritless, without any discussion. *Keller II*, 229 So. 3d at 716. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. This Court must "determine what arguments or theories could have supported the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Trottie*, 720 F.3d at 241 (cleaned up).

An attorney's "failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Wood*, 503 F.3d at 413 (cleaned up). So to demonstrate that his trial counsel performed deficiently by not objecting to McGarry's testimony, Keller must show that these hypothetical objections would

have had merit. As the Court will explain, he has not done so, and therefore he has not shown deficient performance.

First, Keller contends that the testimony about Nguyen's capabilities after each gunshot was inflammatory victim-impact evidence which had no relevance to the jury's determinations during the guilt phase of trial. Keller is mistaken. "Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinion of the crimes and the defendant." *Galloway v. State*, 122 So. 3d 614, 671 (Miss. 2013) (cleaned up). But under Mississippi law, "testimony concerning the background and habitual actions of the victim" is not victim-impact evidence and can be introduced during the guilt phase of trial "to explain the circumstances surrounding the crime and establish guilt." *Id.* (cleaned up). McGarry's testimony had nothing to do with the emotional impact of Nguyen's death on her family. Rather, he described the circumstances of her murder, and that information was highly relevant to the jury's determination during the first phase of Keller's trial. Therefore, it was not impermissible "victim-impact evidence." *Id.* at 671–72.

Even if the Court accepts Keller's framing of McGarry's testimony as victim-impact evidence, such evidence is admissible if it is relevant and "its probative value outweigh[s] the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Snarr*, 704 F.3d at 400 (cleaned up). Keller provided a confession statement with many details about the sequence of events, how many times he shot Nguyen, their relative positions at the time of each gunshot, and her

actions throughout the robbery and murder. [23-14] at 4–8. Dr. McGarry's testimony about Nguyen's capabilities after each gunshot was relevant and probative because it could either corroborate or impeach specific elements of Keller's confession.

Keller also contends that McGarry's opinions about the effect of each gunshot were outside his area of expertise. But Keller does not dispute that McGarry is a medical doctor, board-certified in forensic pathology, who has conducted about 13,000 autopsies in his career, 2,500 of which involved gunshot wounds. [22-5] at 132–34. Expert testimony "serves to inform the jury about affairs not within the understanding of the average" person. *United States v. Moore*, 997 F.2d 55, 57 (5th Cir. 1993) (cleaned up). Therefore, a proposed expert does not have to be "highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). In fact, an "expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) (cleaned up); *see also Worthy v. McNair*, 37 So. 3d 609, 616 (Miss. 2010) (explaining that an expert need not be a specialist to testify in a given branch within a profession). Given McGarry's education and experience, a fairminded jurist could conclude that he was qualified to testify about the gunshots' effects.

Keller argues that McGarry's opinions about the gunshots' effects were unreliable because they had no factual basis. Expert testimony "must be supported

by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). Indeed, expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(b); Miss. R. Evid. 702(b). Under Mississippi law, "absolute certainty is not required of an expert witness. It is only necessary that the facts on which an expert relies for his opinion should afford a reasonably accurate basis for his conclusion." *Gulf Ins. Co. v. Provine*, 321 So. 2d 311, 314 (Miss. 1975). Here, McGarry knew Nguyen's height and weight, the location of each gunshot wound, the trajectory and penetration depth of each gunshot, the location and severity of other bruises on Nguyen's body, the location of powder burns around two of the gunshot wounds, the size and physical distortion of the bullets removed from the gunshot wounds, and that one of the bullets removed measured .22 inches in diameter at its base. [23-30] at 4–9. A fairminded jurist could conclude that this information provided a reasonably accurate basis for his limited testimony about the gunshots' effects on Nguyen.

Finally, Keller argues that his trial counsel should have impeached McGarry's testimony because "it was well known in the legal community at the time that Dr. McGarry had a reputation for providing unreliable and inadmissible testimony." [45] at 117. The Mississippi Supreme Court has specifically rejected similar arguments. *Ronk v. State*, No. 2021-DR-269, 2024 WL 131639, at *17 (Miss. Jan. 11, 2024) (stating that news articles were insufficient to show that McGarry should have been disqualified); *Wilson v. State*, 21 So. 3d 572, 588–89 (Miss. 2009)

(stating that news articles insufficient to show that forensic pathologist's testimony violated petitioner's due-process rights).

Therefore, for all these reasons, the Court concludes that Keller has not shown that these hypothetical objections to McGarry's testimony would have had merit. Accordingly, he has not established that his attorney provided ineffective assistance by not objecting.

Even if Keller had shown that his attorney performed deficiently, he has not shown that it prejudiced his defense. First, he has not shown that the outcome of the guilt phase of trial would have been different if his attorney had objected. Even if one assumes that the trial court would have sustained the objections, Keller's confession would have still been in evidence, corroborated by what remained of McGarry's testimony, the officers' recovery of the gun, and the bank footage. A confession is "powerful evidence of guilt," *United States v. Avants*, 278 F.3d 510, 522 (5th Cir. 2002), "probably the most probative and damaging evidence that could be admitted . . . ." *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998) (cleaned up). A fairminded jurist could conclude that the jury would have still found Keller guilty of capital murder even if his attorney had successfully objected to this portion of McGarry's testimony.

Keller also suggests that this portion of McGarry's testimony was the only evidence supporting the third aggravating factor at sentencing: "[w]hether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest." [22-2] at 50. But a jury could reasonably infer from the sequence of events

described in Keller's confession that he murdered Nguyen to avoid being arrested. In fact, the trial court stated as much in rejecting the defense's objection to the inclusion of the third aggravating factor. [22-7] at 19. Regardless, the trial court's sentencing instructions included three other aggravating factors. [22-2] at 50. For all these reasons, a fairminded jurist could conclude that the result of sentencing would have been the same even if Keller's trial counsel had objected to McGarry's testimony.

Therefore, the Court finds that the Mississippi Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law.

O. Ground 11: Trial Court Error in Refusing Instructions

Keller argues that the trial court violated his right to due process by not giving his proposed jury instructions related to lesser-included offenses. The State responds that the Mississippi Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law.

1. Relevant Facts

At the close of the guilt phase of trial, the defense submitted jury instructions regarding lesser included offenses. [22-2] at 39–43. Proposed instruction D-9 provided:

> The Court instructs the jury that deliberate design to kill is required by Mississippi law to make a homicide a murder. Deliberate design means intent to kill, without authority of law and not legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime.

186

Deliberate design cannot be formed at the very moment of the fatal act, however, the deliberate design need not exist in the mind of the defendant for any definite time, not for hours, days, or even minutes, but if there is deliberate design, and [if it] exists in the mind of the defendant but for an instant before the fatal act, this is sufficient deliberate design to constitute the offense of murder.

[22-2] at 39. Proposed instruction D-10 provided:

The Court instructs the jury that if you find that the State has failed to prove all of the essential elements of the crime of Capital Murder, you may consider the lesser charge of Murder. However, it is your duty to accept the law given to you by the Court, and if the facts and the law warrant a conviction of Capital Murder, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.

Therefore, if you find the Defendant not guilty of Capital Murder, then you shall proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all of the elements of the lesser crime of Murder.

If you find from the evidence beyond a reasonable doubt that the Defendant, Jason Lee Keller:

1. with deliberate design;

2. caused the death of[] Hat Thi Nguyen, a human being;

3. and that this event occurred on June 21, 2007, in the Second Judicial District of Harrison County, Mississippi;

you shall find the Defendant, Jason Lee Keller, guilty of the crime of Murder.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant, Jason Lee Keller, not guilty of Murder.

[22-2] at 40–41. Finally, proposed instruction D-11 provided:

187

The Court instructs the jury that if you find that the State has failed to prove all of the essential elements of the crime of Capital Murder and has failed to prove all of the essential elements of Murder, you may consider the lesser charge of Manslaughter. However, it is your duty to accept the law given to you by the Court, and if the facts and the law warrant a conviction of Murder, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.

Therefore, if you find the Defendant not guilty of Murder, then you shall proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all of the elements of the lesser crime of Manslaughter.

If you find from the evidence beyond a reasonable doubt that:

1. The deceased, Hat Thi Nguyen, was a living person; and,

2. That the Defendant, Jason Lee Keller, did wilfully kill Hat Thi Nguyen without deliberate design and in the heat of passion by the use of a deadly weapon; and

3. The Defendant, Jason Lee Keller, was not acting in necessary self defense; and

4. The Defendant, Jason Lee Keller, was not acting with lawful authority; and,

5. The event occurred on or about June 21, 2007, in the Second Judicial District of Harrison County, Mississippi;

then you shall find the Defendant, Jason Lee Keller, guilty of the crime of Manslaughter.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant, Jason Lee Keller, not guilty of Manslaughter.

[22-2] at 42–43.

During the jury instructions conference, the State objected to D-10, arguing that Mississippi law provided that "when there's been evidence of a robbery that there is no lesser included instruction of murder that would be proper," citing *Davis v. State*, 684 So. 2d 643 (Miss. 1996). [22-6] at 27. The defense had no response. *Id.* at 28. Accordingly, the court refused the instruction based on the State's argument, and it also refused D-9 as unnecessary in light of D-10's refusal. *Id.* The State objected to D-11 on the same grounds, and the trial court sustained the objection, finding that it was not a "proper instruction . . . under the evidence that's been adduced in this case." *Id.*

Keller presented this claim to the Mississippi Supreme Court on appeal. [22-20] at 135–38. The Mississippi Supreme Court noted that the statutory definition of capital murder was "[t]he killing of a human being without the authority of law . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." *Keller I*, 138 So. 3d at 861 (quoting Miss. Code Ann. § 97-3-19(2)(e)). It observed that the State had produced undisputed evidence that Keller intended to rob Nguyen— his confession. *Id.* at 862. Therefore, as "[t]here was no evidentiary basis for a theory that the robbery did not occur," the trial court did not err in refusing the instructions. *Id.*

2.  Analysis

Due process only requires a lesser-included offense instruction "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Williams v. Cain*, 408 F. App'x 817, 822 (5th

Cir. 2011) (per curiam) (quoting *Hopper v. Evans*, 456 U.S. 605, 612 (1982)); *see also*

*Beck v. Alabama*, 447 U.S. 625, 635 (1980). "Mississippi law . . . allows a defendant

to be convicted of capital murder if someone is killed during the course of a robbery

in which [the defendant] was participating." *Bell v. Watkins*, 692 F.2d 999, 1004

(5th Cir. 1982) (citing Miss. Code Ann. § 97-3-19(2)(e)). Therefore, "[i]n Mississippi,

*no* murder committed during the course of a robbery can be simple murder." *Id.* at

1004–05. "Similarly, manslaughter is killing without malice, either in the course of

a felony *other* than rape, burglary, arson or *robbery* or in the heat of passion." *Id.* at

1005 (citing Miss. Code Ann. §§ 97-3-27, -35). Unless there is evidence of "heat of

passion"—which is not argued here—no killing committed during a robbery can be

manslaughter under Mississippi law. *Id.*

     Keller argues that there was an evidentiary basis for the jury to reject the

robbery element. Citing his confession, he contends that he did not intend to rob

Nguyen. [53] at 32. He said:

> I went in to get a pack of cigarettes. It, it just crossed my mind you know.
> Don't know why I did it, but I did it. I asked her for a pack of cigarettes.
> When she turned around, I pulled my gun out and when she turned back
> around, I told her give me all the money. She started screaming, No. I
> just shot her. Then she screamed and I guess she screamed but. It's like
> I didn't tell her nothing, ya know.

[23-14] at 4. "I didn't even ask her for [the money], I just shot her." *Id.* Investigator

Brown asked Keller, "[W]hen you went in there was your plan to rob her or did you

decide to rob her once you got in there?" *Id.* at 14. Keller answered: "I decided once I

got in there. . . . I wasn't thinking. I just got in. No, I just got in there. She was by

herself, you know. I just don't know why I didn't ask her for the money, you know." *Id.*

Keller described what happened after he shot Nguyen the first time: "She got up. While I was trying to get to the register, she got up and ran out the door." *Id.* at 6; *see also id.* at 15. Keller "ran after her," and she stopped. *Id.* at 6. According to Keller, Nguyen said, "Okay, I'll give you the money . . . ." *Id.*; *see also id.* at 15. They went back inside, and she gave him the money: "[S]he said here's the money. She gave it to me. There's a little box with some paperwork in it, and she slid her hand up in there and gave it to me." *Id.* at 8; *see also id.* at 16. Money in hand, Keller shot Nguyen again. *Id.* at 16. She fell to the floor behind the counter. *Id.* at 8. Keller then delivered the fatal shot to back of her head before fleeing with the money and a carton of cigarettes. *Id.* at 6, 8, 13, 17.

Mississippi law defines robbery as "feloniously tak[ing] the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person." Miss. Code Ann. § 97-3-73. Keller specifically confessed that he "decided" to rob Nguyen after he entered her store. [23-14] at 4. Moreover, he confessed that he chased her outside the store after he had shot her, and then he took her back in to get the money. *Id.* at 6, 8. This evidence was undisputed at trial. So the Court concludes that the Mississippi Supreme Court's adjudication of this claim was reasonable. Its decision was not contrary to or an unreasonable application of federal law, and it did not make an unreasonable determination of fact.

P.  Ground 12: Trial Court Error in Excluding Mitigation Testimony

Keller argues that trial court improperly sustained the State's objection to a question his counsel asked a defense witness on redirect during the sentencing phase of trial. Keller called Deborah Whittle, the Officer in Charge of the Harrison County Sheriff's Department's Offender Services program. [22-6] at 90. Her responsibilities included supervision of the Harrison County Jail's disciplinary program. *Id.* At the time of his trial, Keller had been housed in the Harrison County Jail for over two years. *Id.* at 91. During that time, he had "[t]wo minor rule violations." *Id.* One was for not "get[ting] up for head count," and the other was for "being on the top tier without permission." *Id.* at 92. She described these as "minor rule violations," unlike "major rule violations" such as "[f]ighting, contraband, smoking, property destruction, things like that." *Id.* at 93. Since those two rule violations, he had no others. *Id.* at 94–95.

On cross-examination, the State asked only three questions. First, it asked, "[Y]ou said that you are in a supervisory role so other people would bring their reports to you?" *Id.* at 95. Whittle answered, "Yes." *Id.* Then, the State asked, "And you don't really even know Jason Keller?" *Id.* She responded: "Not really." *Id.* Finally, the State asked, "But you do know that while he's at the Harrison County Jail he has broken the rules?" *Id.* She answered, "Yes, sir." *Id.*

On redirect, the defense asked one question: "Would you consider Jason a good inmate?" *Id.* The State objected because it was outside the scope of cross-examination, and the trial court sustained the objection. *Id.*

The defense next called Sergeant Melinda Hester, who had been the supervisor of the maximum-security block of the Harrison County Jail for a year of Keller's time there before trial. *Id.* at 96. She testified that she had observed Keller during that time, and he had "never given [her] any problems." *Id.* at 97. She said, "He's been a fairly good inmate as far as disciplinary. I believe I have had just one disciplinary hearing on him myself." *Id.* She testified that he got along well with other inmates, "didn't cause any fights," and was "rather quiet . . . ." *Id.* In fact, she recommended him for a "life-learning program" with the "minister and chaplains." *Id.* at 97–98.

Keller argues that the trial court erred in sustaining the State's objection to the defense's question on redirect. [45] at 124. He contends that there is virtually no limit on the mitigation evidence that defendants may present, citing *Skipper v. South Carolina*, 476 U.S. 1 (1986), and *McKoy v. North Carolina*, 494 U.S. 433 (1989). [45] at 124. And he argues that Whittle's opinion about whether he was a good inmate fell within the State's cross-examination, as the prosecutor emphasized that Keller had broken the jail's rules. *Id.* at 125.

Keller presented this claim to the Mississippi Supreme Court on appeal. [22-20] at 150–53. The Mississippi Supreme Court agreed "with Keller that the trial court erred in sustaining the State's objection," but it observed that Whittle had testified that "she had no personal knowledge of Keller and that her only personal knowledge of him was that he had received two minor disciplinary actions." *Keller I*, 138 So. 3d at 866. Additionally, Melinda Hester's testimony covered the same

ground, as it was "aimed at proving to the jury that Keller was an inmate who did not pose a threat of violence in a prison setting . . . ." *Id.*

"Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Rhoades v. Davis*, 914 F.3d 357, 365 (5th Cir. 2019) (cleaned up). Therefore, "[a] state court cannot . . . exclude evidence from the jury's consideration if the sentencer could reasonably find that it warrants a sentence less than death." *Id.* (cleaned up). Despite this "low threshold for relevance," *id.* (cleaned up), "trial judges still retain their traditional authority to exclude irrelevant evidence that does not bear on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 366 (cleaned up). The "gravity" of the evidence is pertinent, "insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability." *Id.* (cleaned up). Claims premised on a trial court's exclusion of mitigating evidence are also subject to harmless error analysis, and to succeed on such a claim, the petitioner must show that the alleged error had a "substantial and injurious effect or influence" on the outcome of his trial. *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (cleaned up).

Assuming that the trial court should have allowed Whittle to answer defense counsel's question on redirect, the error was harmless. As the Mississippi Supreme Court noted, Whittle specifically testified that she did not know Keller. [22-6] at 95. Therefore, a reasonable jurist could find no foundation for her to express an opinion

on whether he was a "good inmate." Additionally, the next witness, Melinda Hester, testified that she had observed Keller, and that he had been a "fairly good inmate . . . ." *Id.* at 97. So Keller was able to get the same evidence in through a different witness who had a stronger foundation for the opinion. For these reasons, the Court concludes that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts. *See Tsarnaev v. United States*, 595 U.S. 302, 319 (2022) (rejecting argument that exclusion of "any marginally relevant mitigating evidence" in a capital sentencing violates the Eighth Amendment); *Rhoades*, 914 F.3d at 367–69 (noting that any trial court error in not permitting "humanizing" photographs of petitioner was harmless because of the weight of other evidence against him); *Simmons v. Epps*, 654 F.3d 526, 543–44 (5th Cir. 2011) (per curiam) (stating that while relevant, videotape of petitioner expressing remorse had little probative value).

Q.  Ground 13: Trial Court Error in Sentencing Instructions

Keller claims that the trial court erred by allowing the jury to consider aggravating circumstances that were not supported by the evidence. Specifically, he contends that the third and fourth aggravating factors—whether the murder was committed to avoid a lawful arrest, and whether the murder was especially heinous, atrocious, or cruel—should not have been given to the jury.

At the end of the sentencing phase, the trial court gave the following instruction to the jury:

You have found the defendant guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death or life imprisonment without parole. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant himself. You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

.     .     .

Next to return the death penalty, you must find that the mitigating circumstances—those which tend to warrant the less severe penalty of life imprisonment without parole—do not outweigh the aggravating circumstances—those which tend to warrant the death penalty.

Consider only the following elements of aggravation in determining whether the death penalty should be imposed:

1. Whether the defendant was previously convicted of a felony involving the use or threat of violence to the person.
2. Whether the capital offense was committed while the defendant was engaged in the commission of, or attempt to commit a [r]obbery.
3. Whether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest.
4. Whether the capital offense was especially heinous, atrocious or cruel.

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed . . . .

.     .     .

If you individually find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

[22-2] at 61–63. The trial court also instructed the jury:

> [I]n considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
>
> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders—the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

*Id.* at 77.

Keller's counsel objected to submitting the third aggravator to the jury. [22-7] at 19. She argued that Keller had specifically testified during the sentencing phase of trial that he did not murder Nguyen to avoid arrest. *Id.* The trial court held: "The jury can believe him or not believe him, but they are also free to draw reasonable inferences from the evidence. . . . In taking Dr. McGarry's testimony along with Mr. Keller's own statement I think [the third aggravator] would be proper . . . ." *Id.*

Keller's counsel also objected to submitting the fourth aggravator to the jury, arguing that the record contained insufficient evidence to support it. *Id.* at 19–20. She said:

> [W]e do not have facts here that would support such a thing. We do not have a—such as someone being buried alive. We don't have a kidnapping where they are held for days. We don't have someone who has been like repeatedly sexually assaulted, abused. We have by Dr. McGarry's account an offense that took a matter of minutes to complete. And while I agree there were more than one shot, and the jury could consider that, I do not think that that simple fact that there were four different shots

197

> in a matter of minutes leads a fact situation to be heinous, atrocious and cruel, because I think the case law specifically refers to something that is wicked or evil, and I don't think we have anything close to that in this case.

*Id.* In response, the prosecution cited Dr. McGarry's testimony on how long the total encounter lasted, the number of wounds Nguyen suffered, and the effect they had on Nguyen. *Id.* at 21. The trial court overruled Keller's objection, finding that there was sufficient evidence in the record from which a reasonable jury could infer that the crime was especially heinous, atrocious, or cruel. *Id.* at 21–22.

The jury ultimately found that "[t]he capital offense was committed for the purpose to avoid or prevent a lawful arrest," plus two other aggravating circumstances not at issue here, but it did not find that the murder was especially heinous, atrocious, or cruel. [22-2] at 95.

On appeal, Keller argued that the trial court had erred in permitting the jury to consider the aggravating circumstance of avoiding a lawful arrest. [22-20] at 157–58. The Mississippi Supreme Court held that "[s]ubstantial evidence supported instructing the jury" on the aggravator. *Keller I*, 138 So. 3d at 868. Specifically:

> Keller told police that he had robbed Hat at gunpoint and that she had given him the money, yet he had continued shooting her. Finally, seeing her on the floor and incapacitated, but still alive, Keller had put the gun in close range to Hat's head and had fired the fatal shot.

*Id.* Accordingly, the Mississippi Supreme Court held that although Keller denied that he killed Nguyen to avoid arrest, "there was sufficient circumstantial evidence from which it could be reasonably inferred that a substantial reason for the killing

was to conceal Keller's identity in order to avoid apprehension and eventual arrest by authorities to submit the question to the jury." *Id.* (cleaned up).

Conviction of a crime when the evidence is insufficient to support an element of the offense violates the constitutional guarantee of due process. *Jackson v. Virginia*, 443 U.S. 307, 314 (1979). Habeas relief on a sufficiency claim "is proper if [the Court] find[s] 'that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Simmons*, 654 F.3d at 535 (quoting *Jackson*, 443 U.S. at 324). This principle extends to aggravating circumstances considered by a jury in imposing a death sentence. *Id.* (citing *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990)).

Mississippi law provides 10 aggravating circumstances that a jury may consider in determining whether to impose the death penalty. Miss. Code Ann. § 99-19-101(5). The two aggravators at issue here are whether "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest" and whether "[t]he capital offense was especially heinous, atrocious or cruel." *Id.* § 99-19-101(5)(e), (i).

First, under Mississippi law, "[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance." *Evans v. State*, 725 So. 2d 613, 690 (Miss. 1997) (cleaned up). "[J]urors are entitled to make the logical connection between the

injuries suffered [by the victim] and finding an inference that the defendant

murdered his victim to avoid arrest." *Holland v. State*, 705 So. 2d 307, 355 (Miss.

1997). The defendant's efforts to avoid arrest after the murder are also relevant. *Id.*

at 355–56. "Each case must be decided on its own peculiar facts." *Lynch v. State*,

877 So. 2d 1254, 1269 (Miss. 2004) (cleaned up).

Here, a fairminded jurist could conclude that there was sufficient evidence for

a jury to find, beyond a reasonable doubt, that Keller murdered Nguyen to avoid

arrest. Keller testified during the sentencing phase of trial that he did not kill

Nguyen to avoid arrest or so that she could not identify him. [22-6] at 115.

According to Keller's own confession, though, by the time he fired the final, lethal

shot, he had shot Nguyen three times and gotten the money from her. [23-14] at 7–

8. Indeed, she was incapacitated on the floor when he executed her. *Id.* Dr. McGarry

testified that, at the time, she already had one bullet in her brain, which "would

probably cause some degree of decreased consciousness, either totally unconscious

or brain damaged enough to be less than fully conscious and fully able to do things .

. . ." [22-5] at 146. She "would probably not be . . . at the highest level of thinking.

She probably would be very confused if not stuporous." *Id.* Therefore, a reasonable

jury could infer from these facts that there was no reason for Keller to execute

Nguyen other than to eliminate the possibility of a witness.

In further support of this aggravator, the record contains evidence showing

that Keller was known in the community. He was born in Biloxi, and he grew up

there. [23-18] at 34. He had multiple prior convictions, including burglary, grand

larceny, and armed robbery. *Id.* at 35; *see also* [22-6] at 104–05; [23-13] at 4–5. On the day of the crime, the Biloxi Police Department received "a lot of phone calls" indicating that Keller was the murderer. [22-5] at 112; *see also* [23-14] at 30. He was already suspected to have stolen a .22 revolver from a pawn shop the day before the murder. [22-12] at 42–43. Finally, an officer testified that on the day of the crime, the clerk at a local Subway restaurant—without being solicited or otherwise prompted— asked an officer whether Keller had been arrested yet for "the murder of the Vietnamese lady." *Id.* at 44.

All this evidence shows that Keller was known in the community, which would provide a motive for him to kill Nguyen to avoid identification. Accordingly, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law. And the Mississippi Supreme Court did not make an unreasonable determination of facts.

As for the fourth aggravator—whether the capital offense was especially heinous, atrocious, or cruel—the Court finds that any alleged error was harmless because the jury found in Keller's favor as to that aggravator. *See* [22-2] at 95. Regardless, Dr. McGarry described how the gunshots affected Nguyen during the last moments of her life. *See supra* pp. 7–8. This testimony was corroborated by Keller's confession, when he admitted that he shot Nguyen inside the store, she ran outside, he chased her down and brought her back inside, he shot her again and took the money, and then he finally executed her. [23-14] at 4–6.

Based on this testimony, a reasonable jury could find, beyond a reasonable doubt, that Nguyen's murder was especially heinous, atrocious, or cruel. Accordingly, the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law. And the Mississippi Supreme Court did not make an unreasonable determination of facts.

### R.  Ground 14a: Ineffective Assistance Related to Previous Armed Robbery Conviction

One of the aggravating factors argued by the State and given to the jury during the sentencing phase of trial was that Keller had been "previously convicted of a felony involving the use or threat of violence to the person." [22-2] at 62; *see also* Miss. Code Ann. § 99-19-101(5)(b). Keller claims that his trial counsel provided ineffective assistance by not objecting to argument, evidence, and instructions concerning this aggravator because the prior conviction for armed robbery was not final at the time of the capital murder trial.

In January 2007, Keller committed an armed robbery. [22-16] at 40. In June 2007, he murdered Nguyen and was arrested. Keller was indicted for the armed robbery in July 2007 while he was detained for Nguyen's murder. *Id.* On December 5, 2007, he was tried and convicted on the armed robbery charge. [23-14] at 46; [23-18] at 11, 23; [23-13] at 6–7. On December 14, 2007, Keller filed a motion for a new trial in the armed robbery case. [23-13] at 9. That motion was pending when Keller

202

was tried and convicted on the capital murder charge in October 2009,[27] but the State was of the opinion it "probably had been abandoned" because "it had never been called up." [22-7] at 35. During the sentencing phase of the capital murder trial, the State presented evidence of the armed robbery conviction and argued that it satisfied the aggravating circumstance of having a previous felony conviction involving the use or threat of violence to the person. [22-6] at 69–71; [22-7] at 54. The trial court instructed the jury to consider "[w]hether the defendant was previously convicted of a felony involving the use or threat of violence to the person." [22-2] at 62; *see also* Miss. Code Ann. § 99-19-101(5)(b).

Keller argues that his attorney should have objected to all evidence, argument, and instructions concerning the armed robbery conviction. He contends that there was insufficient evidence to support the instruction for this aggravator because his conviction for armed robbery was not finalized at the time of the capital murder trial. Citing *Jordan v. McKenna*, 573 So. 2d 1371 (Miss. 1990), he contends that the armed robbery conviction was never finalized because he filed a motion for a new trial which the trial court never addressed, thus depriving him of the opportunity to appeal the armed robbery conviction. [45] at 131–33.

The State responds that Mississippi Code Annotated section 99-19-101(5)(b) does not require a "final" felony conviction. [49] at 116–17. It also argues that, at the time of Keller's capital trial, it was "the responsibility of the movant to obtain a ruling from the court on motions and failure to do so constitutes a waiver." *Smith v.*

---

[27] In fact, Keller alleges that the motion for new trial is still pending in the armed robbery case, having never been addressed by the state trial court.

*State*, 986 So. 2d 290, 296 (Miss. 2008) (cleaned up). Thus, the State argues that the armed robbery conviction was final at the time of Keller's capital murder trial because he had failed to obtain a ruling on the motion for a new trial in the armed robbery case. [49] at 117.

Keller presented this claim—that his counsel provided ineffective assistance by not objecting to evidence, argument, and instructions related to the non-finalized armed robbery conviction—to the Mississippi Supreme Court in his petition for post-conviction relief. [23-9] at 32–39. The Mississippi Supreme Court summarily found that the claim was meritless, with no discussion. *Keller II*, 229 So. 3d at 716.

First, *Jordan*—cited by Keller—does not provide that a criminal conviction is only final once the trial court has addressed the defendant's motion for a new trial. 573 So. 2d at 1374. Rather, the case addressed whether collateral estoppel precluded the defendant in a civil case from relitigating whether he had raped the plaintiff when he had already been criminally convicted. *Id.* The opinion contains no substantive discussion of when one becomes a convicted criminal under section 99-19-101(5)(b), nor any dicta that could reasonably be construed as illuminating the issue.

Neither party has cited—and the Court could not find—any opinion from the Mississippi Supreme Court addressing when one becomes "convicted of another capital offense or of a felony involving the use or threat of violence to the person," to apply section 99-19-101(5)(b). But other Mississippi Supreme Court opinions

suggest that a jury verdict of guilty and a final judgment of conviction in the trial court is sufficient to prove that one has been convicted of a crime.

For example, in *Murphree v. Hudnall*, 278 So. 2d 427, 428 (Miss. 1973), the Mississippi Supreme Court addressed whether a plea of *nolo contendere* qualified as a "conviction of any crime" for impeaching a witness. It held that "nothing less than a final judgment, conclusively establishing guilt, will satisfy the meaning of the word 'conviction' . . . ." *Id.* Likewise, in *Nicholson v. State*, 254 So. 2d 881, 884 (Miss. 1971), the Mississippi Supreme Court held that a defendant could be impeached through a previous conviction on appeal. It said: "When a jury in circuit court returns a verdict of guilty, it is a conviction of the crime charged, and unless and until it is reversed by this Court, the conviction stands . . . ." *Id.*[28]

Therefore, under Mississippi law, a criminal conviction is final once "a jury in circuit court returns a verdict of guilty," *id.*, and the trial court enters a final judgment consistent with the verdict. *Murphree*, 278 So. 2d at 428. Here, a jury found Keller guilty of armed robbery and a circuit court entered a final judgment consistent with that verdict on December 5, 2007—well before Keller's capital murder trial. [23-14] at 46; [23-18] at 11, 23; [23-13] at 6–7. Accordingly, the Court concludes that even if Keller's trial counsel had objected to evidence, argument, and instructions concerning the armed robbery conviction, the objection would have

---

[28] *See also Wilcher v. State*, 697 So. 2d 1123, 1138 (Miss. 1997) (holding that it was permissible for the state to use the underlying felony in a felony-murder case as the aggravator to elevate the felony murder to capital murder); *State v. Henderson*, 146 So. 456, 457 (Miss. 1933) ("The word 'conviction' in the [Mississippi] Constitution . . . [is] used in the broad sense, and as the equivalent of the words 'judgment' and 'adjudged' . . . .").

been overruled as meritless. "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Wood*, 503 F.3d at 413 (cleaned up). For this reason, the Court finds that the Mississippi Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts.

S.   Ground 14b: Trial Court Error Related to Armed Robbery Conviction

Liberally construing Keller's briefing, he also argues that the trial court erred by admitting evidence and argument related to the armed robbery conviction, and that it erred in instructing the jury about the aggravating circumstance that he had been "previously convicted of a felony involving the use or threat of violence to the person." [22-2] at 62; *see also* Miss. Code Ann. § 99-19-101(5)(b). He contends that the trial court erred because the armed robbery conviction was not final at the time of the capital murder trial. [45] at 132–36. The State did not respond to this claim.

AEDPA requires federal habeas petitioners to "exhaust all claims in state court prior to requesting federal collateral relief." *Smith*, 515 F.3d at 400; *see also* 28 U.S.C. § 2254(b)(1)(A). This "exhaustion requirement is satisfied when the substance of the federal claim is fairly presented to the highest state court on direct appeal or in state post-conviction proceedings, even if the state court fails to address the federal claim." *Johnson*, 712 F.3d at 231 (cleaned up). "[T]he state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz*, 460 F.3d at 643. This Court has discretion to address the question of exhaustion sua sponte. *See, e.g., United States*

*v. Castro*, 30 F.4th 240, 246 (5th Cir. 2022) (citing *Granberry v. Greer*, 481 U.S. 129, 133 (1987)).

In his petition for post-conviction relief, Keller argued that his counsel provided ineffective assistance by not objecting to evidence, argument, and instructions related to the purportedly non-final armed robbery conviction. [23-9] at 32–39. The Mississippi Supreme Court summarily found that the claim was meritless, with no discussion. *Keller II*, 229 So. 3d at 716. Keller did not argue that the trial court erred in allowing such evidence, argument, and instructions. [23-9] at 32–39. For a claim to be exhausted, "the state court system must have been presented with the same facts *and legal theory* upon which the petitioner bases his current assertions." *Ruiz*, 460 F.3d at 643 (emphasis added). Because Keller did not present this issue to the state court under a theory of trial court error, it is unexhausted.

Alternatively, the claim is meritless, for the same reasons provided in its discussion of Keller's previous claim. Under Mississippi law, a criminal conviction is final once "a jury in circuit court returns a verdict of guilty," *Nicholson*, 254 So. 2d at 884, and the trial court enters a final judgment consistent with the verdict. *Murphree*, 278 So. 2d at 428. Here, a jury found Keller guilty of armed robbery and a circuit court entered a final judgment consistent with that verdict on December 5, 2007—well before Keller's capital murder trial. [23-14] at 46; [23-18] at 11, 23; [23-13] at 6–7. Accordingly, the trial court did not err in admitting evidence and

argument about the armed robbery conviction or instructing the jury with regard to the armed robbery aggravating circumstance.

T.  Ground 15: Prosecutorial Misconduct in Presenting Evidence of Armed Robbery Conviction

Keller claims that the prosecutor in his capital murder trial committed prosecutorial misconduct by presenting evidence and argument about Keller's prior armed robbery conviction to prove section 99-19-101(5)(b)'s aggravating circumstance of a prior conviction "of another capital offense or of a felony involving the use or threat of violence to the person." [45] at 137–40. Citing *Napue v. Illinois*, 360 U.S. 264 (1959), Keller contends that this was misconduct because the prosecutor knew that a motion for new trial was pending in the armed robbery case, which Keller contends prevented the conviction from becoming final.

The State responds that section 99-19-101(5)(b) does not require a "final" felony conviction, and that the armed robbery conviction was final at the time of Keller's trial because he had failed to obtain a ruling on the motion for a new trial and therefore waived it. [49] at 116–17 (citing *Smith*, 986 So. 2d at 296).

Keller presented this claim to the Mississippi Supreme Court in his petition for post-conviction relief. [23-9] at 164–67. The Mississippi Supreme Court summarily denied the claim as meritless without any discussion. *Keller II*, 229 So. 3d at 716.

"[A] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . ." *Napue*, 360 U.S. at 269. To establish a *Napue* claim, "a defendant must prove that the witness's testimony was (1) false, (2) known

to be so by the state, and (3) material." *United States v. Dvorin*, 817 F.3d 438, 451–52 (5th Cir. 2016) (cleaned up). Keller cannot meet these requirements because the State's evidence and argument that he had been convicted of armed robbery was not false. As discussed above, a criminal conviction is final under Mississippi law once "a jury in circuit court returns a verdict of guilty," *Nicholson*, 254 So. 2d at 884, and the trial court enters a final judgment consistent with the verdict. *Murphree*, 278 So. 2d at 428. A jury found Keller guilty of armed robbery and a circuit court entered a final judgment consistent with that verdict on December 5, 2007—well before Keller's capital murder trial. [23-14] at 46; [23-18] at 11, 23; [23-13] at 6–7. The State therefore did not present false evidence or argument to the jury, and this claim is meritless. The Mississippi Supreme Court's adjudication of it was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts.

U. Ground 16a: Trial Court Error in Permitting Evidence of Non-Statutory Aggravating Circumstances

Keller claims that the trial court erred by allowing evidence of non-statutory aggravating circumstances. He argues that the trial court erred by allowing evidence of four prior felony convictions to be admitted into evidence, despite their not being enumerated as "aggravating circumstances" in section 99-19-101(5) or qualifying as "prior violent felonies" under section 99-19-101(5)(b). [45] at 140–43. The State responds that this claim is procedurally barred. [49] at 120.

During the sentencing phase of trial, the State called Gayle Parker, the Circuit Clerk of Harrison County, and introduced into evidence an indictment

charging Keller with armed robbery. [22-6] at 70; [22-16] at 40–41. The indictment

provides that Keller robbed a bank at gunpoint. [22-16] at 40. It also charged Keller

as a "habitual criminal" because he had four prior felony convictions, including

three burglary convictions and one grand larceny conviction. *Id.* at 40–41.[29] The

prosecutor asked Parker to read the charged crime to the jury, specifically

instructing her to only read the second paragraph of the indictment, which did not

include the prior felonies which established Keller's "habitual offender" status. [22-

6] at 70–71; [22-6] at 40.

Defense counsel did not object to the armed robbery indictment being

admitted into evidence in the sentencing phase. [22-6] at 71. Defense counsel,

however, had filed a pretrial motion seeking the exclusion of "[a]ny and all evidence

that may be presented as 404(b) evidence . . . ," [22-1] at 86, which the trial court

granted. *Id.* at 157. On cross-examination, defense counsel asked Parker to explain

what "habitual offender status" means. [22-6] at 72. Parker answered, "I'm not

really sure. . . . I better not comment on it." *Id.*

In the State's rebuttal closing, the prosecutor argued:

> Jason hasn't learned his lesson, and the death penalty would show him
> that that lesson should have been learned.
>
> The crimes that are in the sentence order shows that Mr. Keller,
> as pointed out by counsel opposite, has other felony convictions. The
> armed robbery conviction was his fifth felony conviction, his fifth.
> Yesterday you handed down number six. Six felony convictions, and is

---

[29] To be clear, the armed robbery itself was the basis of the "prior violent felony"
aggravator under section 99-19-101(5)(b), rather than the prior grand larceny and burglary
convictions.

that a man that deserves to live the rest of his life in prison? That's a
man that deserves the ultimate sentence of the death penalty.

[22-7] at 68–69.

Keller presented this issue to the Mississippi Supreme Court on appeal. [22-
20] at 142–49. The Mississippi Supreme Court noted that the State argued the
claim was procedurally barred, and it cited its own precedent establishing a
procedural bar for failure to contemporaneously object. *Keller I*, 138 So. 3d at 864
(quoting *Flowers v. State*, 842 So. 2d 531, 550–51 (Miss. 2003)). It then ruled that
the claim was meritless because "facts argued in the prosecutor's closing argument
had been admitted into the record without a specific objection from the defense as to
the unredacted form of [the armed robbery indictment] and/or the inclusion of
previous nonviolent felonies." *Id.*

A federal habeas claim is procedurally barred where "the last state court to
review the petitioner's claims *unambiguously* based its denial on a state procedural
bar." *Mullis*, 47 F.4th at 387–88 (cleaned up) (emphasis added). "A state court must
be explicit in its reliance on . . . a procedural default" to preclude federal habeas
review. *Winfield*, 2001 WL 85816, at *2. Here, the Mississippi Supreme Court did
not explicitly state that it was rejecting this claim on the basis of a procedural bar.
Rather, it described the State's argument and then rejected the claim on other
grounds.

In any case, the claim is meritless. Even if the Court assumes that the trial
court's admission of the unredacted armed robbery indictment was impermissible
because the four prior felonies establishing Keller's habitual offender status did not

constitute "prior violent felonies" under section 99-19-101, it does not necessarily follow that habeas relief is available. As stated, "[t]he habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States," and "federal habeas corpus relief does not lie for errors of state law." *Swarthout*, 562 U.S. at 219 (cleaned up). "The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings." *Romano*, 512 U.S. at 12.

Keller has cited no clearly established federal law providing that a trial court's admission of non-statutory aggravating factors, by itself, violates a capital defendant's constitutional rights.[30] In fact, the Supreme Court has explicitly held that a state court's consideration of a non-statutory aggravating factor in sentencing does not necessarily render a death sentence constitutionally infirm. *Barclay v. Florida*, 463 U.S. 939, 957–58 (1983) (plurality opinion); *see also Turner v. Epps*, No. 4:07-CV-77, 2010 WL 653880, at *23 (N.D. Miss. Feb. 19, 2010) (citing *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987)). Also, clearly established federal law "does not prohibit consideration of a defendant's future dangerousness." *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). So the Court concludes that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor

---

[30] The Court need not search through case law for support of a litigant's claim, *cf. Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998), and Keller bears the "burden of demonstrating that a constitutional violation occurred . . . ." *Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000).

an unreasonable application of clearly established federal law, and it was not based

on an unreasonable determination of fact.

V.  Ground 16b: Ineffective Assistance of Trial Counsel in Not Objecting to
    Evidence of Non-Statutory Aggravating Circumstances

Keller also claims that his trial counsel provided ineffective assistance by not

objecting to the armed robbery indictment. He argues that although his counsel

filed a pretrial motion to exclude evidence of other crimes, she failed to

contemporaneously object to the armed robbery indictment and highlighted it

during her cross-examination of Gayle Parker. [45] at 141. Keller contends this

prejudiced his defense because it led to the prosecution using the prior felony

convictions as fodder for closing argument. *Id.* at 141–42. The State responds that

Keller has failed to show that his counsel's alleged deficient performance prejudiced

his defense. [49] at 120.

Keller presented this claim to the Mississippi Supreme Court in post-

conviction, [23-9] at 26–32, and the Mississippi Supreme Court summarily denied it

as meritless without any discussion. *Keller II*, 229 So. 3d at 716.

Assuming that Keller's counsel provided deficient representation by not

objecting to the unredacted armed robbery indictment, Keller must still show that

his "counsel's actions resulted in actual prejudice." *Rhoades*, 852 F.3d at 431. In this

context, that means he must demonstrate "a reasonable probability that, absent the

errors, the sentencer would have concluded that the balance of aggravating and

mitigating circumstances did not warrant death." *Young v. Davis*, 860 F.3d 318, 334

(5th Cir. 2017) (cleaned up). This requires the Court to "reweigh the evidence in

aggravation against the totality of available mitigating evidence." *Jordan v. Epps*, 756 F.3d 395, 412 (5th Cir. 2014) (cleaned up).

Keller has not demonstrated prejudice. First, even if the jury erroneously considered his prior felony convictions, it still found three valid aggravating circumstances to be present: that he "was previously convicted of a felony involving the use of threat of violence to the person," that the "capit[a]l offense was committed while the defendant was engaged in the commission of a robbery," and that the "capit[a]l offense was committed for the purpose to avoid or prevent a lawful arrest." [22-2] at 95. Second, it is unclear from the record that the jury considered the four prior felony convictions, as the jury's verdict form specifically says that Keller "was previously convicted of *a felony* involving the use of threat of violence to the person." *Id.* (emphasis added). The trial court specifically instructed the jury to "[c]onsider only" the enumerated statutory "elements of aggravation" listed in the court's instruction, [22-2] at 72, and the Court presumes the jurors followed these instructions. *Sheppard*, 967 F.3d at 470. Keller has not rebutted that presumption.

For these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of fact.

> ### W. Ground 17a: *Brady* Violation by State's Failure to Disclose Compensation Paid to a State Witness

Keller claims that the State committed a *Brady* violation by not disclosing that it had agreed to pay excess compensation to its witness, Terry Ann Muffi, and

214

her non-testifying traveling companion, Gary Roberts. [45] at 145–46. He contends that the prosecution had to disclose these payments because they could have been used to impeach Muffi's testimony at trial. *Id.* at 145–48.

The State responds that this claim is procedurally barred. [49] at 121–22. Alternatively, the State argues that it could not have disclosed the payments to Muffi before the trial because they had not occurred yet, and that the information was not material. *Id.* at 122–23.

Keller presented this claim to the Mississippi Supreme Court on appeal. [22-20] at 45–56. The Mississippi Supreme Court held that Keller was "procedurally barred from raising the issue for the first time on appeal." *Keller I*, 138 So. 3d at 839 (citing *Woodward v. State*, 726 So. 2d 524, 543 (Miss. 1997) (barring defendant from raising issue of excessive fees paid to witness where it was not raised in trial court, despite defendant's claim that he did not receive notice of prosecution's motions)). Although Keller claimed that he was unaware of the payments until after he had been sentenced, the Mississippi Supreme Court noted that the date of the trial court's "order authorizing travel expenses for Gary Roberts was the day of sentencing, October 8, 2009," and Keller "did not oppose the motion for travel expenses at the time nor did he raise it in his motion for new trial on October 15, 2009." *Id.*

Alternatively, the Mississippi Supreme Court held that the claim was meritless. *Id.* at 840. The court observed that the motions and payments occurred post-trial, and that the "record [was] silent as to whether the State had made an

215

agreement with Muffi *before* trial for paid expenses or that Muffi expected

compensation for her expenses prior to her testimony." *Id.* The court also stated that

"all motions for expenses and orders for payment were made part of the trial court's

record." *Id.* Thus, "proving suppression by the State [was] . . . problematic for

Keller." *Id.* Although the Mississippi Supreme Court acknowledged that Keller

could have used the payments to impeach Muffi's credibility, *id.*, "[r]eimbursement

for travel expenses and lodging for a state's witness and the person who

accompanied her . . . can hardly be said to have denied Keller a fair trial or

undermined confidence in the verdict and sentence, particularly considering that

Muffi's testimony was supported" by other evidence. *Id.* at 841.

     1.  Procedural Bar

     The State argues that this claim is procedurally barred because the

Mississippi Supreme Court dismissed it based on an independent and adequate

state-law procedural rule. [49] at 121–22. The Mississippi Supreme Court held that

Keller failed to preserve this issue for appeal because his trial counsel failed to

make a contemporaneous objection. *Keller I*, 138 So. 3d at 839. Keller responds that

the Mississippi Supreme Court "equivocated on whether the issue was procedurally

barred." [45] at 151.

     A federal habeas claim is procedurally barred where "the last state court to

review the petitioner's claims unambiguously based its denial on a state procedural

bar." *Mullis*, 47 F.4th at 387–88 (cleaned up). The "state court must be explicit in its

reliance on . . . a procedural default" to preclude federal habeas review. *Winfield*,

2001 WL 85816, at *2. The Mississippi Supreme Court plainly stated: "We agree that Keller is procedurally barred from raising the issue for the first time on appeal." *Keller I*, 138 So. 3d at 839. Therefore, it unambiguously relied on a state procedural bar.

Still Keller contends that the decision was ambiguous because the Mississippi Supreme Court "assum[ed] for argument's sake that Keller ha[d] not waived his right to raise the issue of the payment" and addressed the claim's merits. *Id.* at 840. He is mistaken. A federal habeas court must "honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law" in the alternative. *Buntion*, 982 F.3d at 949 (cleaned up).

The Fifth Circuit has held that Mississippi's contemporaneous objection rule is an adequate and independent state bar. *Wiley*, 969 F.2d at 103. Keller does not contest this. Rather, he argues that his default should be excused because his trial counsel provided ineffective assistance by not objecting. [45] at 152.

This Court may review the merits of a procedurally barred claim "where the petitioner is able to demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Garza*, 738 F.3d at 675 (cleaned up). In this context, "cause" is "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 582 U.S. at 528 (cleaned up). "[A]ttorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel." *Id.* at 528. But "the exhaustion doctrine

generally requires that a claim for ineffective assistance of counsel be presented to the state courts as an independent claim before it can be used to establish cause for procedural default." *Hatten*, 570 F.3d at 605 (cleaned up).

On appeal, Keller argued that his trial counsel provided ineffective assistance by not discovering the payments to Muffi and Roberts and not raising this issue at the new trial hearing held in February 2010. [22-20] at 54. The Mississippi Supreme Court declined to address the issue on appeal, but preserved Keller's right to raise it in post-conviction proceedings. *Keller I*, 138 So. 3d at 839 n.7. Keller did not raise the issue in post-conviction. [23-9] at 2–4; [23-40] at 2–3; [23-46].

For Keller to succeed on a claim that his trial counsel provided ineffective assistance by not discovering and objecting to the payments made to Muffi and Roberts, he must prove that his trial counsel "rendered deficient performance and that counsel's actions resulted in actual prejudice." *Rhoades*, 852 F.3d 431. To prove prejudice, Keller must show "a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id.* Here, Keller has not shown that the result of his appeal would have been different if his attorney had objected to the payments to Muffi and Roberts. Indeed, the Mississippi Supreme Court provided an alternative ruling on the merits of Keller's *Brady* claim, and it found that there was no evidence of a pretrial agreement to pay Muffi for her travel expenses and that there was ample evidence to corroborate her testimony even if she had been impeached with evidence of the payments. *Keller I*, 138 So. 3d

at 840–41. Keller has therefore not established cause and prejudice to excuse his default, and this claim is procedurally barred.

2.  Merits

Alternatively, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was the decision based on an unreasonable determination of the facts.

On October 8, 2009—the final day of Keller's trial—the State submitted a Motion to Pay Expenses, asking the court to authorize payment of $362.67 to Gary Roberts, Muffi's traveling companion. [22-1] at 159. The motion specified that $321.20 was a mileage reimbursement for 584 miles at $0.55 per mile, and $41.47 was for meals. *Id.* The trial court's docket sheet does not include the motion. *Id.* at 15. At 3:57 p.m. on the same day—after Keller's trial—the trial court entered an Order Allowing Expense to pay Roberts the requested $362.67. *Id.* at 15, 158. At the time of trial, Muffi lived in Tupelo, Mississippi, about 300 miles from Biloxi. [22-5] at 70.

On January 5, 2010, well after Keller's trial had completed, the State filed two motions to pay expenses. [22-2] at 120, 123.[31] One asked for $69.00 to be paid to a hotel on behalf of "Terry Muffi[,] . . . a necessary witness for the prosecution." *Id.* at 120. The other asked for $69.00 to be paid to a hotel on behalf of "Gary Roberts[,]

---

[31] One of the motions was dated December 5, 2010, but the Court believes it must be a scrivener's error because the order granting the motion was dated January 12, 2010. [22-2] at 118, 120.

. . . a necessary witness for the prosecution." *Id.* at 123. The payments were for room charges incurred on October 5, 2009, the first day of Keller's trial. *Id.* at 119, 122. On January 12, 2010, the trial court entered two orders granting the motions. *Id.* at 118, 121.

At the time of Keller's capital murder trial, the statutory pay for "[w]itnesses in the county, circuit, and chancery courts" was "one dollar and fifty cents per day and five cents for each mile going to and returning from the courthouse to their homes by the nearest route, and such tolls and ferriages as they may actually be obliged to pay . . . ." Miss. Code Ann. § 25-7-47 (2005) (amended 2014).

"Under *Brady*, the Government violates a defendant's due process rights if it withholds evidence that is favorable to the accused and material to the defendant's guilt or punishment." *United States v. Hankton*, 51 F.4th 578, 602 (5th Cir. 2022) (cleaned up). To prove a *Brady* violation, a defendant must prove three things: "First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the Government must have suppressed the evidence. Third, the defendant must have been prejudiced." *Id.* at 602–03 (cleaned up).

Assuming Keller can satisfy the first two prongs of the analysis, he has demonstrated no prejudice. First, although the payments exceeded what was permitted by statute,[32] it is unlikely that a reasonable juror would have found them

---

[32] That the payments exceeded what was allowed by Mississippi law is not by itself a permissible basis for a federal habeas claim. *Swarthout*, 562 U.S. at 219 (permitting relief only on the ground that a petitioner is in custody in violation of federal law).

excessive. At the time of Keller's trial, petit jurors in circuit court were paid "not . . . less than Twenty-five Dollars ($25.00) per day and not . . . greater than Forty Dollars ($40.00) per day, plus mileage . . . ." Miss. Code Ann. § 25-7-61 (2008) (amended 2010).[33] And the trial court ordered the County to pay for the sequestered jurors' hotel rooms and meals throughout the trial. [22-4] at 7; [22-1] at 160–61; [22-2] at 2–3. So the Court doubts that any reasonable juror would have found anything unusual or suspicious about the prosecution paying for Muffi's travel expenses.

Second, Keller has not shown that the result of the trial would have been different if the defense had impeached Muffi's testimony with evidence of the expense payments. Keller confessed to the murder, and a confession is "powerful evidence of guilt," *Avants*, 278 F.3d at 522, "probably the most probative and damaging evidence that could be admitted . . . ." *Pyles*, 136 F.3d at 996 (cleaned up). His confession was corroborated by Dr. McGarry's expert testimony, the investigators' retrieval of the murder weapon, and the video from Keesler Federal Credit Union. In short, the evidence of Keller's guilt was overwhelming.

And it is unlikely that a reasonable juror would have doubted the credibility of Muffi's testimony because she was reimbursed for her travel expenses. Keller's

---

[33] The mileage was determined by reference to "the mileage reimbursement rate allowable to federal employees for the use of a privately owned vehicle while on official travel." Miss. Code Ann. § 25-3-41(1) (2006) (amended 2017). A rate of $0.55 per mile is not inconsistent with that granted federal employees around the time of Keller's trial. *Cf. POV Mileage Rates (Archived)*, U.S. Gen. Servs. Admin., https://www.gsa.gov/travel/plan-a-trip/transportation-airfare-rates-pov-rates-etc/privately-owned-vehicle-pov-mileage-reimbursement/pov-mileage-rates-archived [https://perma.cc/6UQA-2NU5]; *Standard Mileage Rates*, Internal Revenue Serv., https://www.irs.gov/tax-professionals/standard-mileage-rates [https://perma.cc/EYC8-F2SA].

own confession corroborated Muffi's testimony. *Compare* [22-5] at 71–81, *with* [23-14] at 3–9, 13–17. Likewise, Teo Nguyen, Investigator Michael Brown, and Sergeant Daryl Montiforte corroborated Muffi's testimony. *Compare* [22-5] at 71–81, *with id.* at 89–93, 100–01, 121. The photographs of the crime scene also corroborated Muffi's testimony. *Compare id.* at 71–81, *with* [22-16] at 3–13.

For all these reasons, the Court concludes that the Mississippi Supreme Court's alternative adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law, and it was not based on unreasonable determinations of fact.[34]

## X. Ground 18: Ineffective Assistance of Trial Counsel in Not Objecting to Prosecutor's Penalty Phase Closing Argument

Keller claims that his trial counsel provided ineffective assistance by not objecting to statements the prosecutor made during closing argument contrary to the evidence admitted at trial. [45] at 154–57. The State responds that Keller has not demonstrated that his counsel provided deficient representation or that the failure to object prejudiced his defense. [49] at 123–26.

Keller presented this claim to the Mississippi Supreme Court in his petition for post-conviction relief. [23-9] at 132–39. The Mississippi Supreme Court summarily denied it as meritless without discussion. *Keller II*, 229 So. 3d at 716.

---

[34] *See, e.g.*, *Williams v. Yarbrough*, 228 F. App'x 705, 707 (9th Cir. 2007) (per curiam) (finding witness's receipt of witness protection program payments was not material for *Brady* purposes because it "would not have put the entire case in such a different light as to undermine confidence in the verdict" (cleaned up)).

In his rebuttal closing argument, the prosecutor argued that the death penalty was the appropriate sentence given these facts. He said:

> Death penalty cases are rare, they hardly come up because the facts and evidence don't justify it in most of the other cases that we deal with, most of the other homicides. The facts in this case, not only what Mr. Keller did to Ms. Hat, but the facts about his priors, his prior conviction for armed robbery and aggravating circumstances warrants the justification of the death penalty.
>
> The defendant did seem to be yesterday trying to blame everybody but himself about what happened. His dad got on the stand and said it was drugs, it was Jason on drugs. The counselor got on the stand and said it was drugs. Jason got on the stand and said it was drugs. It wasn't any of that, it was Jason. Jason killed her because he wanted to see what it felt like to kill another human being. That's the type of human that you will be considering. Not Jason on drugs, drugs didn't have anything to do with this. He's sober as all get-out that morning. He's been asleep for five or six hours. He walks past convenien[ce] stores, banks. He wants to be a man, go in one of those places and be a man. Don't go find the single 5′5″, 130 pound woman and treat her like a dog.
>
> The aggravating factors that we have, all of the factors, especially heinous, atrocious and cruel, that he committed this crime to avoid arrest, that it was a crime committed during a robbery, and the fact that he's got an armed robbery, a prior crime of violence, six months before. He hasn't learned his lesson. He used a gun to rob a bank, he uses a gun to kill Ms. Hat. Jason hasn't learned his lesson, and the death penalty would show him that that lesson should have been learned.

[22-7] at 67–68.

### 1. Invoking Position of Government Attorney

Keller first argues that his trial counsel provided ineffective assistance by not objecting to the prosecutor's assertion that the facts here warranted the death penalty more than others. He contends that this line of argument improperly invoked the prosecutor's position as the government's attorney as a basis for the imposition of the death penalty and that his attorney should have objected.

Keller is correct that a prosecutor may not "invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction of a criminal defendant." *United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979). "Except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *United States v. Alaniz*, 726 F.3d 586, 616 (5th Cir. 2013) (cleaned up). A prosecutor may, however, "state his contention as to the conclusions that the jury should draw from the evidence." *Garza*, 608 F.2d at 662 (cleaned up). In fact, "[c]ounsel is accorded wide latitude during closing argument," and the Court "assume[s] that a jury has the common sense to discount the hyperbole of an advocate, discounting the force of the argument." *United States v. Mearis*, 36 F.4th 649, 656 (5th Cir. 2022) (cleaned up).

Here, a reasonable jurist could conclude that the prosecutor did not invoke his personal status as a government attorney. The prosecutor stated that "[d]eath penalty cases are rare" because most cases do not meet the steep requirements. [22-7] at 67.[35] And defense counsel emphasized the gravity of the jury's task. *Id.* at 62, 66. The prosecutor then advocated for the State's position that this case warranted the death penalty. *Id.* at 67. He did not overtly refer to his position as a government attorney, much less cite it as a reason to sentence Keller to death. In that respect, Keller's argument requires a leap of inference, distinguishing this case from others

---

[35] This was and is an objectively true statement, and the jurors' own experience in this case (*i.e.*, multiple days of jury selection, sequestration, two stages of trial, and complex instructions of law) would suggest to them that it was true.

in which the Fifth Circuit has chided government attorneys for invoking their position.[36] Therefore, a reasonable jurist could conclude that the prosecutor did not invoke his position as a government attorney as a basis for the jury's verdict and that any objection on that basis would have been futile. "[C]ounsel is not required to make futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Regardless of the propriety of the prosecutor's remark, "[a] decision not to object to a closing argument is a matter of trial strategy," *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992), and, as such, is "virtually unchallengeable." *Neal*, 78 F.4th at 790 (cleaned up). To rebut the "strong presumption" that this choice by his trial counsel was an "exercise of reasonable professional judgment," Keller must "prove that his attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound strategy." *Id.* (cleaned up). When evaluating an ineffective assistance claim, the Court "is required . . . to affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did." *Id.* (cleaned up).

---

[36] *See, e.g.*, *United States v. Bennett*, 874 F.3d 236, 252 (5th Cir. 2017) ("I am not here to convict an innocent person. I have never, to my knowledge, convicted an innocent person."); *United States v. Smith*, 814 F.3d 268, 274–75 (5th Cir. 2016) ("[W]hat incentive is there for us to come in and try a person if he's not the person that did the offense?"); *Garza*, 608 F.2d at 662 ("[I]f I thought that I had ever framed an innocent man and sent him to the penitentiary, I would quit."). *But see United States v. Robles-Pantoja*, 887 F.2d 1250, 1256 (5th Cir. 1989) ("The prosecutor here did not express any purely personal opinion about the credibility of his witnesses . . . . All the prosecutor did was urge the jury to assess the motives and bias of federal agents and police officers in the same way they would assess the motives and bias of *any* witness.").

Keller's briefing contains much argument about why the prosecutor's remarks were inappropriate, but it contains very little argument about why his attorney's failure to object was unsound trial strategy. In fact, none of the cases Keller cited address a claim of ineffective assistance premised on the failure to object to a closing argument. Keller simply asserts—without any supporting argument—that his counsel's failure to object was unreasonable. [45] at 156–57. In that respect, his briefing is deficient, and the Court need not search through case law and the record for arguments and evidence in support of his claim. *Ragas*, 136 F.3d at 458. Keller bears the "burden of demonstrating that a constitutional violation occurred . . . ." *Lockett*, 230 F.3d at 707. Therefore, the Court need not address this claim further because, having not sufficiently briefed it, Keller did not carry his burden.

In any case, a reasonable jurist can conceive sound reasons why Keller's trial counsel chose not to object to the prosecutor's remarks. Primarily, his counsel could have reasonably concluded that objecting to the prosecutor's remarks—which were buried in over six pages of rebuttal argument[37]—would just draw more attention to them. *Vasquez v. Thaler*, 505 F. App'x 319, 330 (5th Cir. 2013) (per curiam) (rejecting ineffective assistance claim where petitioner's trial counsel "could have reasonably concluded" that objecting to a prosecutor's closing would draw further attention to it). And it is unlikely that counsel's failure to object to the remark prejudiced Keller's defense, in light of his prior armed robbery conviction, the

---

[37] [22-7] at 67–73.

number of times he shot Nguyen, McGarry's testimony on the nature of Nguyen's injuries, and the evidence indicating that Keller executed Nguyen after he had taken the money. *See id.* (finding that trial counsel's failure to object to remarks in closing was harmless where the record contained extensive evidence of petitioner's criminal background and guilt). For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of fact.

### 2. Lack of Evidentiary Support

Keller also argues that his trial counsel should have objected to the prosecutor's assertion that Keller "wanted to see what it felt like to kill another human being" and "want[ed] to be a man, go in one of those places and be a man." [22-7] at 68. He contends that there was no evidentiary support for these statements.

Keller is correct that a prosecutor may not suggest that evidence which was not presented at trial provides additional grounds for finding a defendant guilty. *See Garza*, 608 F.2d at 663–64. But even assuming that the prosecutor's remarks about Keller's motivation were improper, he must still show that his attorney's failure to object to the comments was unsound trial strategy. As with the comments discussed above, Keller has not done so. Instead, he simply asserted—without any supporting argument—that his counsel's failure to object was unreasonable. [45] at 156–57. In that respect, his briefing is deficient, and he has not carried his "burden

of demonstrating that a constitutional violation occurred . . . ." *Lockett*, 230 F.3d at 707.

Still, the Court again notes that Keller's counsel could have reasonably concluded that objecting to the prosecutor's remarks would just draw more attention to them. *Vasquez*, 505 F. App'x at 330. Moreover, the Court "assume[s] that a jury has the common sense to discount the hyperbole of an advocate," *Mearis*, 36 F.4th at 656 (cleaned up), and Keller has not shown that his attorney's failure to object to these comments prejudiced his defense. As with the previous comment, it is unlikely that counsel's failure to object had any bearing on the jury's verdict, given his prior armed robbery conviction, the number of times he shot Nguyen, McGarry's testimony on the nature of Nguyen's injuries, and the evidence indicating that Keller executed Nguyen after he had taken the money. *See Vasquez*, 505 F. App'x at 330.

And the trial court instructed the jurors: "If any argument, statement or remark has no basis in the evidence, then you should disregard that argument[,] statement or remark," [22-2] at 15–16, and "if [the attorneys'] recollection of the evidence differs from what your recollection is, you must follow your own recollection." *Id.* at 69. "[J]urors are presumed to follow their instructions." *Sheppard*, 967 F.3d at 470.

For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of fact.

3.  Non-Statutory Factors

Finally, Keller argues that his trial counsel should have objected to the prosecutor's suggestion that the jury should impose the death penalty based on non-statutory aggravating factors—specifically, his criminal history and propensity to engage in criminal behavior. The prosecutor said:

> The aggravating factors that we have, all of the factors, especially heinous, atrocious and cruel, that he committed this crime to avoid arrest, that it was a crime committed during a robbery, and the fact that he's got an armed robbery, a prior crime of violence, six months before. He hasn't learned his lesson. He used a gun to rob a bank, he uses a gun to kill Ms. Hat. Jason hasn't learned his lesson, and the death penalty would show him that that lesson should have been learned.

[22-7] at 68.

First, it is unclear from this remark that the prosecutor was referring to Keller's criminal history beyond the armed robbery he committed about six months before he murdered Nguyen. *See* [22-16] at 40; [23-13] at 34–49. He was tried and convicted of that armed robbery in December 2007, and it provided the basis for the first aggravating factor given to the jury. [23-14] at 46; [23-18] at 11, 23; [23-13] at 6–7; [22-2] at 61–63. So a reasonable jurist could conclude that the remark was not improper, and "counsel is not required to make futile motions or objections." *Koch*, 907 F.2d at 527.

Assuming the remark was improper, Keller must still show that his attorney's failure to object was unsound trial strategy. As with the comments discussed above, Keller has not done so. Instead, he simply asserted—without any supporting argument—that his counsel's failure to object was unreasonable. [45] at

156–57. In that respect, his briefing is deficient, and he has not carried his "burden of demonstrating that a constitutional violation occurred . . . ." *Lockett*, 230 F.3d at 707.

Even so, Keller's counsel could have reasonably concluded that objecting to the comment would just highlight it for the jury. *Vasquez*, 505 F. App'x at 330. Moreover, the Court "assume[s] that a jury has the common sense to discount the hyperbole of an advocate," *Mearis*, 36 F.4th at 656 (cleaned up), and Keller has not shown that his attorney not objecting prejudiced his defense. As with the previous comments, it is unlikely that his counsel not objecting had any bearing on the jury's verdict, given that evidence of the prior armed robbery conviction was already in evidence, along with all the other evidence supporting the conviction. *See Vasquez*, 505 F. App'x at 330. Additionally, the trial court specifically instructed the jury that their deliberations were "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," [22-2] at 61, and "jurors are presumed to follow their instructions." *Sheppard*, 967 F.3d at 470.

For these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of fact.

Y.  Ground 19: Trial Court Error in Sentencing Instructions

Keller claims that the trial court erred by refusing to give the defense's proposed sentencing instructions SP-2, SP-6, and SP-7. Before the Court explains and addresses Keller's argument, it will set out the relevant facts.

The defense's proposed instruction SP-2 provided:

> The Court instructs the jury that before the Defendant can be sentenced to death by lethal injection, the aggravating circumstances must be proven to you beyond a reasonable doubt. It must also be proven to you beyond a reasonable doubt that the mitigating circumstances do not outweigh the aggravating circumstances. Finally, it must also be proven to you beyond a reasonable doubt that death by lethal injection is the appropriate punishment for the Defendant.
>
> If upon review of the evidence any one of you has any reasonable doubt as to any of these matters, the jury must inform the Court, in writing, that you are unable to agree unanimously on punishment.

[22-2] at 86. The State objected, arguing that it was improper to instruct the jury as to the method of execution and that the "aggravating circumstances must be proven beyond a reasonable doubt," and that the court's sentencing instruction C-10 was sufficient. [22-7] at 27–28. The court sustained the objection:

> I think SP-2 . . . is, in fact, covered by C-10. This is simply repeating to them that they have to weigh the factors and that there has to be proof beyond a reasonable doubt concerning the aggravators. I think there's also in C-10 instruction that if they are unable to reach a verdict—there is a portion of that instruction that tells them what verdict to return.

*Id.* at 28.

The defense's proposed instruction SP-6 provided:

> Each individual juror must decide for themselves whether the death penalty or life imprisonment without parole or probation is an appropriate punishment for the defendant. Even if mitigating circumstances do not outweigh aggravating circumstances, the law permits you, the jury[,] to impose a sentence of life imprisonment without the possibility of parole.
>
> Only if you, the jurors, unanimously agree beyond a reasonable doub[t] that death is the appropriate punishment may you impose a sentence of death.
>
> You should indicate your findings in the jury verdict form which you will have with you in the jury deliberation room.

[22-2] at 89.

As for this instruction, the trial court held: "It looks to me D-SP6 is well covered by C-10 and the other instructions because C-10 does tell them they may still impose life or they may not agree. At this point I'm going to refuse D-SP6. I think it's well covered by the other instructions." [22-7] at 33.

The defense's proposed instruction SP-7 provided:

> The Court instructs the jury that a decision to afford an individual Defendant mercy and thereby sentence him to life imprisonment without parole would not violate the laws of this State or your oath as jurors. Even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then nevertheless, you may still sentence the Defendant to life imprisonment without parole.

[22-2] at 90.

The State objected to SP-7 on the grounds that it was an improper "mercy instruction." [22-7] at 33. The court sustained the objection without further argument. *Id.*

Instruction C-10,[38] which was ultimately given to the jury, provided:

> You have found the defendant guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death or life imprisonment without parole. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant himself. You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

A.

---

[38] The record contains three versions of Instruction C-10: C-10, C-10A, and C-10B. [22-2] at 49–66. C-10B was the version ultimately given to the jury, after making the minor edits noted in C-10 and C-10A. *Id.* at 54, 60, 66.

To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed:

1. That the defendant actually killed Hat Thi Nguyen;

2. That the defendant attempted to kill Hat Thi Nguyen;

3. That the defendant intended the killing of Hat Thi Nguyen take place or;

4. That the defendant contemplated that lethal force would be employed.

B.

Next to return the death penalty, you must find that the mitigating circumstances—those which tend to warrant the less severe penalty of life imprisonment without parole—do not outweigh the aggravating circumstances—those which tend to warrant the death penalty.

Consider only the following elements of aggravation in determining whether the death penalty should be imposed:

1. Whether the defendant was previously convicted of a felony involving the use or threat of violence to the person.

2. Whether the capital offense was committed while the defendant was engaged in the commission of, or attempt to commit a [r]obbery.

3. Whether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest.

4. Whether the capital offense was especially heinous, atrocious or cruel.

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper:

"We, the jury, find the defendant should be sentenced to life imprisonment without parole."

If one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt, then each of you must consider whether there are mitigating circumstances, which outweigh the aggravating circumstance(s). Consider the following elements of mitigation in determining whether the death penalty should not be imposed:

1. Whether the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Any other matter, any other aspect of the defendant's character or records, and any other circumstance of the offense brought to you during the trial of this cause, which you, the jury, deem to be mitigating on behalf of the defendant.

If you individually find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

## C.

The verdict you return must be written on a separate sheet of paper signed by the foreman. Your verdict should be written in one of the following forms and the verdict of the jury shall be signed by the foreman of the jury:

1. If all twelve of you find that the sentence of death should be imposed, the form of your verdict shall be:

We, the jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:

[List or itemize all facts found, if any, from the list under Section A of this instruction, which you unanimously agree, exist in this case beyond a reasonable doubt.]

234

Next we, the jury, unanimously find that the aggravating circumstances of:

[List or itemize all facts found, if any, from the list under Section B of this instruction, which you unanimously agree, exist in this case beyond a reasonable doubt.]

exist beyond a reasonable doubt and is/are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the defendant should suffer death.

2.  If all twelve of you find that a sentence of life imprisonment without parole should be imposed, the form of your verdict shall be:

We, the jury, unanimously find that the defendant should be sentenced to life imprisonment without parole.

3.  If you are unable to unanimously agree on the sentence, the Judge will sentence the Defendant to life imprisonment without parole and the form of your verdict shall be:

We, the jury, are unable to agree unanimously on punishment.

[22-2] at 61–65.

The trial court also instructed the jury:

The verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

*Id.* at 68. The trial court reminded the jury:

> [T]he procedure that you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment without parole or whether it requires the imposition of death, in light of the totality of the circumstances present.

*Id.* at 80. Finally, it told the jurors that they, "as individual jurors, must consider mitigating circumstances. Therefore, even if all other eleven jurors find that a certain mitigating circumstance does not exist, if you believe it does exist, you must find that mitigating circumstance, and weigh it in your further deliberations." *Id.* at 81.

After the jury had returned the death sentence, the trial court polled them and verified that the verdict was unanimous. [22-7] at 76.

Additionally, the trial court's preliminary jury instruction instructed that Keller was "presumed innocent of any wrongdoing whatsoever." [22-4] at 21; *see also id.* at 23, 25; [22-2] at 10–13. The court also explained the two stages of a capital murder trial and instructed the venire multiple times that the State had the burden of proof to "prove all of the elements of any crime charged beyond a reasonable doubt." [22-4] at 22, 24–25; [22-2] at 11. It told the venire that Keller had "no burden to prove his innocence of this crime or to prove anything." [22-4] at 25. The trial court did not limit these instructions to the first stage of trial. Rather, it made clear that "[a]s in the first stage the defendant has no burden or duty to produce any evidence" during the penalty phase of trial. *Id.* at 26; *see also* [22-2] at 12.

Likewise, at the close of the first stage of the trial, the court instructed the jury that "[t]he presumption of innocence attends the Defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of his guilt beyond a reasonable doubt. The defendant is not required to prove his innocence." [22-2] at 18. The trial court made it clear that the "presumption [of innocence] places upon the State of Mississippi the burden of proving the defendant guilty of every material element of the crime with which he is charged." *Id.*

Keller argues that the trial court's denial of proposed instructions SP-2, SP-6, and SP-7 violated his right to due process because the instructions as ultimately provided did not inform the jurors: (1) "that each individual juror had to decide the sentence for themselves"; (2) that the prosecution had the burden of proof to "establish[ ] everything necessary for imposition of a death sentence"; (3) that the jury could return a sentence of life imprisonment even if there were no mitigating factors; and (4) that the death penalty could only be imposed if the jury unanimously decided to impose it. [45] at 158.

Keller presented this claim to the Mississippi Supreme Court on appeal. [22-20] at 159–63. The Mississippi Supreme Court held that "the trial court did not abuse its discretion in refusing" proposed instruction SP-2, citing its decisions in *Thorson v. State*, 895 So. 2d 85 (Miss. 2004), and *Edwards v. State*, 737 So. 2d 275 (Miss. 1999). *Keller I*, 138 So. 3d at 869. It also held that the trial court's other instructions adequately covered the issues addressed by proposed instruction SP-6, and "there was no error on the part of the trial court in refusing an unnecessary,

cumulative instruction." *Id.* Finally, it rejected Keller's argument that he was entitled to proposed instruction SP-7's "mercy instruction." *Id.* at 869–70 (citing *Chamberlin v. State*, 989 So. 2d 320, 342–43 (Miss. 2008)).

Even if the Court assumes that clearly established federal law requires instruction on the topics Keller claims the trial court did not address,[39] each of the trial court's instructions did, in fact, adequately cover them. First, Keller argues that his proposed instructions were necessary to inform the jurors that each of them had to decide the sentence for themselves. [45] at 158. This was adequately covered in Jury Instruction 7, when the trial court instructed the jury that the "verdict . . . must represent the considered judgment of each juror," and that they had a duty to deliberate "in view of reaching an agreement if you can do so without violence to your individual judgment." [22-2] at 68.

Keller also claims that his proposed instructions were necessary to inform the jurors that the prosecution had the burden of proof to "establish[ ] everything necessary for imposition of a death sentence." [45] at 158. This was adequately covered in the trial court's preliminary instructions to the venire when it explained the two stages of trial and provided multiple instructions on the State's burden of proof. [22-4] at 22, 24–25; [22-2] at 10–11. The trial court made it clear that the burden of proof did not shift in the second stage of trial, clarifying that "[a]s in the first stage the defendant has no burden or duty to produce any evidence" during the penalty phase of trial. [22-4] at 26; *see also* [22-2] at 12. And at the close of the first

---

[39] To be clear, Keller cited no clearly established federal law requiring these instructions.

238

stage of trial, the court instructed the jury that "[t]he presumption of innocence attends the Defendant throughout the trial . . . ." [22-2] at 18.

Keller claims that his proposed instructions were necessary to inform the jury that they could return a sentence of life imprisonment even if there were no mitigating factors. The trial court's primary sentencing instruction, C-10, states: "In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you *may* impose the death sentence." [22-2] at 63 (emphasis added). Therefore, the court's instructions indicated that the jury was not required to impose the death sentence even if they found that the mitigating circumstances outweighed the aggravating circumstances.

Finally, Keller claims that his proposed instructions were necessary to inform the jury that the death penalty could be imposed only if the jury unanimously decided to impose it. [45] at 158. The trial court's primary sentencing instruction, C-10, required the jury to "unanimously" make each required finding to impose the death penalty. [22-2] at 61–62, 64–65.

"The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The question for this Court is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Id.* (cleaned

up). The "burden is especially heavy" where "no erroneous instruction was given," and a "claim of prejudice is based on the failure" to give an instruction. *Id.* at 155. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* A disputed "instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Montegut v. Whitley*, 66 F.3d 320, 1995 WL 534858, at *2 (5th Cir. July 31, 1995) (per curiam) (unpublished table decision). "[J]urors are presumed to follow their instructions." *Sheppard*, 967 F.3d at 470.

Keller comes far short of meeting this burden. Each of the topics he claims the trial court did not address was, in fact, adequately covered by the court's instructions. In any case, he has not shown that the omission of his proposed instructions "so infected the entire trial that the resulting conviction violates due process . . . ." *Kibbe*, 431 U.S. at 154 (cleaned up); *see also Westbrooks v. Collins*, 992 F.2d 323, 1993 WL 152138, at *3 (5th Cir. Apr. 21, 1993) (per curiam) (unpublished table decision) (holding that a petitioner was not prejudiced by trial court's failure to give a cautionary instruction where the jury was adequately made aware of infirmities in witness's testimony by other evidence); *Evans v. Thigpen*, 809 F.2d 239, 243 (5th Cir. 1987) (holding that a mercy instruction was unnecessary because other instructions adequately covered the jury's discretion in sentencing), *abrogated on other grounds by Stringer v. Black*, 503 U.S. 222 (1992). For all these reasons, the Court concludes that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly

established federal law, and that it was not based on an unreasonable

determination of fact.

Z.  Ground 20: Trial Court Error in Addressing Jury Questions

Keller claims that the trial court did not adequately address notes from the

jury. The relevant facts are:

On October 7, 2009, during the sentencing phase of trial—after the State had

introduced its sentencing evidence, but before it had rested—the jury was excused

for lunch at 11:58 a.m. [22-6] at 73. The trial court recessed until 1:15 p.m. *Id.* at 74.

Just before starting back after lunch, the bailiff brought in a note from the jurors.

*Id.* It said: "[W]ill we be asked individually to give our verdict of life [in ]prison or

death penalty in front of the court[?]" *Id.* The State recommended that the court

advise the jury that they may be polled as they were after their verdict in the guilt

phase of trial. *Id.* The defense agreed, but wondered whether one of the jurors was

concerned about what would happen if they could not agree on a sentence. *Id.* at 74–

75. The trial court proposed orally telling the jury when they were brought back in:

"[A]t this point you've already been told that you have to wait until you receive all

the evidence and you will [be] given specific instructions at the end of the

sentencing phase . . . , and if you reach a unanimous verdict pursuant to the

direction you may be polled just as you were this morning." *Id.* at 75. Both the State

and defense agreed to this plan. *Id.*

After the jury returned to the courtroom, the court addressed them: "Ladies

and gentlemen, a note was sent out to the court during your lunch break. And let

me ask first, . . . was this note from the jury jointly or simply from an individual?"
*Id.* The foreperson answered: "From an individual." *Id.* at 76. The judge asked: "So
no one has deliberated or discussed the case to this point as far as sentencing,
correct?" *Id.* The foreperson answered: "Correct." *Id.* The court then instructed the
jury:

> [Y]ou will continue to receive evidence at this time. You will be given
> instructions very much as happened this morning with regard to how to
> apply the law and what the law is, and depending on what choice you
> make concerning those instructions then you may also be polled like you
> were this morning. So that should hopefully . . . answer your question.
> So that you know, neither the court or the parties [are] going to ask what
> your deliberations were and who felt what way. As I explained to you
> during voir dire you don't have to explain your verdict to any[]one. Does
> everybody understand? Hopefully that sufficiently answers the question
> for you and you will be given appropriate instructions to follow at the
> appropriate time, okay.

*Id.*

     While the jurors were deliberating the sentence, they sent out two more
notes. [22-7] at 74. The first note asked, "Can we have 11 copies of the judge's
instructions?" [22-2] at 93. Neither the State nor the defense objected to the request,
and the trial court gave the jurors additional copies of the instructions. [22-7] at 74.
The second note asked, "Can we have the password for the computer? Or can
someone unlock it for us?" [22-2] at 94. Neither the State nor the defense objected to
the computer "being unlocked for them so that they could listen to the disk or look
at the disks that were in evidence," and the trial court fulfilled the jury's request.
[22-7] at 74.

Keller argues that the first note from an individual juror "establishes conclusively" that at least one juror was considering the sentence before he or she had heard mitigating evidence. [45] at 163.[40] Accordingly, Keller claims that the trial court erred by not giving a precautionary instruction to the jury that they were not to consider sentencing until they had heard all the evidence, argument, and instructions. *Id.* Keller admits that the trial court properly addressed the two notes sent out during deliberation, but he contends that "given that issues with premature deliberation had arisen earlier in the proceedings as to both culpability[41] and sentence, the fact that any communications from the jury were not fully on the record undermines the confidence in the fundamental fairness of the trial." *Id.* at 164.[42]

Keller presented this claim to the Mississippi Supreme Court on appeal. [22-20] at 165–68. The Mississippi Supreme Court held: "The issue is procedurally barred for failure to object contemporaneously or raise the issue post-trial." *Keller I,*

---

[40] Keller has not asserted an independent claim of juror misconduct based on this contention. And Keller has not asserted an independent claim of ineffective assistance premised on his counsel's agreement with the trial court's handling of the juror's note and failure to move for a mistrial.

[41] Keller did not allege juror misconduct based on premature deliberation in either phase of trial. He argued to the Mississippi Supreme Court that the jury engaged in premature deliberation during the first phase of trial, citing the juror who had a wedding scheduled for the weekend after the trial. The Court has already rejected that claim.

[42] Any claim premised upon the two jury notes during deliberation is meritless. Neither note suggested any juror misconduct, and there is no constitutional infirmity in a jury asking for additional copies of the court's instructions and the means to view admitted evidence. The trial court's failure to immediately make a record of the notes when they were received did not undermine confidence in the fundamental fairness of his trial, and Keller does not dispute the accuracy of the record made later.

138 So. 3d at 871. Alternatively, the Mississippi Supreme Court said, "that the note in the instant case did not indicate that the jury had deliberated prior to the close of evidence during the sentencing phase . . . ." *Id.* "Moreover, the note did not suggest that even one juror had made a determination as to the proper sentence, but, rather, questioned whether each juror would be polled." *Id.* at 872. As a result, the claim was meritless. *Id.* at 871–72.

The State argues that this claim is procedurally barred. [49] at 131–32. Keller contends that it is not procedurally barred because the Mississippi Supreme Court provided an alternative merits ruling. [45] at 166–67. He also contends that he can overcome the procedural bar because his trial counsel provided ineffective assistance in not objecting to the trial court's handling of the juror note, citing *Trevino v. Thaler*, 596 U.S. 413 (2013). [53] at 46–47.

A federal habeas claim is procedurally barred where "the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar." *Mullis*, 47 F.4th at 387–88 (cleaned up). The Mississippi Supreme Court unambiguously stated that the claim was procedurally barred because Keller did not contemporaneously object. *Keller I*, 138 So. 3d at 871. The Fifth Circuit has held that Mississippi's contemporaneous objection rule is an adequate and independent state bar. *Wiley*, 969 F.2d at 103. The Mississippi Supreme Court's alternative ruling on the merits does not alter this federal habeas Court's obligation to honor the state court's ruling that the claim is procedurally barred. *Buntion*, 982 F.3d at 949.

As for Keller's argument that he can overcome the procedural bar, he misconstrued the applicable law.

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez v. Ryan*, 566 U.S. 1, 17 (2012). In *Trevino*, the Supreme Court extended *Martinez*, holding that it also applied when a state's post-conviction procedural framework, because of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise an ineffective-assistance-of-trial-counsel claim on direct appeal. 569 U.S. at 414.

Here, Keller has not asserted an independent claim of ineffective assistance of trial counsel premised on counsel's actions with respect to the jury notes.[43] Rather, he plainly framed the issue as one of trial court error. *See* [40] at 104; [45] at 162; [49] at 46. The *Martinez/Trevino* exception to procedural default only applies to claims of ineffective assistance of trial counsel. *Davila*, 582 U.S. at 524; *Murphy v. Davis*, 732 F. App'x 249, 257 (2018) (per curiam). So this claim is procedurally barred.

---

[43] To the extent that Keller's pleading could be construed as alleging ineffective assistance of counsel arising from these events, the Court finds that such a claim is meritless. As explained below, the trial court committed no error, and there is no evidence that the jury conducted early deliberations. Accordingly, any objection by Keller's trial counsel would have been futile, and "counsel is not required to make futile motions or objections." *Koch*, 907 F.2d at 527.

Even if the claim were not procedurally barred, it is meritless. Keller cited no clearly established federal law addressing similar jury note situations. And he cited no evidence that the jury improperly conducted early deliberations. Indeed, the trial court explicitly asked the jury foreperson whether anyone had "deliberated or discussed the case . . . as far as sentencing," and the foreperson denied it. [22-6] at 76.

Additionally, after the jury returned a guilty verdict in the first phase of trial, the trial court instructed the jury:

> [A]s you were told during voir dire there are two phases of the trial, and we will begin the second phase shortly. That will involve additional presentation of evidence to you and then some additional jury instructions . . . that you will apply to that phase of the case. . . . There's no further discussion that you have to have at this point. You can't make[]up your minds yet with regard to sentencing because you haven't heard that evidence or received those instructions yet. Everyone understand? Ladies and gentlemen, also I'm going to excuse the two alternates to go with you to the jury room. They will rejoin you for the sentencing phase, but don't discuss what you have already deliberated with them or with each other nor are you to have further deliberations.

*Id.* at 53. After the State had introduced its sentencing evidence but before it rested, the court sent the jury out for lunch and instructed them: "You're not ready to deliberate yet. You've not heard all of the evidence nor have you received the instructions of the law. You've still got some more to go so don't deliberate, don't make up your minds and don't discuss the case amongst yourselves." *Id.* at 73. The Court presumes the jurors followed these instructions, and Keller has not rebutted that presumption. *Sheppard*, 967 F.3d at 470.

For these reasons, the Court finds that this claim is procedurally barred. Alternatively, the Mississippi Supreme Court's adjudication of the claim was neither contrary to nor an unreasonable application of clearly established federal law, and the Mississippi Supreme Court did not base its decision on an unreasonable determination of fact.

AA.    Ground 21: Juror Misconduct

Keller claims that his right to fair trial was violated by juror misconduct in not disclosing material information during voir dire. The relevant facts are:

During voir dire, the court introduced the attorneys in the case. [22-3] at 146–47. First, it introduced Mr. Scott Lusk and Ms. Beth McFadyen, representing the State, and it asked Mr. Lusk to "introduce . . . all the other members of the office." *Id.* at 146. Mr. Lusk introduced himself and Ms. McFadyen, and he listed these other staff: Mark Ward, Chris Schmidt, Joel Smith, Charles Wood, George Huffman, Jenny Tyler Baker, Kimberly Henry, Matthew Burrell, Crosby Parker, Christopher Fisher, and Cono Caranna, the District Attorney. *Id.* at 146—47. After introducing Keller and the defense team, the judge asked whether any of the venire knew "any of the attorneys or the accused in this case?" *Id.* at 148. Several veniremen raised a hand, *id.*, including venireman number 8, Mr. Aguilard. [22-4] at 4.

Mr. Aguilard said, "I've heard of the DA's [name] thrown around in my house because my parents know him." *Id.* The court responded, "When you say thrown around that could be good or bad, and I'm not going to ask which, but anything

about that that you think would cause you to favor one side or the other?" *Id.* Aguilard replied, "Absolutely not," and the court asked him whether he could be "fair to both sides no matter who represents who." *Id.* Aguilard responded, "Yes, ma'am." *Id.* Aguilard was eventually seated as Juror No. 3. [22-5] at 54.

Several years later, Keller's post-conviction attorneys obtained an affidavit from Mr. Aguilard in which he stated: "During voir dire, I was asked whether I knew anyone in the District Attorney's office. My parents know the DA and I told the judge about that. My sister, Dixie Newman, was also employed in the Harrison County DA's office for several years. She is now on the Biloxi city council, and recently ran for mayor of Biloxi." [23-12] at 28. Aguilard's sister, Dixie Newman, represented on her website that she had "[w]ork [e]xperience" in the "District Attorney's Office—Worthless Checks Division." [23-13] at 11.

Keller argues that his right to a fair trial was violated because Mr. Aguilard concealed material information during voir dire, citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984). [45] at 168–70. He presented this claim to the Mississippi Supreme Court in post-conviction. [23-9] at 167–71. The Mississippi Supreme Court summarily denied the claim as meritless without any discussion. *Keller II*, 229 So. 3d at 716. The State argues that the claim is meritless, and the Mississippi Supreme Court's decision was reasonable. [49] at 133.

To obtain habeas relief on the basis of a juror's concealment of material information during voir dire, "a party must first demonstrate that a juror failed to

answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.[44] "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* Therefore, "[e]ven when a juror's non-disclosure is dishonest as opposed to mistaken, his behavior is not a basis for reversal unless the dishonesty appears to be rooted in bias or prejudice." *United States v. Bishop*, 264 F.3d 535, 555 (5th Cir. 2001).

This claim is meritless because Keller has not shown that Aguilard did not honestly answer a question during voir dire. As recounted above, after she introduced Keller and the defense team, the judge asked whether any of the venire knew "any of the attorneys or the accused in this case?" [22-3] at 148. Keller has not directed the Court to any evidence that Mr. Aguilard knew him or any of the attorneys in the case.

Even if the Court assumes that Aguilard dishonestly answered the trial court's question, Keller has not shown that such dishonesty was "rooted in bias or prejudice." *Bishop*, 264 F.3d at 555. For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor

---

[44] The Fifth Circuit has stated that its application of the *McDonough* test "to claims for juror bias on direct appeal from federal convictions does not necessarily mean" that it applies the same test in habeas cases. *Montoya v. Scott*, 65 F.3d 405, 418 (5th Cir. 1995). "However, other circuits have applied *McDonough* in the habeas context," and the Fifth Circuit has "assume[d] . . . that a *McDonough* theory of juror bias would be sufficient to obtain federal habeas relief." *Id.* at 419.

an unreasonable application of clearly established federal law, and that its decision was not based on an unreasonable determination of fact.

Keller also requests that the Court permit him discovery on this claim and hold an evidentiary hearing. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts provide that a "judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." "A petitioner demonstrates 'good cause' under Rule 6(a) where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *United States v. Fields*, 761 F.3d 443, 478 (5th Cir. 2014) (cleaned up). Phrased differently, good cause exists when the petitioner's allegations "establish[] a prima facie claim for relief." *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (cleaned up). As explained above, Keller's claim is meritless, and he is not entitled to discovery.

And as for an evidentiary hearing:

> If a petitioner failed to develop the factual basis of a claim in state court, he may obtain an evidentiary hearing on the claim in federal court if he shows that: (1) either the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable, or a factual predicate that could not have been previously discovered through the exercise of due diligence; and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 471 (5th Cir. 2023) (per curiam) (cleaned up). Keller has not met these requirements. Still, a federal habeas court is "prohibited from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under [Section] 2254(d)." *Id.* (cleaned up).

BB.   Ground 22: Ineffective Assistance of Trial Counsel in Not Objecting to Sentencing Instructions and Verdict Form

Keller claims that his trial counsel provided ineffective assistance by failing to "ensure that, considering the context of this case and the totality of the circumstances, jurors properly applied the instructions and fully considered all constitutionally relevant mitigating evidence." [45] at 172. He argues that the jurors should have been "directly instructed that they could sentence Keller to life if they found aggravating evidence outweighed mitigating evidence." *Id.* at 174. He also argues that the verdict form should have "provide[d] an option where jurors could find that aggravating evidence outweighed mitigating evidence but still sentence Mr. Keller to life imprisonment," and that "[j]urors' constitutional obligations to consider and give effect to mitigating evidence in all circumstances were not made clear during voir dire." *Id.*

At bottom, Keller claims that his trial counsel should have "request[ed] jury instructions and verdict forms that ensure jurors will be able to give effect to all relevant mitigating evidence," and "object[ed] to instructions or verdict forms that are unconstitutional or do not properly instruct jurors on the law, . . . offer[ing]

alternative instructions." *Id.* at 175. He presented this claim to the Mississippi Supreme Court in post-conviction. [23-9] at 156–60. The Mississippi Supreme Court summarily denied it as meritless, without discussion. *Keller II*, 229 So. 3d at 716.

Keller apparently claims that his trial counsel provided ineffective assistance based on the same facts as Ground 19, in which he claimed that the trial court erred by not giving the jury the proposed defense instructions SP-2, SP-6, and SP-7. The factual premise of this ineffective assistance claim is fatally flawed. Contrary to Keller's argument, his trial counsel did, in fact, submit proposed instructions addressing the precise issues that he raises here.

Even if Keller's trial counsel had not submitted the proposed instructions, the jury was accurately and adequately instructed, as the Court discussed above. *See* [22-2] at 63, 80–81, 84. Therefore, any deficient representation related to these instructions did not prejudice the defense because the trial court's instructions were adequate. For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on unreasonable determinations of fact.

CC.    Ground 23: Cumulative Error

Finally, Keller claims that the cumulative effect of the errors at his trial— particularly the cumulative effect of his trial counsel's alleged ineffective assistance—entitles him to relief. [45] at 176–77. The State responds that he has not satisfied the requirements for habeas corpus relief based on cumulative error.

[49] at 136–37. Keller presented this claim to the Mississippi Supreme Court on appeal. [22-20] at 179–80. The Mississippi Supreme Court held: "Having found only one harmless error among Keller's assigned errors, the Court finds no cumulative effect of error in the instant case. The issue is without merit." *Keller I*, 138 So. 3d at 877.

"The Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims." *Hill*, 781 F. App'x at 280–81. The Fifth Circuit has observed:

> We have reservations with respect to the applicability of cumulative error in the context of ineffective assistance after the enactment of AEDPA. This is because in order for there to be constitutional error in the form of ineffective assistance of counsel, the petitioner must fulfill both prongs of *Strickland*. If either prong is not satisfied, then the petitioner has not shown constitutional error, much less unreasonable constitutional error. On the other hand, if a petitioner demonstrates both prongs of *Strickland* and an objectively unreasonable determination in state court, relief is available. There is no need to cumulate.

*Zimmerman*, 2003 WL 21356018, at *12. In other words, if a habeas petitioner shows *any* ineffective assistance, he can get relief, and there is no need to cumulate prejudice. But if there was no ineffective assistance, there is nothing to cumulate. So the Court declines to extend the cumulative error doctrine in the manner Keller suggests.

Even if the cumulative error doctrine applied here, Keller has not satisfied the requirements for its application. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair

trial, which calls for reversal." *Allen v. Vannoy*, 659 F. App'x 792, 818 (5th Cir. 2016) (per curiam) (cleaned up). The doctrine only applies in habeas cases "where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process." *Id.* (cleaned up). Cumulative error only applies in "rare instances," or "the unusual case in which synergistic or repetitive error violated the defendant's constitutional right to a fair trial." *Id.* (cleaned up).

Keller cannot meet this steep burden because there is nothing to cumulate here. He has not shown that any of his unbarred claims have merit, that the Mississippi Supreme Court's adjudication of them was contrary to or an unreasonable application of clearly established federal law, or that the Mississippi Supreme Court based its decisions on unreasonable determinations of fact. *See Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (agreeing with district court ruling that meritless claims cannot be cumulated). And he has not shown that his trial was "so infected" with error to violate his constitutional right to a fair trial. Accordingly, the Mississippi Supreme Court's adjudication of Keller's cumulative error claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of fact.

## IV.    Conclusion

The Court has considered all arguments. Those it did not address would not have changed the outcome. For the reasons provided above, the Court denies

Keller's Second Amended Petition for a Writ of Habeas Corpus and dismisses it with prejudice.

The Rules Governing Section 2254 Cases require the Court to issue or deny a certificate of appealability ("COA") upon the entry of a final order adverse to the petitioner, and a petitioner must obtain a COA before appealing this Court's decision denying habeas relief. 28 U.S.C. § 2253(c). To obtain a COA, Keller must show "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Keller has satisfied neither requirement. Accordingly, the Court denies a certificate of appealability.

SO ORDERED, this 23rd day of September, 2024.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE
